IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONWIDE AGRIBUSINESS INSURANCE COMPANY, as subrogee of CWH FARMS, | § § § § | |
| Plaintiff, | § | CIVIL ACTION NO.: 4:19-CV-00425-O |
| | § | |
| vs. | § § | |
| DEERE & COMPANY, | § § | |
| Defendant. | § § | |

## **APPENDIX**

1.   Defendant Deere & Company's Responses and Objections to Plaintiff's Request for Admission, Set I……………………………………………………APPX.0001-APPX.0017 (Exhibit A)

2.   June 10, 2020 Deposition of 30(b)(6) Trace Landers………...……APPX.0018-APPX.0022 (Exhibit B)

3.   May 19, 2020 Deposition of Cody Wayne Hughes………...……APPX.0023-APPX.0029 (Exhibit C)

4.   July 28, 2020 Deposition of Jeff Ratheal………………….……APPX.0030-APPX.0033 (Exhibit D)

5.   July 28, 2020 Deposition of Cade Owen………………….…..APPX.0034-APPX.0040 (Exhibit E)

6.   August 20, 2020 Deposition of Trace Landers…………………..APPX.0041-APPX.0042 (Exhibit F)

7.   Affidavit of Cody W. Hughes…………………………………APPX.0043-APPX.0044 (Exhibit G)

8.   Affidavit of Willis W. Hughes…………………………………APPX.0045-APPX0046 (Exhibit H)

9.   Steven R. Hamers, Mechanical Engineering Report #1………...…APPX.0047-APPX0079 (Exhibit I)

10.    August 18, 2020 Deposition of Steve Hamers, P.E., Volume II…APPX.0080-APPX.0082
       (Exhibit J)

11.    Affidavit of Mark H. Whatley, IAAI-CFI, CFEI, CVFI…………APPX.0083-APPX.0084
       (Exhibit K)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONWIDE AGRIBUSINESS | § | |
| INSURANCE COMPANY, as Subrogee | § | |
| of CWH FARMS, | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:19-CV-248 |
| | § | |
| DEERE & COMPANY, | § | |
| Defendant. | § | |

### DEFENDANT DEERE & COMPANY'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S REQUESTS FOR ADMISSION, SET I

TO:   Plaintiff, by and through its counsel, William T. Sebesta and Randall J. Poelma, Jr., DOYEN SEBESTA & POELMA, LLP, 450 Gears Road, Suite 350, Houston, Texas 77067; and David J. Taylor and Michelle D. Hurley, YOST & BAILL, LLP, 2050 U. S. Bank Plaza South, 220 South Sixth Street, Minneapolis, MN 55402.

Pursuant to Federal Rule of Civil Procedure 36, Deere & Company ("Deere") serves

its responses and objections to Plaintiffs' First Set of Requests for Admission, Set I.

Respectfully,

GERMER BEAMAN & BROWN PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288 Telephone
(512) 472-0721 Facsimile

By:   /s/ Chris A. Blackerby
        Chris A. Blackerby, Attorney in charge
        State Bar No. 00787091
        cblackerby@germer-austin.com
        Ben T. Zinnecker
        State Bar No. 24066504
        bzinnecker@germer-austin.com

ATTORNEYS FOR DEFENDANT
DEERE & COMPANY

4715992

1



0001

<u>Certificate of Service</u>

This instrument was served on the following counsel in compliance with Rule 5 of

the Federal Rules of Civil Procedure on January 22, 2020:

William T. Sebesta
<u>wsebesta@ds-lawyers.com</u>
Randall J. Poelma, Jr.
<u>rpoelma@ds-lawyers.com</u>
DOYEN, SEBESTA & POELMA, LLP
450 Gears Road, Ste. 350
Houston, Texas 77067

David J. Taylor
<u>dtaylor@yostbaill.com</u>
Michelle D. Hurley
<u>mhurley@yostbaill.com</u>
YOST & BAILL, LLP
2050 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, MN 55402

<u>/s/ Chris A. Blackerby</u>
Chris A. Blackerby

0002

<u>PRELIMINARY STATEMENT</u>

To avoid repetition, Deere incorporates the following Preliminary Statement into its responses and objections to First Set of Requests for Admission, Set I where the form or content justifies:

1.     *Case Background and Allegations:*  This case arises out of a fire involving a 2017 John Deere CS690 cotton stripper bearing product identification number (PIN) 1N0C690SKH4065098 ("Subject Cotton Stripper") that occurred on October 24, 2017 near Roscoe, Texas.  Plaintiff brings a cause of action against Deere for breach of express warranty related to the Subject Cotton Stripper.  Plaintiff specifically alleges the Subject Cotton Stripper was defective because "it allowed for the shearing off of various bolt heads associated with the saw tooth blade, under normal operation."  *See* Joint Report (ECF No. 16) ¶ 1.a.  Plaintiff has not disclosed its specific theories regarding the cause and origin of the fire.

2.     *Unique Product, Fire, and Defect Theory:*  This case involves a unique product, fire, and defect theory, as described in the preceding paragraph.  To the extent these requests seek information or documents regarding other products or product models that do not share the same systems or component parts as the Subject Cotton Stripper, or seek information regarding systems or component parts—either of the Subject Cotton Stripper, or of other products—that are not implicated by the subject fire and defect theory, Deere objects to such requests as overly broad, not relevant, and not proportional to the needs of this case, considering the issues at stake in the action, the importance of the

requested discovery in resolving the issues, and the burden or expense of the requested discovery.

3.    *Limitations to Answers:*  This case is in its early stages, and Plaintiff has provided only limited information about its defect and cause and origin theories concerning the Subject Cotton Stripper.  Accordingly, Deere is only able to provide limited information Plaintiff seeks through its requests at this time.  Upon receiving additional information regarding Plaintiff's cause/origin and defect theories, Deere will supplement its responses in accordance with Deere's obligations under the Federal Rules of Civil Procedure and any scheduling order entered by the Court, as reflected in paragraphs 4 and 5 of this Preliminary Statement.

4.    *Reasonable Efforts:*  In responding to Plaintiff's requests, Deere spoke with those employees and conducted a reasonable search of those places in their records where information, if any, responsive to Plaintiff's requests would normally be known or kept. To the extent Plaintiff's requests, or any portions thereof, seek to require Deere to take any action other than as enumerated in the preceding sentence, Deere objects because the requests are unduly burdensome and oppressive.  Deere employs a large number of persons and cannot be required to interview each employee as well as review the millions of documents generated annually in connection with the operation of its business.

5.    *Investigation Ongoing:*  Deere has made a reasonable good faith effort to locate information responsive to these discovery requests.  However, Deere has not completed its investigation.  Therefore, Deere may, while conducting its investigation, determine that additional information and documents may exist pertaining to subjects

covered by Plaintiff's discovery requests.  Deere reserves the right to supplement these responses as permitted by Rule 26(e) of the Federal Rules Rules of Civil Procedure.

6.    *Supplementation:*  Deere will make reasonable efforts to respond, as Deere understands and interprets each discovery request.  If Plaintiff subsequently supplies information differing from Deere's interpretation, Deere reserves the right to supplement its responses.

7.    *"Warranty":*  The term "Warranty," as used in the responses below, refers to the Warranty for New John Deere Agricultural Equipment and Limited Warranty for New Turf & Utility Equipment (US & Canada Only) applicable to the Subject Cotton Stripper and attached as Exhibit A to these Responses.

## OBJECTIONS TO "INSTRUCTIONS FOR REQUESTS"

Deere objects to Plaintiff's global instructions and definitions to the extent they purport to impose obligations or burdens upon Deere greater than those imposed by the Federal Rules of Civil Procedure.

Deere objects to Instruction A with respect to the term "located in any and all offices you and/or any employees, agents, employers and/or representatives maintain" because it impermissibly broadens the definition of "possession, custody, or control" in Rule 34(a)(1) of the Federal Rules of Civil Procedure.  Deere will comply with its obligations under Rule 34(a)(1).  Deere further objects to the second sentence of Instruction A as improperly seeking discovery on discovery.

Deere objects to Instruction B with respect to the term "any documents you have that contain all or part of the information contained" as vague, overbroad, not relevant, and

not proportional to the needs of this case, considering the issues at stake in the action, the importance of the requested discovery in resolving the issues, and the burden or expense of the requested discovery. Deere further objects to Instruction B to the extent it impermissibly broadens the definition of "possession, custody, or control" in Rule 34(a)(1) of the Federal Rules of Civil Procedure. Deere will comply with its obligations under Rule 34(a)(1).

Deere objects to Instruction C as an improper attempt to contravene the privilege log procedure set forth by the Rules. Deere will comply with Rule 26(b)(5)(A) of the Federal Rules of Civil Procedure.

Deere objects to Instruction D with respect to the term "locate [*sic*] in any and all offices you and/or your employees, agents, employers and/or representatives maintained for the period of seven years preceding the last date of compliance with this request" because it impermissibly broadens the definition of "possession, custody, or control" in Rule 34(a)(1) of the Federal Rules of Civil Procedure. Deere will comply with its obligations under Rule 34(a)(1).

## OBJECTIONS TO DEFINITIONS

Deere objects to the definition of "you" (¶ A), as used to expand the scope of Plaintiff's specific requests, on the grounds that it renders the requests vague, overbroad, not relevant, and not proportional to the needs of this case, considering the issues at stake in the action and the importance of the requested discovery in resolving the issues. Deere will respond to Plaintiff's discovery requests on behalf of itself and only on behalf of itself. Deere further objects to the definition of "you" with respect to the terms "servants,"

"agents," "counsel," and "persons acting for them on their behalf in any capacity," as impermissibly seeking information protected by the attorney-client privilege and/or the attorney work product protection doctrine.

Deere objects to the definition of "document" (¶ A), as used to expand the scope of Plaintiff's specific requests, on the grounds that the definition renders Plaintiff's requests overbroad, irrelevant, and not proportional to the needs of this case, considering the issues at stake in the action and the importance of the requested discovery in resolving the issues. Deere will interpret the term "document" as it is defined in Rule 34(a)(1)(A) of the Federal Rules of Civil Procedure.  Deere further objects to the definition of "document" with respect to the term "all written . . . matter of any kind or nature and any other tangible thing . . . known by you to exist" because it impermissibly broadens the definition of "possession, custody, or control" in Rule 34(a)(1) of the Federal Rules of Civil Procedure. Deere will comply with its obligations under Rule 34(a)(1).  Deere further objects to the term "document" with respect to the terms "drafts of any document," "revisions of drafts of any documents," and "original or preliminary notes," because it purports to impose obligations greater than those imposed by the Federal Rules of Civil Procedure, rendering the requests vague, overbroad, irrelevant, and not proportional to the needs of this case, considering the issues at stake in the action and the importance of the requested discovery in resolving the issues.

Deere objects to the definition of "relate(s) to" (¶ C), as used to expand the scope of Plaintiff's specific requests, on the grounds that the definition renders Plaintiff's requests

overbroad, irrelevant, and not proportional to the needs of this case, considering the issues at stake in the action and the importance of the requested discovery in resolving the issues.

Deere objects to the definitions of "identify" and "identity" (¶ E), as used to expand the scope of Plaintiff's specific requests, on the grounds that they render the requests vague, overbroad, not relevant, and not proportional to the needs of this case, considering the issues at stake in the action and the importance of the requested discovery in resolving the issues. Deere further objects to the definition of "identify" and "identity" with respect to the terms "current or last home and business address" and "current or last known telephone number" because it invades the privacy of present and former employees of Deere, as well as third parties.

Deere objects to the definitions of "person" (¶ F) with respect to the term "all present and former officers, directors, agents, employees, representatives, attorneys and others acting or purporting to act on behalf of such natural person, partnership, corporation or other business entity," as used to expand the scope of Plaintiff's specific requests, on the grounds that it renders the requests vague, overbroad, not relevant, and not proportional to the needs of this case, considering the issues at stake in the action and the importance of the requested discovery in resolving the issues.

Deere objects to the definition of "product" (¶ G) with respect to the term "any and all preceding John Deere cotton strippers of a similar model," as used to expand the scope of Plaintiff's specific requests, on the grounds that it renders the requests vague, overbroad, not relevant, and not proportional to the needs of this case, considering the issues at stake in the action and the importance of the requested discovery in resolving the issues. This

term is not limited to the Subject Cotton Stripper, or the systems and component parts on the Subject Cotton Stripper relevant to the subject fire and/or Plaintiff's defect theories.

Deere refers Plaintiff to paragraphs 1 and 2 of the Preliminary Statement above.

<u>RESPONSES TO REQUESTS FOR ADMISSION</u>

<u>REQUEST FOR ADMISSION NO. 1:</u>  Admit attached hereto, as Exhibit A, is a true and correct copy of the original purchase document for the subject John Deere C690 Cotton Stripper with Serial Number IN0C690SKH4065098 ("Subject Stripper), that is the subject of this lawsuit.

RESPONSE:  Deere admits the first page of Exhibit A appears to be a copy of the Sales Record between CWH Farms and the dealer (Hurst) pertaining to the Subject Cotton Stripper, and the remainder of the pages appear to be an unsigned "copy" of the Retail Installment Contract – Security Agreement pertaining to the Subject Cotton Stripper.

Deere denies the remainder of this request.

<u>REQUEST FOR ADMISSION NO. 2:</u>  Admit the Subject Stripper was sold as a new John Deere product.

RESPONSE:  Deere admits it sold the Subject Cotton Stripper as new equipment to the dealer (Hurst).

To the extent this request seeks information regarding whether the dealer sold the Subject Cotton Stripper as new equipment, Deere states it is more convenient, less burdensome, and less expensive for Plaintiff to obtain this information from the dealer.  Accordingly, after making a reasonable inquiry, the information known or easily obtainable is insufficient to enable Deere to admit or deny this portion of the request.

Deere denies the remainder of this request.

<u>REQUEST FOR ADMISSION NO. 3:</u>  Admit that the Subject Stripper was sold with a John Deere Limited Product Warranty that began to run on or about August 7, 2017.

RESPONSE:  Deere admits it provides, for cotton strippers sold as new equipment, the Warranty.  Deere does not use the term "John Deere Limited Product Warranty" to describe the Warranty.

REQUEST FOR ADMISSION NO. 4:  Admit that on October 24, 2017, when the Subject Stripper was destroyed by fire, it was still covered by the John Deere limited product warranty.

RESPONSE:  Deere admits, on October 24, 2017, the Subject Cotton Stripper was still in the applicable warranty term under the Warranty.

Deere objects to the terms "destroyed" and "covered" as vague and undefined, rendering the request vague, not relevant, and not proportional to the needs of this case, considering the issues at stake and the importance of the requested discovery in resolving the issues.

Beyond this, Deere states this request contains interdependent, compound issues because it relies on the assumption that the subject fire "destroyed" the Subject Cotton Stripper. Because Deere denies this assumption, as Deere understands the term "destroyed," Deere denies the remainder of this request.

REQUEST FOR ADMISSION NO. 5:  Admit that the John Deere limited product warranty applies to the design of the subject Stripper as a whole.

RESPONSE:  Deere objects to the terms "applies to the design of" and "the subject Stripper as a whole" as vague and overbroad, rendering the request vague, overbroad, not relevant, and not proportional to the needs of this case, considering the issues at stake in the action and the importance of the requested discovery in resolving the issues.  This request is not limited to the systems and component parts on the Subject Cotton Stripper relevant to the subject fire and/or Plaintiff's defect theories.  Deere refers Plaintiff to paragraphs 1 and 2 of the Preliminary Statement above.

Deere objects to this request as improperly seeking an admission of a conclusion of law and/or the application of law to an incomplete set of hypothetical facts.

Accordingly, Deere denies this request.

REQUEST FOR ADMISSION NO. 6:  Admit that the John Deere limited product warranty applies to the Subject Stripper's saw drum and blade.

RESPONSE:  Deere objects to the term "applies to the . . . saw drum and blade" as vague, rendering the request vague, not relevant, and not proportional to the needs of this case, considering the issues at stake in the action and the importance of the requested discovery in resolving the issues.

Deere objects to this request as improperly seeking the application of law to an incomplete set of hypothetical facts.

Accordingly, Deere denies this request.

REQUEST FOR ADMISSION NO. 7:  Admit that the John Deere limited product warranty applies to the bolts that secure the saw tooth drum blade on the Subject Stripper.

RESPONSE:  Deere objects to the term "applies to the bolts" as vague, rendering the request vague, not relevant, and not proportional to the needs of this case, considering the issues at stake in the action and the importance of the requested discovery in resolving the issues.

Deere objects to this request as improperly seeking the application of law to an incomplete set of hypothetical facts.

Accordingly, Deere denies this request.

REQUEST FOR ADMISSION NO. 8:  Admit that the Subject Stripper had less than 10 hours of use on it at the time of the total loss fire that gives rise to this law suit.

RESPONSE:  After making a reasonable inquiry, the information known or easily obtainable is insufficient to enable Deere to admit or deny whether the Subject Cotton Stripper had fewer than 10 hours of use at the time of the subject fire.

Deere objects to the term "total loss fire" as vague and undefined, rendering the request vague, not relevant, and not proportional to the needs of this case, considering the issues at stake and the importance of the requested discovery in resolving the issues.

Beyond this, Deere states this request contains interdependent, compound issues because it relies on the assumption that the subject fire was a "total loss fire."  Because Deere denies this assumption, as Deere understands the term "total loss fire," Deere denies the remainder of this request.

REQUEST FOR ADMISSION NO. 9:  Admit that the John Deere limited product warranty is a promise to the purchaser that the John Deere product is free from defects in material and workmanship for a period of time specified by the warranty.

RESPONSE:  Deere admits, under the Warranty—and pursuant to its specific terms, which Deere incorporates by reference into this answer—Deere promises to repair or replace, at its option, any part of new Equipment purchased from a Selling Dealer which is found to be defective in material or workmanship during the applicable warranty term.

Deere denies the remainder of this request.

0011

<u>REQUEST FOR ADMISSION NO. 10:</u>   Admit that the John Deere limited product warranty for the Subject Stripper covered defects in workmanship and materials.

RESPONSE:  Deere admits the Warranty covers, during the applicable warranty term, defects in material or workmanship of parts of new Equipment purchased from a Selling Dealer pursuant to the specific terms of the Warranty, which Deere incorporates by reference into this answer.

Deere denies the remainder of this request.


<u>REQUEST FOR ADMISSION NO. 11:</u>   Admit that the John Deere limited product warranty for the Subject Stripper was for twelve (12) months after the purchase of the Subject Stripper.

RESPONSE:  Deere admits, under the Warranty, which Deere incorporates by reference into this answer, the warranty term for the Subject Cotton Stripper was 12 months.

Deere denies the remainder of this request.


<u>REQUEST FOR ADMISSION NO. 12:</u>  Admit that John Deere limited product warranties that accompany new John Deere products are priced into the purchase price of the specific John Deere product it applies to.

RESPONSE:  Deere objects to the term "priced into the purchase price" as vague and overbroad, and to the entire request as vague, overbroad, not relevant, and not proportional to the needs of this case, considering the issues at stake in the action or the importance of the requested discovery in resolving the issues.  This request is not limited to the Subject Cotton Stripper, the systems and component parts on the Subject Cotton Stripper relevant to the subject fire and/or Plaintiff's defect theories, or any issue material to Plaintiff's breach of express warranty cause of action.  Deere refers Plaintiff to paragraphs 1 and 2 of the Preliminary Statement above.

<u>REQUEST FOR ADMISSION NO. 13:</u>   Admit that the John Deere limited product warranty that accompanies new John Deere products is something the consumer purchases along with the John Deere product itself.

RESPONSE:  Deere objects to the entire request as vague, overbroad, not relevant, and not proportional to the needs of this case, considering the issues at stake in the action or the importance of the requested discovery in resolving the issues.  This request is not limited to the Subject Cotton Stripper, the systems and component parts on the Subject Cotton Stripper relevant to the subject fire and/or Plaintiff's defect theories, or any issue material to Plaintiff's breach of express warranty cause of action.  Deere refers Plaintiff to paragraphs 1 and 2 of the Preliminary Statement above.

<u>REQUEST FOR ADMISSION NO. 14:</u>  Admit that there is value in the John Deere limited product warranty that accompanies new John Deere products.

RESPONSE:  Deere objects to the entire request as vague, overbroad, not relevant, and not proportional to the needs of this case, considering the issues at stake in the action or the importance of the requested discovery in resolving the issues.  This request is not limited to the Subject Cotton Stripper, the systems and component parts on the Subject Cotton Stripper relevant to the subject fire and/or Plaintiff's defect theories, or any issue material to Plaintiff's breach of express warranty cause of action.  Deere refers Plaintiff to paragraphs 1 and 2 of the Preliminary Statement above.

<u>REQUEST FOR ADMISSION NO. 15:</u>   Admit that the John Deere limited product warranty that applies to the Subject Stripper was intended to protect the purchaser if a defect in the Subject Stripper causes itself to start on fire.

RESPONSE:  Deere objects to this request, in its entirety and with respect to the terms "defect" and "causes itself to start on fire," as vague, overbroad, not relevant, and not proportional to the needs of this case, considering the issues at stake in the action or the importance of the requested discovery in resolving the issues.  This request is not limited to the Subject Cotton Stripper, the systems and component parts on the Subject Cotton Stripper relevant to the subject fire and/or Plaintiff's defect theories, or any issue material to Plaintiff's breach of express warranty cause of action.  Deere refers Plaintiff to paragraphs 1 and 2 of the Preliminary Statement above.

Deere objects to this request as improperly seeking an admission of the application of law to an incomplete set of hypothetical facts.

**0013**

REQUEST FOR ADMISSION NO. 16:  Admit that John Deere denied warranty coverage for the Subject Stripper.

RESPONSE:  Because this request is vague and overbroad in time, Deere interprets the request as seeking information about whether Deere has ever covered repairs under the Warranty for the Subject Cotton Stripper.  Given that understanding, Deere denies this request.

REQUEST FOR ADMISSION NO. 17:  Admit that John Deere failed to provide an explanation for why warranty coverage was not afforded.

RESPONSE:  This request contains interdependent, compound issues because the request relies on an assumption Deere denies.  Accordingly, Deere denies this request and refers Plaintiff to Deere's response to request no. 16.

REQUEST FOR ADMISSION NO. 18:  Admit that John Deere failed to provide an explanation to the owner of the Subject Stripper as to what caused the total loss fire on or about October 24, 2017.

RESPONSE:  Deere objects to the term "total loss fire" as vague and undefined, rendering the request vague, not relevant, and not proportional to the needs of this case, considering the issues at stake and the importance of the requested discovery in resolving the issues.

Beyond this, Deere states this request contains interdependent, compound issues because it relies on the assumption that the subject fire was a "total loss fire."  Because Deere denies this assumption, as Deere understands the term "total loss fire," Deere denies the remainder of this request.

## INTEGRATED INTERROGATORY

INTERROGATORY NO. 1:  If any of the response to the foregoing Requests were other than an unqualified admission, state all the facts and identify all witnesses and documents that support your Response.

ANSWER:  Deere generally refers Plaintiff to the answers above; to the witnesses Deere has identified and will identify in this case; and to the documents Deere has produced and will produce in this case.

**0014**

Beyond this, Deere objects to this request, in its entirety and with respect to the terms "all the facts . . . that support" and "all witnesses and documents that support," as vague and lacking reasonable particularity, overbroad, not relevant, and not proportional to the needs of this case, considering the issues at stake, the importance of the requested discovery in resolving the issues, and the burden or expense of the requested discovery.

<u>INTEGRATED REQUEST FOR PRODUCTION</u>

<u>REQUEST FOR PRODUCTION NO. 1:</u>   Any and all documents used, relied upon, identified, or relating to information provided by you or your attorney in answering the Requests for Admissions and Interrogatory served contemporaneously with this Request.

ANSWER:  Deere generally refers Plaintiff to the documents Deere has produced and will produce in this case.

Beyond this, Deere objects to this request, in its entirety and with respect to the term "[a]ny and all documents used, relied upon, identified, or relating to," as vague and lacking reasonable particularity, overbroad, not relevant, and not proportional to the needs of this case, considering the issues at stake, the importance of the requested discovery in resolving the issues, and the burden or expense of the requested discovery.

STATE OF ILLINOIS           )
                            )      SS
COUNTY OF ROCK ISLAND       )


## VERIFICATION


I, Paul Wilczynski, state that I am Assistant General Counsel of Deere & Company, and as such am authorized to sign this document.

The foregoing Defendant Deere & Company's Response to Plaintiff's Integrated Interrogatory has been prepared by others.  Upon information and belief, based on their representations, I believe them to be true and correct.

Dated this _____ day of January 2020.

_____
Paul Wilczynski
Assistant General Counsel


Subscribed and sworn to before me this _____ day of January 2020.

_____
Notary Public

```
OFFICIAL SEAL
AMBER L HARTMAN
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires Sep 19, 2020
```

# WARRANTY FOR NEW JOHN DEERE AGRICULTURAL EQUIPMENT AND LIMITED WARRANTY FOR NEW TURF & UTILITY EQUIPMENT (US & CANADA ONLY)

**A. GENERAL PROVISIONS** – With respect to purchasers in the United States, "John Deere" means Deere & Company, 1 John Deere Place, Moline, IL 61265, and with respect to purchasers in Canada, "John Deere" means John Deere Canada ULC, 295 Hunter Road, P. O. Box 1000, Grimsby, Ontario L3M 4H5. The warranties described below are provided by John Deere to the original purchasers of new Agricultural, Turf and Utility Equipment ("Equipment") purchased from John Deere or authorized John Deere dealers (the "Selling Dealer"). These warranties apply only to Equipment intended for sale in Canada and the US. Under these warranties, John Deere will repair or replace, at its option, any part covered under these warranties which is found to be defective in material or workmanship during the applicable warranty term. Warranty service must be performed by a dealer or service center located in Canada or the US, and authorized by John Deere to sell and/or service the type of Equipment involved (the "Authorized Dealer"). The Authorized Dealer will use only new or remanufactured parts or components furnished or approved by John Deere. Warranty service will be performed without charge to the purchaser for parts and/or labor. However, the purchaser will be responsible for any service call and/or transportation of Equipment to and from the Authorized Dealer's place of business (except where prohibited by law), for any premium charged for overtime labor requested by the purchaser and for any service and/or maintenance not directly related to any defect covered under these warranties. These warranties are transferable, provided the authorized John Deere dealer is notified of the ownership change, and John Deere approves the warranty transfer.

**B. WHAT IS WARRANTED** – Subject to paragraph C, all parts of any new Equipment are warranted for the number of months or operating hours specified below. Each warranty term begins on the date of delivery of the Equipment to the original purchaser, (except for certain agricultural tillage, planting, cultivating, harvesting, and application Equipment which may have a delayed warranty start date, but only if established by John Deere and noted by Selling Dealer on the Purchase Order). **Included In 5E Series Tractor and Compact Utility Tractor Powertrain Warranty - Engine:** cylinder block, cylinder head, valve covers, oil pan, emissions control components, timing gear covers, flywheel housing, and all parts contained therein. **Powertrain:** transmission, transmission case, differential and axle housings, clutch housings, MFWD front axle assembly, and all parts contained therein (does not include external drivelines, dry clutch parts, or steering cylinders). SWEEPS, SHOVELS, PLOWSHARES, AND DISK BLADES: A replacement part will be furnished without charge if breakage occurs and the amount of wear is less than the wear limits established by John Deere.

| AGRICULTURAL EQUIPMENT | WARRANTY TERM |
| --- | --- |
| Tractors | 24 Months or 2000 Hours, Whichever Comes First |
| Tractors used in Earthmoving Applications exceeding 150 hours per year (except those specific models and configurations approved by John Deere as having a two year warranty in scraper applications) | 90 Days |
| 5E Series Tractors | 24 Months or 2000 Hours, Whichever Comes First |
| a) Powertrain on 5E Series Tractors (components as per B above) | 60 Months or 2000 Hours, Whichever Comes First |
| Scrapers | 6 Months for MY14 and earlier<br>12 Months for D Series and MY15 and later |
| Frontier™ Equipment | 12 months |
| Sugar Cane Harvesters and Loaders | 12 months or 1500 hours, Whichever Comes First |
| All other Equipment (includes Ag Management Solutions (AMS) products) | 12 Months |
| Premium Balers | 24 Months or 12,000 bales, Whichever Comes First: First 12 Months, No Bale Limitation |
| Large Square Balers | 12 Months, No Bale Limitation |
| a) Powertrain on Large Square Balers | 24 Months or 20,000 bales, Whichever Comes First |
| Hagie Manufacturing Company LLC Sprayers | 24 Months or 1000 Hours, Whichever Comes First |
| Engines in Self-Propelled Equipment except Tractors* | 24 Months or 2000 Hours, Whichever Comes First |

*Engine Items Covered in through 24 – Engine block, cylinder head, rocker arm cover, timing gear cover, crankcase pan and all parts enclosed within these units. Also included are the fuel injection pump, turbocharger, water pump, torsion damper, manifolds, and engine oil cooler. All other engine related items are not covered in months 13 through 24.

| TURF & UTILITY EQUIPMENT | WARRANTY TERM |
| --- | --- |
| 1) Z200 Series and Z425 EZtrak™ Mowers, Z300 Series and Z525E  ZTrak™ Mowers, and D100 Series Tractors** | 24 Months or 120 Hours, Whichever Comes First |
| 2) S200 Series Tractors** | 36 Months or 200 Hours, Whichever Comes First |
| 3) X300 Series Tractors; Z400 Series EZtrak™ Mowers  and  Z500M  Series   ZTrak™ Mowers (Except Z425 and  Z525E)** | 48 Months or 300 Hours, Whichever Comes First |
| 4) X500 Series Tractors: Z600 Series EZtrak™ Mowers and Z500R Series  ZTrak™ Mowers** | 48 Months or 500 Hours, Whichever Comes First |
| 5) X700 Series Tractors** | 48 Months or 700 Hours, Whichever Comes First |
| 6) JS Series Residential Walk-Behind Mowers | 24 Months in Private Residential – Personal Use or 90 Days in Any Other Application |
| 7) Wide Area Mowers, Front Mower Traction Units and Mower Decks, QuikTrak™ Mowers, Commercial Walk Behind Mowers | 24 Months |
| 8) Z900B, Z900E, and Z900M Series ZTrak™ Mowers | 36 Months or 1200 Hours, Whichever Comes First: First 24 Months, No Hour Limitation |
| 9) Z997, Z900A Series and Z900R Series ZTrak™ Mowers | 36 Months or 1500 Hours, Whichever Comes First: First 24 Months, No Hour Limitation |
| 10) Compact Utility Tractors | 24 months or 2000 hours, Whichever Comes First |
| a) Powertrain on Compact Utility Tractors (components as per B above) | 72 months or 2000 hours, Whichever Comes First |
| 11) GATOR™ Utility Vehicles (except CX) | 12 Months or 1000 Hours, Whichever Comes First |
| 12) Implements/Attachments sold separately or used on Equipment listed in 7 through 11 | 12 Months |
| 13) CX GATOR™**,  All other Turf & Utility Equipment | 24 Months in Private Residential - Personal Use or 12 Months in Any Other Application |

**Implements/Attachments purchased on the same Purchase Order as the Equipment listed will be covered by the Equipment's warranty terms. Implements/Attachments purchased separately will be covered by the warranty term on line 12.

**C. (I) ITEMS COVERED SEPARATELY** – (1) Tires, rubber tracks and batteries; (2) John Deere Hand Held-Portable products; (3) John Deere Walk Behind Snowthrowers; (4) When applicable, a separate emissions warranty statement will be provided by Selling Dealer.

**(II) WHAT IS NOT WARRANTED** – Pursuant to the terms of these warranties, JOHN DEERE IS NOT RESPONSIBLE FOR THE FOLLOWING: (1) Used Equipment; (2) Any Equipment that has been altered or modified in ways not approved by John Deere, including, but not limited to, setting injection pump fuel delivery above John Deere specifications, modifying combine grain tanks, and modifying self-propelled sprayers with unapproved wheels, tracks, tanks or booms; (3) Depreciation or damage caused by normal wear, lack of reasonable and proper maintenance, failure to follow operating instructions/recommendations: misuse, lack of proper protection during storage, vandalism, the elements or collision or accident; (4) Normal maintenance parts and/or service, including but not limited to, oil, filters, coolants and conditioners, cutting parts, belts, brake and clutch linings; (5) Any Utility Vehicle used for racing or other competitive purpose; (6) Chains on Premium Balers.

**D. SECURING WARRANTY SERVICE** – To secure warranty service the purchaser must, (1) Report the Equipment defect to an Authorized Dealer and request warranty service within the applicable warranty term: (2) Present evidence of the warranty start date with valid proof of purchase: and (3) Make the Equipment available to an Authorized Dealer within a reasonable time.

**E. NO IMPLIED WARRANTY, REPRESENTATION OR CONDITION** – To the extent permitted by law, neither John Deere nor any company affiliated with it makes any warranties, representations, conditions or promises express or implied as to the quality, performance or freedom from defect of the Equipment covered by these warranties other than those set forth above, AND NO STATUTORY OR IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY OR FITNESS ARE MADE. TO THE EXTENT LEGALLY REQUIRED, ANY IMPLIED WARRANTIES OR CONDITIONS SHALL BE LIMITED IN DURATION TO THE APPLICABLE PERIOD OF WARRANTY SET FORTH ON THIS PAGE. THE PURCHASER'S ONLY REMEDIES IN CONNECTION WITH THE BREACH OR PERFORMANCE OF ANY WARRANTY ON JOHN DEERE EQUIPMENT ARE THOSE SET FORTH ON THIS PAGE. IN NO EVENT WILL THE DEALER, JOHN DEERE OR ANY COMPANY AFFILIATED WITH JOHN DEERE BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES. (Note: Some jurisdictions do not allow limitations on how long an implied warranty lasts or the exclusion or limitation of incidental or consequential damages so the above limitations and exclusions may not apply to you.) In the event the above warranty fails to correct purchaser's performance problems caused by defects in workmanship and/or materials, purchaser's exclusive remedy shall be limited to payment by John Deere of actual damages in an amount not to exceed the amount paid for the Equipment. This warranty gives you specific legal rights, and you may also have other rights which vary from jurisdiction to jurisdiction.

**F. NO DEALER WARRANTY** THE DEALER HAS NO AUTHORITY TO MAKE ANY WARRANTY, REPRESENTATION, CONDITION OR PROMISE ON BEHALF OF JOHN DEERE, OR TO MODIFY THE TERMS OR LIMITATIONS OF THIS WARRANTY IN ANY WAY.

**G.** If further information is desired, contact Selling Dealer or John Deere at 1-866-993-3373 (Agricultural) or 1-800-537-8233 (Turf & Utility Equipment).

(Effective November 1, 2016)

EXHIBIT

A

0017

www.exhibitsticker.com

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF TEXAS
 3               FORT WORTH DIVISION
 4    --------------------------------

      NATIONWIDE AGRIBUSINESS INSURANCE
 5    CO., Et Al,
 6          Plaintiff,
                             CIVIL ACTION NO.:
 7                           4-19-CV-00425-0
          vs.
 8

      DEERE & COMPANY,
 9

             Defendant.
10    ----------------------------------
11       VIDEO-CONFERENCE 30(b)(6)DEPOSITION OF
12                  TRACE LANDERS
13             Taken JUNE 10, 2020
14            Commencing at 9:00 A.M.
15
16
17
18
19
20    DATE:         JUNE 10, 2020
21    TIME:         9:00 A.M.
22    PLACE:        Moline, Illinois
23    REPORTED BY:  Mari Skalicky, RMR, CRR
24                  (via video-conference)
25    JOB NO.:      MW 4136995
```

Exhibit

B

0018

Page 14

1  Q.  Does John Deere have a warranty
2     department?
3  A.  A warranty department?  I wouldn't say
4     it's a warranty department, but it is
5     people allocated to look at and deal with
6     and, you know, inspect, deal with
7     warranty.  It's typically a portion of
8     their job.
9  Q.  Do you know anything about the corporate
10     structure of how the warranty evaluation
11     process is set up?
12  A.  Can you clarify that question?
13  Q.  Well, as I understood your answer is that
14     there is a lot of people maybe that have
15     some involvement in warranty aspects as
16     part of their job at Deere.
17  A.  Right.
18  Q.  But you said that there wasn't a warranty
19     department?
20  A.  Right.
21  Q.  I'm wondering, I mean, really just talking
22     very broad, big block on stuff here, is
23     there an aspect of Deere that is assigned
24     to evaluating --
25  A.  Yeah.

Page 15

1  Q.  -- taking in warranties?
2  A.  So it's more of a process.  When a
3     customer has an issue that they feel is a
4     defect and may warrant warranty, they will
5     report back to their dealer, an approved
6     dealer.  And the dealer at times, most of
7     the times he's going to work with the DTAC
8     person, so that's a dealer technical
9     assistant contact.  And so that by working
10     with them, that gets back to us.  A lot of
11     times so the DTAC, if he -- a lot of times
12     they have solutions, they've dealt with
13     these issues in the past quite a bit.
14        If it gets past them, a lot of times
15     the DTAC folks may need to talk to
16     engineers or folks like myself, fire
17     engineers, to help them out with the
18     assistance and to make determinations of
19     warranty, whether it's warranted, whether
20     it's not.
21        So like I say, department, specific
22     department, no, but there are many, many
23     people within John Deere that are very
24     capable that deal with warranty.
25  Q.  Sure.  The process that you just

Page 16

1     described, you said that that was done for
2     the purpose of investigating whatever the
3     problem is in determining warranty
4     coverage?
5  A.  Right.
6  Q.  Do you have an idea or can you give me a
7     general idea as to how long that process
8     is intended to last?
9  A.  There is no documented or, I mean, each
10     case is different.  Each failure is
11     different to you, know, some failures can
12     take a day or two to fix if we have parts.
13     Others maybe we have to orders parts from
14     the parts depot.  So there is no
15     documented or set rule on how long that
16     will take.
17  Q.  Outside of having to order parts, how long
18     is the process of evaluating the cause and
19     making a determination of warranty
20     coverage?  How long is that intended to
21     take?  Obviously, if you determine you
22     have to order parts and there is a tail to
23     that, but that shorter process of
24     evaluating and coming to a determination,
25     how long does that take?

Page 17

1  A.  Well, it's not that straightforward.  It
2     depends on the, you know, severity of the
3     failure, severity of the loss, you know,
4     obviously if it's just a simple sheared
5     nut or bolt or something or if it's more
6     involved, you know, other components that
7     are larger and need more analysis, that's
8     going to take longer.  So there is really
9     not a cut-and-dried answer I can give you.
10  Q.  You referenced a sheared nut or bolt as a
11     possible scenario.  Is that the type of
12     scenario that gets evaluated for warranty
13     coverage?
14  A.  It depends.  At times, yes, it would be.
15  Q.  Give me a scenario or describe a scenario
16     when it would at times be evaluated for
17     warranty coverage?
18  A.  A time when it could get evaluated for
19     warranty would be say you have a tractor,
20     you have an implement, maybe a nut or bolt
21     falls off on the piece of tillage
22     equipment and maybe you lose a disc or
23     something on an implement, and it would
24     have to be -- so it would have to be --
25     that implement would have to be in that

5 (Pages 14 - 17)

0019

Page 18

1  warranty period, whatever that warranty
2  period would be.
3      Say it's 12 months, and then someone
4  in that list of people I provided to you
5  would have to analyze that from Deere, and
6  we'd have to see if it was a defect of
7  material or workmanship.  If it was indeed
8  a defect of material or workmanship, then
9  we would repair or replace that component
10  or part that was found to be defective.
11 Q.  You said that you had given us a list of
12  people.  I may have missed it in terms of
13  how you testified to that.  Can we talk
14  about that list of people that would be
15  involved in that warranty process?
16 A.  Yeah.
17 Q.  You said, I mean, you described an
18  instance where a customer might go into a
19  dealership and the dealership, not John
20  Deere, but the dealership might be working
21  with DTAC employees, right, or DTAC
22  operators?
23 A.  Correct.
24 Q.  Who else at Deere would be involved in the
25  warranty evaluation process?

Page 19

1 A.  In the -- okay, so in the warranty
2  evaluation process, potential engineers
3  help make the decision on whether or not a
4  failure, you know, how a failure occurred.
5  DTAC folks that have history with similar
6  failures, you know, those are two of the
7  big ones.  Are you looking for -- to make
8  technical determinations, is that what
9  you're getting at?
10 Q.  No.  I'm looking from A to B.  I'm looking
11  for, if I have a lawn tractor from John
12  Deere that's under warranty, and I bring
13  it to the dealership, who am I going to
14  deal with at Deere?
15 A.  Okay.
16 Q.  I mean, from the very starting point, do I
17  have to send a form in?  How do I have to
18  notify you?  What's step 1, 2, 3 through
19  the end?
20 A.  Okay.  So I understand.  So what the
21  customer would do is contact an approved
22  John Deere dealer that would be able to
23  perform the work.  They would be
24  responsible for providing that machine to
25  the dealer, you know, for inspection to

Page 20

1  see what's wrong with it.  If it is
2  something that would be warrantable,
3  meaning, we have a defect of material or
4  workmanship, you know, and I've mentioned
5  all the folks that may need to help in
6  that determination, being a DTAC
7  representative, potentially an engineer
8  from John Deere, potentially a fire
9  engineer from John Deere.
10      And then when that happens, if that
11  is approved, Deere would replace at no
12  cost, repair or replace that defective
13  component on this particular machine.
14 Q.  Is it just that group of people that you
15  just described that makes the
16  determination of if it is approved as you
17  testified, potential DTAC employee, an
18  engineer, and/or a potential fire engineer
19  from John Deere?
20 A.  Those are the ones I'm involved with most
21  often.
22 Q.  Beyond who you might be involved with,
23  Mr. Landers, you're here to testify more
24  broadly as to the John Deere process as a
25  whole, right?

Page 21

1 A.  Right.
2 Q.  So who else besides those possible three
3  people would be involved in evaluating,
4  taking in information on warranty claims,
5  evaluating them, helping in the decision
6  process and determining whether or not it
7  is or is not approved?
8 A.  Well, I mean, if when we see history of
9  warranty, we see similar history, the
10  quality control department at the factory,
11  quality would get involved.  You know,
12  that's outside probably the process,
13  looking to make improvements down the
14  road.  You know, it's potential that those
15  are some of the folks that would get
16  involved as well.
17      I mean, I've really listed quite a
18  few of the folks that I work with.  I
19  don't really have too many more names here
20  for you.
21 Q.  Well, we haven't talked about any names,
22  but we've talked about three --
23 A.  I said positions.
24 Q.  -- three positions, and if that's the
25  entire universe that John Deere uses to

6 (Pages 18 - 21)

0020

Page 190

1  going to get a chance to depose him.  If
2  you're saying you're going to depose him
3  now --
4       MR. TAYLOR:  No.  No.  No.  No.  I
5  could but --
6       MR. BLACKERBY:  You're going to have
7  a chance to talk to him at length about
8  what he thought about broken bolt heads.
9       MR. TAYLOR:  I'm talking about the
10  warranty.  This is not -- this is
11  different.  This is in the warranty
12  process, he's been talking about the
13  warranty process.  He is here designated
14  as that guy.  And I'm asking him and then
15  he inserted himself into saying that.  If
16  he wants to say that that inserting me in,
17  is that's my fire investigator role, I
18  won't talk about that, that's fine, but
19  the question that is on the table and what
20  is being currently explored is, what did
21  Deere know at the time of denying it, and
22  that is not February 18th of 2020 when
23  Mr. Landers gets involved.
24       MR. BLACKERBY:  Right.  I got it.  So
25  going back --

Page 191

1       MR. TAYLOR:  I'm sorry.
2       MR. BLACKERBY:  I'm just -- I know
3  you and I have had a conversation before
4  this.  He's given expert opinion.  It
5  addresses in part these bolts.  That's
6  part of his designated expert opinions.
7  He's already said that Deere looked at
8  these notes and report and photographs and
9  that's what he, as part of their decisions
10  to make a decision on the claim of
11  liability, that when the claim of warranty
12  was a claim of liability by Nationwide.
13       MR. TAYLOR:  The only link for -- I
14  mean, we can tip-toe around that
15  distinction.  The only link for the
16  liability is the claim for warranty.
17       MR. BLACKERBY:  You're right.  Now
18  that you filed suit.
19       MR. TAYLOR:  No.  Once Cody bought
20  that product, there is a potential claim
21  for liability.  And that's the reality.
22  And once they were on notice, but I mean,
23  be that as it may, this is a different
24  thing than the fire investigation.  And I
25  don't need to talk to him about the bolts.

Page 192

1  I think we've got hours to talk about the
2  bolts.
3       MR. BLACKERBY:  Right.
4  BY MR. TAYLOR:
5  Q.  But in terms of investigating this
6  warranty, this warranty claim, from -- and
7  now that we know you knew about the broken
8  bolts on or about December 13th of 2017,
9  what steps did John Deere take to further
10  investigate the cause of those broken
11  bolts before it denied warranty?  Were
12  there metallurgical exams?  Were there
13  material exams?  What other steps were
14  taken?
15  A.  So I mentioned this before.  I looked into
16  the assembly print of the cleaner, okay.
17  I looked at that print just to see how it
18  was assembled, what were the quality
19  control measures, and just to see what the
20  likelihood is that something like that
21  could occur.  Gave me John Rupert's name,
22  and I talked to him about it.
23       MR. BLACKERBY:  Hey, Dave, Dave.
24       MR. TAYLOR:  Yes.
25       MR. BLACKERBY:  This would be a time

Page 193

1  I would normally get for break.  I don't
2  know if you're getting close to being
3  done.
4       MR. TAYLOR:  I'm getting real close.
5       MR. BLACKERBY:  Couple of minutes or
6  something?
7       MR. TAYLOR:  Probably.
8       MR. BLACKERBY:  Okay.
9  BY MR. TAYLOR:
10  Q.  I actually have to look at some pictures
11  real quick, but I'm tell you what, you
12  give me five minutes, then I'll have it
13  consolidated and we'll be quick.
14       MR. BLACKERBY:  Okay.
15       (A brief recess was taken.)
16  A.  I'm going to maximize this here.
17  BY MR. TAYLOR:
18  Q.  Mr. Landers, before we broke, we did have
19  a very short, minor discussion on bolts.
20  I just want to ask a very simple question.
21  Typically speaking, are bolts on John
22  Deere products warranted items?
23  A.  Bolts, if they had a defect of material or
24  workmanship could be.
25  Q.  What does John Deere do to determine

49 (Pages 190 - 193)

0021

Page 194

1   whether or not a bolt that is alleged to
2   have been defective and under warranty,
3   what does John Deere do to determine
4   whether or not that bolt is defective in
5   workmanship or material?
6   A. They would have to inspect it. They would
7   have to do a metallurgical analysis of it.
8   Zinc coating analysis. They would
9   basically have to inspect it to the print.
10  Q. And that would likely require taking the
11  bolt and doing some physical work on it
12  itself, right?
13  A. Right.
14  Q. And that is what John Deere would believe
15  is necessary to determine whether or not a
16  bolt that is alleged to have been
17  defective and under warranty was in fact
18  defective in workmanship or material,
19  right?
20  A. Right.
21  Q. You understand that the allegations for
22  this warranty claim are that there were
23  broken bolt heads and John Deere denied
24  warranty coverage based on the fact that
25  its investigation was undetermined in

Page 195

1   terms of the cause of the fire, right?
2   A. Right.
3   Q. You also understand that John Deere has
4   not done any metallurgical analysis on any
5   of the broken bolt heads to determine, as
6   you say, whether or not they were
7   defective in material or workmanship,
8   which is what you say would have been a
9   necessary step that John Deere could take?
10  A. So -- and you're mentioning the four or
11  five that are broke on this machine?
12  Q. I'm talking, generally speaking, about
13  what would be needed to be done to look
14  into a bolt and determine whether or not
15  it's defective. You talked about that.
16      And then I'm asking you to
17  acknowledge that that was not done in this
18  case.
19  A. Can I -- in this case, this specific case
20  on these bolts that broke, it was not
21  done.
22  Q. Right.
23  A. But can I expand on that?
24  Q. I don't want to get into your fire
25  analysis, because I think that's what

Page 196

1   you're going to explain to me.
2   A. Okay. Then we'll leave it.
3   Q. Yeah. The bottom line is that typically
4   if Deere was to investigate whether or not
5   a bolt that is alleged to have been
6   defective and under warranty, that
7   typically Deere would take that to a
8   metallurgical exam or some sort of
9   materials exam, even though that was the
10  allegation in this case, that was never
11  done, correct?
12      MR. BLACKERBY: Form.
13  BY MR. TAYLOR:
14  Q. Correct, Mr. Landers?
15  A. Correct. A bolt of that size that's been
16  through a fire?
17  Q. You, sir, are not a metallurgist, and I
18  would venture to guess you should stop the
19  testimony on that regard there.
20      The fact of the matter is that it was
21  not looked at?
22  A. Right.
23  Q. I just want to make sure I've got
24  everything covered.
25      Sir, did we talk about all of the

Page 197

1   additional information that was collected
2   by Deere between December 17th and May of
3   2019? Is there anything else that you can
4   think of that was done by Deere in terms
5   of furthering its investigation in that
6   time frame?
7   A. No.
8   Q. Would you agree with me that regardless of
9   whether or not we're talking about one of
10  these minor warranty-type claims or even a
11  more significant one, or one involving a
12  fire, that it is Deere's position that it
13  is their exclusive providence to determine
14  whether or not something is or is not
15  defective?
16  A. When you say "their," meaning?
17  Q. Deere. That your warranty document
18  basically says, we will warrant these
19  products to be free from defects in
20  workmanship and material, and your
21  exclusive -- and that is going to be
22  determined in our own estimation, and your
23  exclusive remedy is going to be repair,
24  replacement of those defective materials,
25  that's what the obligation is, right?

50 (Pages 194 - 197)

## Page 1

```
1            IN THE UNITED STATES DISTRICT COURT
2            FOR THE NORTHERN DISTRICT OF TEXAS
3                   FORT WORTH DIVISION
4   NATIONWIDE AGRIBUSINESS      *
    INSURANCE COMPANY, AS        *
5   SUBROGEE OF CWH FARMS,       *
                                 *
6       Plaintiff,               *
                                 * CIVIL ACTION NO.
7   VS.                          * 4:19-cv-00424-O
                                 *
8   DEERE & COMPANY,             *
                                 *
9       Defendant.               *
10
11
12  ********************************************************
             ORAL AND VIDEO DEPOSITION OF
13                 CODY WAYNE HUGHES
                    MAY 19, 2020
14  ********************************************************
15
16
17       ORAL AND VIDEO DEPOSITION of CODY WAYNE HUGHES,
18  produced as a witness at the instance of the Defendant,
19  and duly sworn, was taken in the above-styled and
20  numbered cause on the 19th day of May, 2020, from 10:01
21  a.m. to 1:35 p.m., before Donna Haynes, CSR, RPR, CMRS,
22  in and for the State of Texas, reported by machine
23  shorthand, at The Hampton Inn, 302 SE Georgia Avenue,
24  Sweetwater, Texas, pursuant to the Federal Rules.
25
         ACCURACY PLUS REPORTING SERVICES  (325) 677-3355
```

## Page 2

```
1          A P P E A R A N C E S
2   Mr. David J. Taylor
    YOST & BAILL, LLP
3   2050 U.S. Bank Plaza South
    220 South Sixth Street
4   Minneapolis, MN  55402
    612.338.6000
5   dtaylor@yostbaill.com
6   ATTORNEY FOR THE PLAINTIFF
7   Mr. Chris A. Blackerby
    GERMER BEAMAN & BROWN, PLLC
8   301 Congress Avenue, Suite 1700
    Austin, TX  78701
9   512.472.0288
    cblackerby@germer-austin.com
10
    ATTORNEY FOR THE DEFENDANT
11
12  THE VIDEOGRAPHER:  Mr. Gary Gilmore
13
14
15
16
17
18
19
20
21
22
23
24
25
         ACCURACY PLUS REPORTING SERVICES  (325) 677-3355
```

## Page 3

```
1                      INDEX
2   Stipulations...................................    1
3   Appearances....................................    2
4   CODY WAYNE HUGHES
        Examination by Mr. Blackerby..............    5
5       Examination by Mr. Taylor................  123
        Examination by Mr. Blackerby.............  147
6
7   Changes and signature.........................  154
8   Reporter's Certification......................  156
9
10                     EXHIBITS
11  1 - .............................................   19
        (Notebook provided by witness, Cody
12       Wayne Hughes)
13  2 - .............................................   36
        (Hurst Sales Record dated 8/07/17)
14
15  3 - .............................................   39
        (Retail Installment Contract - Security
16       Agreement)
17  4 - .............................................   46
        (Warranty for New John Deere Agricultural
18       Equipment and Limited Warranty for New
         Turf & Utility Equipment - US & Canada
19       Only)
20  5 - .............................................   81
        (Aerial map)
21
22  6 - .............................................   81
        (Photographs)
23
24  7 - .............................................   96
        (Letter dated 11/03/17 from Nationwide
25       to Hurst Farm Supply)
```
         ACCURACY PLUS REPORTING SERVICES  (325) 677-3355

## Page 4

```
1   8 - .............................................  101
        (Miscellaneous e-mails)
2
3   9 - .............................................  102
        (Miscellaneous e-mails)
4
5   10 - ............................................  ---
        (No exhibit)
6
7   11 - ............................................  109
        (Text messages)
8
9   12 - ............................................  121
        (Invoice from Dale Martin & Son Tire
10       Company, Inc.)
11  13 - ............................................  122
        (Invoice for fire extinguisher)
12
13  14 - ............................................  147
        (Photographs)
14
15  15 - ............................................  148
        (Thumb drive)
16
17
18
19
20
21
22
23
24
25
```
         ACCURACY PLUS REPORTING SERVICES  (325) 677-3355



Exhibit C

0023

Page 13

1    A.  Yeah.  The C and the S, I mean, I know you're
2  familiar, but the "CS" stands for cotton stripper, and
3  then the model is a 690.
4    Q.  Right.  Do you -- and I know you mentioned that
5  CWH owned that machine?
6    A.  Yes, sir.
7    Q.  Did you own -- does it own other machines as
8  well as that subject machine?
9    A.  Oh, yes, like as far as other farm equipment?
10    Q.  Yes.
11    A.  Yes, sir.  Yeah, we're -- I would say 99.9
12  percent of our farm equipment is John Deere brand except
13  for a Skid Steer that is a Kubota.
14    Q.  Well, we'll forgive you.
15        Do you have any other -- did you have any
16  at the time -- going back to October 24th, 2017, did you
17  have other cotton strippers or just one, just one
18  machine?
19    A.  No.  Okay.  And I just want to paint the
20  picture --
21    Q.  Sure.
22    A.  -- of '17.  This was a time where the CS690s,
23  they've always been around for a cotton picker, but at
24  the time they were the new thing, latest and greatest,
25  you know, coming out, supposed to do the job of two

Page 14

1  cotton strippers.  And we did -- we have always had one,
2  a 7460, which is a basket cotton stripper.  And this
3  requires, you know, an operator; then you have to have a
4  bow buggy operator, tractor and a bow buggy.  And then
5  you have to have a builder and another tractor to
6  actually build the module.  So it's -- you know, there's
7  three people out there, three employees, and all the
8  farm equipment tied up.
9        Well, we have always -- we kind of grew our
10  operation over the years, and so it was getting to a
11  point where we were having to hire out our -- more help
12  and it was costing us money, and we -- when -- we knew
13  the cotton stripper was going to -- or the CS690 was
14  going to be available in '17, and so we had ordered it
15  back in the end of '16, rather.
16        And so, basically, we were just trying to
17  be more efficient with our employees and go forth,
18  and so we traded in our 7460, rolled the equity into
19  this new machine, because you see the price tag on it,
20  and we sold our bow buggy and we sold our builder, and
21  that's how we ended up with the CS690 --
22    Q.  Got it.
23    A.  -- from the factory -- or from Deere.
24    Q.  And so at the time when the fire occurred, you
25  had one -- just one machine?

Page 15

1    A.  Yes, sir.
2    Q.  Prior to that, you had a 7460, which -- and
3  other equipment --
4    A.  Yeah.
5    Q.  -- that you had to use because you had to have
6  multiple pieces of equipment; right?
7    A.  Yes, sir.
8    Q.  Okay.
9    A.  Yeah.
10    Q.  And it's -- you've already kind of said it --
11    A.  Yeah.
12    Q.  -- but one of the things that happened around
13  2017 is that Deere came out with a new machine that
14  would do multiple jobs --
15    A.  Yes.
16    Q.  -- and basically make it more efficient; is
17  that right?
18    A.  Yes, sir.  Yes, that is correct.
19    Q.  And so the subject machine -- and when I talk
20  about "subject machine" or whatever, I'm going to be
21  referring to the one that was involved in the fire.  If
22  I'm going to refer to some other machine --
23    A.  Okay.
24    Q.  -- I'll specify; okay?
25    A.  Yes, sir.

Page 16

1    Q.  So the subject machine was the first time you
2  got a CS650 (sic); is that right?
3    A.  Yes.  That was the --
4    Q.  Or 690?
5    A.  -- that was the first year we had ran it.  My
6  neighbor at the time, he -- he actually had the
7  prototype sent to him to run and so, you know, we were
8  watching it, looking across the turnrow, watching it and
9  seeing how -- how many more acres, like, he could
10  harvest a day just with one person.  It was kind of
11  amazing, you know, to sit there and watch.
12        And so we -- I rode with him, went over a
13  few things with him.  His operator -- actually some of
14  the Deere engineers come down and actually he has them
15  on speed dial, you know, because they can critique
16  things and kind of report back because the stripper was
17  totally different than the picker because the picker has
18  been around for, man, probably five or six years prior
19  to the -- them releasing this cotton stripper version.
20    Q.  And just -- I know we're using names that
21  are --
22    A.  Yes.
23    Q.  -- very -- the terms that are familiar to you.
24  The picker --
25    A.  Yes.



Page 37

1 get to you?

2    A. Yes, sir.

3    Q. How long do you -- how long before that do you

4 think you ordered it?

5    A. Oh, man, I'd have to look back there, but I

6 think it's in that timeline.

7    Q. That's fine. That's fine. Just roughly, if

8 you could.

9    A. I would say it -- I mean, it's like almost

10 12 months prior. Like, when you're -- well, I can tell

11 you when because Jeff would call because what we were

12 trying to do is assign a value of our 7460, which you

13 can see here he has a notation of "855 to 773," because

14 at the time we were trying to get into this new machine,

15 this new CS690, we were trading in that 7460, which is

16 right there in the trade-in information, and he assigns

17 the value based on the fan hours.

18        So he would call us and say, "Hey, are you

19 done?" And basically, they already had that machine

20 sold. Like, he had it spoken for. They were waiting

21 for us to get our crop out before he actually took

22 possession of it, so ...

23    Q. Okay.

24    A. So, yes, I would say if that was August of '17,

25 we made -- we agreed to sell it probably in October or

Page 38

1 November of '16.

2    Q. Okay. When did you actually take -- I know

3 that was when money exchanged hands. When did you take

4 delivery of the subject machine?

5    A. We took delivery -- it would have been in the

6 spring, probably April or May of '17.

7    Q. Okay. So you took delivery of the machine in

8 April or May, and then --

9    A. Yeah.

10    Q. -- Exhibit 2 was signed in August?

11    A. Yes, because -- and they already had, you know,

12 we were already approved for, like, to do the purchase,

13 but to actually -- when they delivered the thing,

14 instead of it going -- no, it got delivered up to, like,

15 Lorenzo, I believe, and they actually put together --

16 they put together the machine up there. I mean, it's

17 put together in the factory, but, like, attaching the

18 basket, it's stuff, like, that was shipped.

19    Q. Sure.

20    A. Yes, sir. But I want to say, it might have

21 been August -- I mean, like I said, it's been so long

22 ago. I want to say, when we signed the deal, Jeff --

23 we've done business with them, like, they went ahead and

24 delivered the machine to our shop, but we came up and

25 did the paperwork, like, in August or whatever.

Page 39

1        (Deposition Exhibit No. 3 marked)

2    Q. (BY MR. BLACKERBY) Okay. And Exhibit 3 looks

3 like it's dated around the same time as Exhibit 2, and

4 that looks like a security agreement?

5    A. Yes, sir. It's in this notebook, but, yes,

6 that is -- that is where it shows our down payment and

7 then what we actually financed, and we financed it

8 through Deere.

9    Q. Okay. So you financed the purchase price

10 through John Deere Financial?

11    A. Yes, sir.

12    Q. Now, you mentioned that, when you purchased

13 this machine you got some training, a bunch of training,

14 when they came out and showed you how to do -- do

15 everything; is that right?

16    A. Yes, sir.

17    Q. Kind of tell us -- break it down to us. So you

18 purchased the machine, they delivered it to you, and

19 then at some point you get training. Tell us about the

20 training that you were provided and what they were

21 training you on.

22    A. Okay. It's basically all the stuff that

23 when -- at the time when there was -- I don't believe

24 how many -- I don't remember exactly how many Hurst sold

25 in '17, but they sold quite a few. They invited -- they

Page 40

1 do it every year. They invited the new purchasers of

2 the CS690s, the cotton strippers, this new baler. And

3 then they even put on another clinic for, like, the

4 basket machines. And at that meeting they walked us

5 through the maintenance, fire procedures, anything --

6 and it's where you could -- you could ask questions

7 and -- but one of the big deals was the fire.

8        I mean, they basically said, you know, to

9 have a water trailer out in the field because they know

10 that these were prone to catch on fire, and there's no

11 doubt about it. And actually, when we signed this

12 agreement, there's a portion in this financing statement

13 that says you can insure it through John Deere. But one

14 of the big downfalls is they do not insure it for fire.

15    Q. Okay. And the reason that that is true is fire

16 is a known hazard with this type of equipment; is that

17 right?

18    A. Yes, sir.

19    Q. Is that -- is that -- is that specific to this

20 particular machine or all cotton pickers in general

21 or --

22    A. Oh, I mean, any type of harvest equipment is

23 prone to --

24    Q. And why is that?

25    A. Well, number one, it's a dry crop. Any type --



Page 49

1   A. Uh-huh. And it walks through the fire
2  procedure.
3   Q. And that's -- and you recognize that?
4   A. Oh, yeah. Yeah, I watched that video. It's
5  pretty -- I mean, it's kind of boring, but, yeah, I
6  watched it one day in my living room.
7   Q. So you -- you -- and did you read -- go through
8  and read the operator's manual?
9   A. Yeah. I wouldn't say I read it, like, front to
10 back, but, yes, I know what it is. I've looked at it,
11 but ...
12   Q. It's pretty hard to read front to back --
13   A. Yes, sir. Yeah.
14   Q. -- because it's pretty long. But you made
15 yourself familiar with the contents?
16   A. Oh, yes, sir. Yeah.
17   Q. And you read and watched the video which
18 included the things you need to do in case of fire?
19   A. Yeah. Which is one thing we were deathly
20 afraid of.
21   Q. And you felt like you were prepared based
22 upon --
23   A. Oh, yes.
24   Q. -- all the training in the video and the
25 materials, what to do?

Page 50

1   A. Yes. And then, you know -- well, you know, but
2  that's the deal -- like, you've got to start sometime
3  and so we took it to the field, the machine, and --
4   Q. Hold on a second. Hold on a second. I'm going
5  to let you get there. Hold on.
6   A. All right.
7   Q. So you purchase it; we do this -- you sign the
8  agreement; you take delivery of the machine. Do you
9  remember when it actually came into your possession
10 where you could start operating it? Do you remember
11 when that happened?
12   A. Well, that's when I'm -- yeah, it says
13 August 7th. You know, that's probably -- I know it
14 showed up and we put it inside of our shop and it sat
15 there for, like, months before we actually went to the
16 field with it.
17   Q. Okay. This fire occurred on October the
18 24th, 2017?
19   A. The first fire.
20   Q. The fir -- well, my understanding was there
21 were two fires. One was on October the 23rd, 2017 --
22   A. Yes, sir.
23   Q. -- and the main one was on the next day; is
24 that right?
25   A. Yes, sir. That's correct.

Page 51

1   Q. When did you -- when did you first start using
2  the machine in the field?
3   A. The 23rd of October.
4   Q. So the first day?
5   A. The first day.
6   Q. And who was the operator?
7   A. I was.
8   Q. Did anybody else ever operate besides you?
9   A. No. Our farmhand was in the field with me.
10   Q. Okay. So take us to the first day. It's
11 October 23rd, 2017, and you were getting ready to do
12 your first work in the field.
13   A. Yeah. Okay. So, that morning of the 23rd,
14 that's when Brad Davis, the shop foreman there at
15 Snyder, Cade, a mechanic from Hurst -- and they came to
16 the shop and we had it all ready to go, like, had the --
17 like, I don't know exactly if -- when they actually
18 installed the cameras, but I think it was prior to this
19 23rd day. It comes standard with, like, two cameras,
20 but I believe we put two more cameras on the machine
21 just to -- there's some -- like, you want to be able to
22 watch the wrapping mechanism in the back to make sure it
23 doesn't mis-wrap or anything, and that's when they did
24 the walk-through with you.
25        And then that evening, which was around --

Page 52

1  I'd say we took it to the field, it was probably around
2  5:00 that evening. It was a beautiful day, you know,
3  October, like, fall day. Pull in the field, you know,
4  put it into harvest mode, go around just -- you know,
5  I'm nervous because this is the first time I'm going to
6  be with our own machine, because I've ran these before,
7  like I said, with my -- a neighbor. And I even did the
8  fire procedure. I showed -- he showed me how to do it
9  in the field about a week prior. They were already
10 harvesting before we were.
11        When I took it to the field that day on the
12 23rd, I pulled in. We have turnrows, and I pulled it
13 in, you know, checked everything, put it in harvest
14 mode, and took off. And, of course, you know, in the
15 back of your mind you're -- all the training, all
16 everything you had, like, the fire is still the biggest,
17 like, threat or, you know, the biggest deal you're
18 watching for.
19        And so I was, like, "You know what? I'm
20 going to do the fire procedure," so I did it twice. I
21 harvested. And you've got to get the bale up to, I
22 believe it was, a minimum of like -- like 18 inches
23 diameter because inside the screen it's showing you the
24 inches, how big the bale is in the actual RMB unit. And
25 it got up big enough and I stopped, did the fire



Page 53

1  procedure, kicked it out, which is moving -- getting the
2  bale wrapped and moving it to the handler and letting it
3  on the ground.
4          I did it again just to make sure everything
5  was -- you know, I knew how to get the bale out of the
6  machine.  And our hand, the reason he was there is he
7  brought our water trailer because we were trying to be
8  prepared as much as we could.  And the reasoning we
9  brought the water trailer out is that training in
10 Lorenzo, Joe Hurst says, like, "Have a water trailer in
11 the field because when you dial 911 it's going to be
12 45 minutes before the fire department can get there and
13 find you in a remote location and, you know, the damage
14 is going to be done," and that they didn't have any
15 other machines available, so that was in our head.  But
16 after that, did the fire procedure.
17     Q.  Can I stop you right there?  When you say "the
18 fire procedure" --
19     A.  Yeah.
20     Q.  -- for the folks on the jury, whatever, who
21 don't know what the fire procedure is, what is the fire
22 procedure?
23     A.  Okay.  At that time -- it's pretty complicated,
24 I mean, but what you have to do, and now knowing how it
25 is, like, when you're actually on fire, you know, you

Page 54

1  can sit there and say you're going to run out the door
2  in the case of a fire going.  When it actually happens,
3  your adrenaline is up and a lot of stuff can happen.
4          But we -- the fire procedure in this
5  machine is you -- you hold your -- your foot down.  It
6  looks like a dimmer switch in, like, an old pickup.  I
7  don't know if you've ever had a pickup that had the
8  dimmer switch.  You hold your foot down on it.  And what
9  this does is it sends the cotton from the accumulator
10 that's already come through the cleaner, so basically
11 you're trying to get all of the cotton out of the
12 machine.
13         So you're taking it all out of the
14 accumulator and the baler is sitting there running.
15 Then -- I mean, this has been two years ago, but then
16 you have to hold, press left on the -- to engage the
17 baler; then you've got to press and hold it to get the
18 RMB unit to actually kick the bale out after it's
19 wrapped.  So that is the fire procedure.  It's to get
20 the cotton out of the machine.
21     Q.  Okay.  You mentioned RMB unit.  That stands
22 for --
23     A.  Round bale module.
24     Q.  Okay.
25     A.  That's the actual big green portion of the

Page 55

1  machine on the back end that looks like a hay baler.
2     Q.  And we may have talked about this, but the
3  whole purpose of this machine is you take it to this
4  field of cotton, it strips the cotton, bales it --
5     A.  Yes.
6     Q.  -- in a round bale and spits it out the back;
7  right?
8     A.  Yes, all on the go.
9     Q.  All right.
10    A.  No stopping.
11    Q.  All right.  No stopping.  Unlike the previous
12 machines?
13    A.  Oh, yeah, where you'd stop, wait on the bow
14 buggy, dump it, and then go.
15    Q.  Okay.  And -- and part of what you're
16 explaining when you say "the fire procedure" is that
17 part of the thing you need to do is get the cotton out
18 of the machine --
19    A.  Yes.
20    Q.  -- in case there's a fire?
21    A.  Yes.
22    Q.  And that was the procedure that was prescribed
23 to get the fire -- cotton out of the machine as fast
24 as possible?
25    A.  Yes, exactly.

Page 56

1     Q.  Now, you were saying that -- now, we're going
2  back to the 23rd.
3     A.  Yeah.
4     Q.  You said you got on the machine.  I think you
5  said you started operating around 5:00?
6     A.  Yes, sir.
7     Q.  Okay.  And you ran through this fire procedure
8  a couple of times?
9     A.  Yes, I did.
10    Q.  Then tell us -- take us from there.
11    A.  Okay.  So then it's on a field down by my house
12 and it's long rows.  They're probably half-mile rows of
13 cotton, straight rows.  I take off and I kick out -- it
14 was either one -- you know, it -- so basically when
15 you're running this machine it has an auto mode, so it
16 knows -- it has a sensor in there, when the cotton gets
17 so far up in the accumulator, it automatically starts
18 the RMB baling mechanism because it's not running the
19 whole time.  So it bales until the accumulator is empty;
20 then it cuts off; you harvest.  The accumulator fills up
21 again, kicks on, up until the desired height of that
22 bale inside the machine.
23         And once it meets that designated height or
24 diameter, it senses -- it's a program; it's all auto --
25 it kicks and wraps the bale in that yellow wrap that I



Page 57

1 guess everybody has seen, or pink or blue, whatever
2 color, but it wraps the bale. Then it automatically
3 opens the RMB unit, the bale comes to the back, and the
4 whole time you're still harvesting so the accumulator is
5 still filling up.
6          The baler -- the RMB comes back down, and
7 you can hold that bale for as long as you want to on the
8 back, like, if you want to dump it on the end of the
9 turnrow which is at the end of the field. So you can
10 hold it up until the other one is ready to come out --
11      Q. Right.
12      A. -- so you've got to get rid of it. You can
13 hold it for a little bit of time, but all this is
14 dependent on how good of cotton you're in because of how
15 fast you can run. But -- so we did that. It did it
16 twice. But on the -- when I turned on the end, I
17 noticed there was smoke coming out of my baler, and
18 that's when I was, like, "Am I seeing this? Is it
19 dust?" You know, and being around cotton your whole
20 life, like, you know the smell of cotton. It has a real
21 distinct smell to it.
22      Q. You mean cotton on fire or just cotton?
23      A. No, cotton -- just cotton -- yes, cotton on
24 fire. It has a real distinct, like, the smell to it,
25 the smoke smell. So I turned the end on the field and I

Page 58

1 looked back there and I see the smoke and I'm, like,
2 "Oh, Lord."
3          So I stop, I pick up and move to the
4 field -- or the end of the -- out of the rows I was on,
5 move to the pass that I'd just harvested, and I
6 immediately looked -- you know, do the training, like I
7 looked to see which way the wind is blowing. And a lot
8 of that out there, I already knew which way the wind was
9 blowing because we have wind turbines and they --
10 they'll turn into the wind. Well, anyway, did the fire
11 procedure, got the bale ejected, and at this time it was
12 still -- it was still smoking, no flame.
13      Q. And where was the smoke coming from?
14      A. From the baler.
15      Q. Okay.
16      A. Yes, sir. Yeah. Right on the seam of the RMB
17 unit on the right side, or -- yeah, that would be the
18 passenger side, I guess, if you're sitting in the cab.
19 And that's when, you know, I ejected it and went back.
20 And then I put the bale on the ground and I drove up to
21 our water trailer that was in the field, and our hand
22 was sitting on the turnrow. And I just told him, I was,
23 like, "Man, just" -- I was wanting him to ride with me
24 because it did have a buddy seat in there, but I wanted
25 to get com -- you know, familiar with the machine.

Page 59

1          Well, we squirt it down and we put it into
2 transport mode and just looking for signs or what
3 possibly could have caused this. And there was one
4 little burnt spot on the big feeder belt. It's a big
5 green belt that runs through there. And, of course, we
6 were done for the day. I was, like, "Yeah, I'm not
7 running this again," but that's when I called, you know,
8 the guys from Hurst. And I was, like, "Look, I had
9 a fire," and they said, "We'll be out in the morning to
10 come inspect it." So that's kind of where the first day
11 was.
12      Q. Okay. Now, I know as we go --
13      A. Well, and also, by this time, well, 30 minutes
14 or so, I looked back and the bale was just in flames.
15      Q. So the bale you had ejected actually caught
16 fire?
17      A. Yes.
18      Q. I know we're talking about fires and you're
19 familiar with fires from your history with working --
20 doing cotton farming. I assume you're not a cause and
21 origin fire expert?
22      A. Oh, no, sir.
23      Q. Okay. But we're going to try to get your
24 observations of what you saw --
25      A. Yeah. Yeah.

Page 60

1      Q. -- as much as you can -- as you can give us,
2 okay?
3      A. Okay.
4      Q. So you've said what could have caused this.
5 You didn't determine what the cause was for that first
6 fire. You said you noticed a burned spot.
7      A. No, but that -- yeah, because, you know, you'll
8 notice, like, the -- yeah, just physical observation
9 looking through it. And then -- yeah, and that's when
10 we called the Deere mechanic to come out and, like,
11 "Maybe there's something we're missing. Like, he can
12 come and look through it."
13      Q. Okay. You called Hurst, and they sent somebody
14 out the next morning on the 24th?
15      A. Yes, sir.
16      Q. Okay.
17      A. Yep.
18      Q. Do you remember who it was that came out?
19      A. Yeah, it was Cade and the mechanic.
20      Q. Okay. And did they look over the machine?
21      A. He did. And he -- they looked over the belts,
22 the bearings, the -- everything, and they could not find
23 anything wrong with it. They did see the little burnt
24 spot on the belt, on the feeder belt. But he's, like,
25 "Man, it's not enough to replace it." He said, "You



Page 61

1  dodged a bullet, basically," and that was his own words.
2        And his boss -- Dad had, in the meanwhile
3  that morning, went up to Hurst Farm -- because I will
4  say, backing up to the first fire, and I failed to say
5  this, but after it was up -- we squirted it down with
6  water because we didn't know if it was still a hot spot
7  in there, and I exhausted the fire extinguisher on board
8  the machine.
9        So Dad, that next morning, went to Hurst,
10  got the fire extinguisher recharged, or traded it in,
11  rather, and then bought some additional brushes and just
12  stuff that we were just trying to -- things that we've
13  known, like, our other stripper -- like, a fire brush,
14  that it doesn't come standard on the machine, but it's
15  where if it does start in the lint cleaner it will kick
16  it and throw it out the burr pile out the side of the
17  machine, which is when it separates the lint from the
18  burr.
19     Q.  Okay.
20     A.  So we put that on and he cleared us to run.  He
21  was, like, "Y'all are -- y'all are good to go," like --
22     Q.  "He" being?
23     A.  Cade, the mechanic.
24     Q.  He looked it over, saw nothing mechanic --
25     A.  Yeah, and he was on the phone with his boss,

Page 62

1  which was Brad, the guy that was out the day before.
2  And Dad was talking to Brad about, you know, what had
3  happened.  Brad never come to the field, but he gave him
4  an infrared gun, you know, one you can aim and get
5  temperatures on.
6        And what Brad suggested was, "When
7  you -- before you start harvesting, like, kick it on,
8  kick the header on and just shoot that thing on the
9  bearings and just see if they're getting hot, you know,
10  or if they're going out."  And so we did that and -- you
11  know, and Dad, I don't know, you know, they -- he's
12  like, "Man" -- he's, like -- he kept saying, "Something
13  doesn't -- doesn't sound right," but he said, "Cody, I'm
14  not used to this machine.  I don't know what this thing
15  is supposed to sound like on the header."  And so we
16  really thought, you know, that would be my first thought
17  just from my years of doing that is it would either have
18  to be in the header or the cleaner.  Because if that
19  would have happened, the fire would have originated from
20  the accumulator, which is essentially the basket on a
21  basket stripper, but the baler is taking it one step
22  further.  But that's where --
23     Q.  So let me back up a little bit.  So they -- the
24  tech from the dealership came out; they turned it on;
25  you looked -- you used a gun to see if there were any

Page 63

1  hot spots, and nothing showed up --
2     A.  Nothing --
3     Q.  -- as you were operating the header?
4     A.  Yes, sir.  Yep.
5     Q.  Okay.  And that indicated at least that --
6     A.  Like, there was nothing at the -- like the
7  header could have -- that's just eliminating the
8  possibility of a bearing getting above the normal
9  operating temperature, which --
10     Q.  Okay.  Again, there are various possible causes
11  for a fire on one of these in the field.  You've already
12  talked about some of them.
13     A.  Oh, yes.
14     Q.  And one of the things that you-all tried to do
15  is eliminate a bearing or something like that?
16     A.  Yes.  And then the next thing was, Dad was
17  like, "Where -- what part of the field" -- like, we were
18  in a field -- now, I'll be perfectly honest.  We have
19  fields that have rocks in them; they're, like, you know,
20  hard rocks, but this field is a great blackland farm.
21  We looked, spun the header -- I mean, excuse me, the
22  cleaner, which is saws -- it's got teeth all in it.  You
23  know, one of those could have come loose.  We were
24  looking, and there's -- it's in pristine condition.
25  No -- and if a rock does get in there it will bend those

Page 64

1  things, you know, when it -- because it's spinning so
2  fast.  There was no signs of a rock going through that
3  machine.
4     Q.  Okay.  Did the tech look at that part of the
5  machine?
6     A.  The cleaner?
7     Q.  Yeah.
8     A.  That was the first thing he looked at.
9     Q.  Did he see anything amiss?
10     A.  No.  No, he didn't.
11        MR. TAYLOR:  Objection, form.
12        MR. BLACKERBY:  I'll fix it with a -- what
13  was wrong?
14        MR. TAYLOR:  You asked him what he saw.
15        MR. BLACKERBY:  Okay.
16     Q.  (BY MR. BLACKERBY)  When you talked to the tech
17  from Hurst Farm Supply, did he mention seeing anything
18  about -- anything wrong with the cleaner?
19     A.  No, I mean, he spun it.  I mean, it's got belts
20  and I helped him.  I mean, we spun that thing and looked
21  at not only the initial saw, the bottom saw, like, no --
22  no visible signs.
23     Q.  Okay.  These saws, you talked about these
24  sawtooth blades that are on there?
25     A.  Yes, they're --



Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                    FORT WORTH DIVISION
3   NATIONWIDE AGRIBUSINESS    §
    INSURANCE COMPANY, as      §
4   subrogee of CWH FARMS,     §
                               §
5          Plaintiffs          §    CIVIL ACTION NO:
                               §    4:19-CV-00425-0
6   VS.                        §
                               §
7   DEERE & COMPANY,           §
                               §
8          Defendant           §
9   _____
10              ORAL DEPOSITION OF
                   JEFF RATHEAL
11                 Volume 1 of 1
                   July 28, 2020
12              (Reported Remotely)
    _____
13
14         ORAL DEPOSITION OF JEFF RATHEAL, produced as
15  a witness at the instance of the PLAINTIFFS, and duly
16  sworn, was taken in the above-styled and numbered cause
17  on July 28, 2020 from 10:08 a.m. to 11:42 a.m. before
18  Katrina L. Gentry, CSR No. 2630 in and for the State of
19  Texas, reported by Stenographic method.  The witness is
20  located at 507 E. Coliseum Dr., Snyder, Texas 79549,
21  pursuant to the Federal Rules of Civil Procedure, Notice
22  and the First Emergency Order Regarding the COVOD-19
23  State of Disaster, and the provisions stated on the
24  record or attached hereto.
25
```

Page 3

```
1                   INDEX TO PROCEEDINGS
2                                                    PAGE
3   Appearances.....................................  2
4   JEFF RATHEAL
5         Examination by Mr. Taylor.............. 5
          Examination by Mr. Zinnecker...........54
6         Further Examination by Mr. Taylor......65
          Further Examination by Mr. Zinnecker...66
7         Further Examination by Mr. Taylor......67
          Further Examination by Mr. Zinnecker...70
8
    Corrections/Signature Pages.....................73
9
    Reporter's Certificate..........................75
10
11  ********************************************************
                    EXHIBIT INDEX
12
    EXHIBIT NO.    DESCRIPTION                    PAGE
13
    Exhibit 54     Work Order Preview             58
14
15                     -o0o-
16
```

Page 2

```
1          A P P E A R A N C E S
2
3   COUNSEL FOR THE PLAINTIFF:
4       DAVID J. TAYLOR - via Zoom
        Yost & Baill, LLP
5       2020 U.S. Bank Plaza South
        220 South Sixth Street
6       Minneapolis, Minnesota 55402
        Phone:  612.338.6000
7       Email:  Dtaylor@yostbaill.com
8   COUNSEL FOR HURST FARM SUPPLY:
9       WILLIAM H. BOYLES - via Zoom
        Craig, Terrill, Hale & Grantham
10      State Bar No. 02798000
        8422 Garland Road
11      Dallas, Texas 75218
        Email: Willb@cthglawfirm.com
12
13  COUNSEL FOR THE DEFENDANT, DEERE & CO:
14      BENJAMIN T. ZINNECKER - via Zoom
        State Bar No. 24066504
15      Email:  Bzinnecker@germer-austin.com
                    AND
16      CHRIS A. BLACKERBY - via Zoom
        State Bar No. 00787091
17      Email: Cblackerby@germer-austin.com
        Germer Beaman & Brown, PLLC
18      301 Congress Avenue, Suite 1700
        Austin, Texas 78701
19      Phone:  512.472.0288
20
21
22
23
24
25
```

Page 4

```
1          P R O C E E D I N G S
2          COURT REPORTER:  We are on the record.
3   Today's date is July 28th, 2020.  The time is 10:08 a.m.
4   This is the deposition of JEFF RATHEAL, and it is being
5   conducted remotely in accordance with the Seventeenth
6   Emergency Order regarding the COVID-19 State of
7   Disaster, Sections 3(c) and (d).  The witness is located
8   at 507 E. Coliseum Drive, Snyder, Texas 79549.
9          My name is Katrina Gentry.  My certification
10  number is 2630.  I am administering the oath and
11  reporting the deposition remotely by stenographic means
12  from my home office in Corpus Christi.  I am
13  representing Hill & Romero, 7000 N. 10th Street, Suite
14  C-2B, McAllen, Texas 78504.
15         The witness has been identified to me
16  through attestation of counsel.
17         Is that correct, Counsel?
18         MR. ZINNECKER:  Yes, that's correct.
19         COURT REPORTER:  Okay, thank you.
20         Would counsel please state their
21  appearances and locations for the record.
22         MR. TAYLOR:  David Taylor on behalf of the
23  Plaintiffs broadcasting from Minneapolis, Minnesota.
24         MR. ZINNECKER:  Ben Zinnecker for Deere &
25  Company in Snyder, Texas in the same room as the
```



ESQUIRE
DEPOSITION SOLUTIONS

Exhibit
D

0030

Page 9

1    Q. (By Mr. Taylor) So the reason I even say that
2  is because Hurst Farm Supply and your involvement in
3  here in this case is not readily apparent, so if I need
4  to try to explain some reasons -- I don't want to -- I
5  don't want to fumble over my words in terms of trying to
6  make sure we've got the record straight here.
7        So the subject cotton stripper in this case
8  you understand was purchased from Hurst Farm Supply,
9  correct?
10   A. That is correct.
11   Q. And the cotton stripper that we're talking
12  about that is the subject of this case that started on
13  fire was purchased by CWH Farms.
14   A. Yes, sir.
15   Q. Had you or do you have prior business dealings
16  with CWH Farms prior to the purchase of the subject
17  cotton stripper?
18   A. Yes, sir.
19   Q. Was it primarily with Cody Hughes or with
20  Cody Hughes' dad?
21   A. Both.
22   Q. How long, as far as you know, has Hurst Farm
23  Supply been doing business with CWH Farms?
24   A. Ten or 15 years.
25   Q. A very typical customer coming in buying either

Page 10

1  equipment, trading in equipment, that type of stuff?
2    A. Yes, sir.
3    Q. And then does Hurst Farm Supply do a lot of the
4  maintenance work or the work on the CWH Farms
5  implements?
6    A. Yes, sir.
7    Q. Were you involved in the actual sale of the
8  CWH cotton stripper?
9    A. Yes, sir.
10   Q. Just to be sure I'm clear, when I say "CWH
11  cotton stripper" we're talking about the cotton stripper
12  that's subject of this lawsuit.
13   A. Yes, sir.
14   Q. Okay. Tell me about your involvement in the
15  sale of that cotton stripper.
16   A. I sold the cotton stripper to CWH Farms.
17   Q. Okay. Do you recall when that was?
18   A. 2017.
19   Q. Tell me about the process of selling the
20  stripper to CWH Farms in 2017.
21   A. I just -- we talked about buying one, he talked
22  about buying one, and I sold him one, we ordered it from
23  John Deere Finance -- John Deere, and got it in, and
24  then we set it up and we delivered it.
25   Q. Is that a fairly typical process you follow for

Page 11

1  selling new equipment, new John Deere equipment?
2    A. Yes, sir.
3    Q. Stuff like this like a cotton stripper, large
4  combine is generally ordered and then it's delivered to
5  you guys, you set it up and then deliver it to the
6  customer?
7    A. Yes, sir.
8    Q. When -- at what point do you present or do you
9  provide the purchase paperwork, that type of stuff, to
10  the customer, in this case CWH Farms?
11   A. We sign our purchase order before the machine
12  is ordered, and then we do the paperwork when the
13  machine gets here.
14   Q. Okay. At the time the machine gets here when
15  it gets delivered is it at that time that you present
16  the customer with the warranty, the John Deere warranty?
17   A. Yes, sir.
18   Q. Do you know what the terms of the typical
19  John Deere agricultural equipment warranty are, given
20  your experience as a John Deere dealer?
21   A. Yes, sir.
22   Q. What is your understanding of what John Deere
23  covers in regards to its agricultural equipment
24  warranty?
25      MR. ZINNECKER:  Form.

Page 12

1    A. The defects, or something like that.
2    Q. (By Mr. Taylor) In your course of working at
3  Hurst Farm Supply have you ever had to replace any new
4  John Deere agricultural equipment pursuant to a
5  warranty?
6    A. No, sir.
7    Q. Have you in your time with Hurst Farm Supply
8  ever had to repair a John Deere piece of agricultural
9  equipment that's under warranty?
10   A. Yes, sir.
11   Q. Tell me how you go about that process, how you
12  learn about the problem, how you go about repairing it,
13  and how you communicate with Deere.
14   A. Customer calls in with some kind of problem
15  with their piece of equipment, and then we either -- the
16  machine comes to our store for repair, or we do a
17  service call in the country and our technicians diagnose
18  the problem. According to what that problem is they
19  follow what that process is to fix it and do the
20  repairs.
21      They may require us to -- that may require
22  us to be in contact with John Deere to help us figure
23  out what's wrong, and then do those repairs.
24   Q. Who pays for those repairs typically?
25   A. If it's a warranty item situation John Deere



Page 33

1    A.  That is correct.

2    Q.  Okay.  So they open those up and they look

3 inside.

4    A.  Yes.

5    Q.  And then do they put them back on and run the

6 machine, or do they run the machine with the covers

7 off?

8    A.  They put them back on and ran the machine.

9    Q.  Okay.  As far as you know is that the extent

10 of the inspection that Mr. Owens did of the sawtooth

11 drums?

12    A.  Yes.

13    Q.  And we had confirmed earlier that he didn't

14 take pieces of equipment off of the subject stripper in

15 the course of at least the 24th -- or the 23rd

16 inspection, correct?

17    A.  I was not there, so I'm not sure what all that

18 inspection was.

19    Q.  He didn't tell you, "Yeah, I removed the

20 header, I looked inside here, I removed this, I removed

21 that."  That was not part of the discussion nor part of

22 your testimony?

23    A.  No, sir.

24    Q.  Correct?

25    A.  That is correct.

Page 34

1    Q.  So Mr. Hughes (sic) comes back on the 24th of

2 October after the second fire, he does a similar

3 inspection as you understand it as to what he did on the

4 23rd?

5    A.  Similar, yes, sir.

6    Q.  And his results are the same, he doesn't know

7 what happened.

8    A.  That is correct.

9    Q.  He's consistent in not identifying any evidence

10 that he believes is indicative of foreign debris coming

11 into the machine, correct?

12    A.  Yes, sir.

13    Q.  Then at some point you come out to the field on

14 October 24th?

15    A.  That is correct.

16    Q.  Were there anybody -- was there anybody else

17 there from Hurst Farm besides you and Cade?

18    A.  I believe one other technician was there,

19 Brad Davis.

20    Q.  What did you and Brad and Cade do when you're

21 in the field?

22    A.  We just tried to help them get stuff cleaned

23 up.  We were trying to make it where we could get it on

24 a truck to repair it.

25    Q.  By the 24th of October, 2017 had Hurst Farm

Page 35

1 Supply notified John Deere corporate of these two fires?

2    A.  I believe we did, yes.

3    Q.  What was John Deere's response to the

4 October 23rd, 2017 fire?

5    A.  I don't remember that.

6    Q.  Do you recall any response?

7    A.  I don't.

8    Q.  John Deere didn't send out a technician or tell

9 you to contact D-Tag to figure out what might have

10 happened?

11    A.  Not that I'm aware of, no, sir.

12    Q.  The D-Tag system is a system that's utilized by

13 entities like Hurst Farm to troubleshoot certain

14 problems, correct?

15    A.  Yes, sir.

16    Q.  So without any reaction from John Deere on the

17 October 23rd fire, you have another fire on

18 October 24th, 2017; what is John Deere's reaction to

19 that fire?

20         MR. ZINNECKER:  Form.

21    A.  I'm not aware of the reaction.

22    Q.  (By Mr. Taylor) Is it fair to say they didn't

23 do anything?

24    A.  I don't know that, sir.

25    Q.  Well, fair to say you are not aware of them

Page 36

1 doing anything.

2    A.  That is correct.

3    Q.  You, as the local John Deere dealership that

4 sold the machine that was in communication with

5 John Deere corporate, are not aware of John Deere doing

6 anything in response to the October 23rd, 2017 fire nor

7 the October 24, 2017 fire, correct?

8         MR. ZINNECKER:  Form.

9    A.  To my knowledge, no.

10    Q.  (By Mr. Taylor) So you were in the field on

11 October 24th, 2017 trying to help your customer,

12 Cody Hughes, and try to figure out the best of a bad

13 situation, right?

14    A.  That is correct.

15    Q.  What did you do in terms of trying to make the

16 best of that bad situation?  You put it in transport

17 mode, you were thinking about trying to get it out of

18 the field to go for repair?

19    A.  Yes, sir.

20    Q.  Did you separate the header from the machine?

21    A.  No, sir.

22    Q.  Was the header separated from the machine when

23 you got there?

24    A.  No, sir.

25    Q.  Who separated the header?  Who took the header



Page 37

1  off the machine?

2      A. I don't remember that.

3      Q. Okay.  You do understand at some point it was

4  taken off the stripper though, right?

5      A. Yes, sir, yes.  I don't know who did that.

6      Q. Yes, sir.

7          Did you look at the header on October 24th,

8  2017?

9      A. I did not inspect it.  I did look at it, yes,

10  but I did not inspect it.

11     Q. Okay.  Did you see -- well -- well, ultimately

12  the header is purchased by Hurst Farm, right?

13     A. Yes, sir.

14     Q. Do you know how long after the October 24th

15  fire that it was purchased?

16     A. I don't have that right in front of me, but I

17  can find out.

18     Q. A couple months, though, like early in December

19  I think it likely was?

20     A. Yes, sir.

21     Q. Okay.  Prior to making that purchase did  Hurst

22  Farm Supply inspect the header?

23     A. Yes, sir.

24     Q. I mean, you didn't go buy it sight unseen,

25  right?

Page 38

1      A. Yes.

2      Q. Did Hurst Farm Supply believe that there was

3  anything wrong or defective with the header when it

4  purchased it?

5      A. No, sir.

6      Q. Did you believe that there were any bearings

7  that were failing?

8      A. No, sir.

9      Q. Did you see -- prior to the purchase of the

10  CWH header, did you see any evidence of that header

11  having rebar ingested into it?

12     A. No, sir.

13     Q. Any evidence of rocks being passed through it?

14     A. No, sir.

15     Q. Ultimately Hurst Farm Supply sold that header

16  to another customer, correct?

17     A. Yes, sir.

18     Q. And did so without ever having to make any

19  repairs to it.

20     A. That is correct.

21     Q. You, as -- at the time of the purchasing the

22  header in December of 2017 did not believe there was a

23  problem with it as a result of the fire, correct?

24     A. Yes, sir.

25     Q. Also at the time of purchasing the header in

Page 39

1  December of 2017, you did not believe that that header

2  was the cause of the two CWH fires, correct?

3      A. Yes, sir.

4      Q. In and around the time of the fire, whether

5  it's October all the way through December 2017 or even

6  early part of '18, did Hurst Farm Supply ever do

7  anything to determine what the cost of repair was for

8  the machine or would be for the machine?

9      A. Yes.

10     Q. Describe for me the process that was followed

11  at that time.

12     A. We had a technician look at the machine to see

13  what it would take to repair it.

14     Q. And put together like an invoice, that kind of

15  thing?

16     A. Put together a quote.

17     Q. Do you recall as you sit here today, sir, what

18  that rough number was, cost of repair to the CWH

19  machine?

20     A. In the neighborhood of 300,000.

21     Q. What -- do you recall generally what the

22  machine had been purchased for?

23     A. I'm sorry, I don't understand your question.

24     Q. The machine -- well, the CWH machine was,

25  according to the inspection, was in a condition where it

Page 40

1  needed about $300,000 worth of repair on or about

2  October 24th, 2017, right?

3      A. Yes, sir.

4      Q. Do you know what that machine was purchased

5  for, what CWH paid for that machine prior to that

6  roughly?

7      A. Yes, sir.

8      Q. And what is that rough number?

9      A. $650,000.

10     Q. So somewhere 40 to -- 40 to 50 percent of the

11  cost of the machine was going to need to be reinvested

12  into the stripper to execute the repairs based on you

13  guys' review post fire?

14     A. Yes, sir.

15     Q. If Hurst Farm Supply were to perform that, say,

16  $300,000 or so of repairs, would Mr. Hughes have a

17  warranted machine --

18     A. Yes, sir.

19     Q. -- with John Deere?

20     A. Sorry, ask that again.

21     Q. Would that be a warranted machine pursuant to

22  the terms of John Deere as you understand it?

23     A. Yes, sir.

24     Q. So all of the repairs that you proposed making,

25  this 300, whether it's 325, maybe 350, whatever that



**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                   FORT WORTH DIVISION

3    NATIONWIDE AGRIBUSINESS   §
     INSURANCE COMPANY, as     §
4    subrogee of CWH FARMS,    §
                               §
5         Plaintiffs           §    CIVIL ACTION NO:
                               §    4:19-CV-00425-O
6    VS.                       §
                               §
7    DEERE & COMPANY,          §
                               §
8         Defendant            §

9    _____

10             ORAL DEPOSITION OF
                   CADE OWEN
11               Volume 1 of 1
                 July 28, 2020
12             (Reported Remotely)

13   _____

14             ORAL DEPOSITION OF CADE OWEN, produced as a
15   witness at the instance of the PLAINTIFFS, and duly
16   sworn, was taken in the above-styled and numbered cause
17   on July 28, 2020 from 11:56 a.m. to 1:23 p.m. before
18   Katrina L. Gentry, CSR No. 2630 in and for the State of
19   Texas, reported by Stenographic method.  The witness is
20   located at 507 E. Coliseum Dr., Snyder, Texas 79549,
21   pursuant to the Federal Rules of Civil Procedure, Notice
22   and the First Emergency Order Regarding the COVOD-19
23   State of Disaster, and the provisions stated on the
24   record or attached hereto.
25
```

**Page 2**

```
1              A P P E A R A N C E S
2
3    COUNSEL FOR THE PLAINTIFF:
4         DAVID J. TAYLOR - via Zoom
          Yost & Baill, LLP
5         2020 U.S. Bank Plaza South
          220 South Sixth Street
6         Minneapolis, Minnesota 55402
          Phone:  612.338.6000
7         Email:  Dtaylor@yostbaill.com
8    COUNSEL FOR HURST FARM SUPPLY:
9         WILLIAM H. BOYLES - via Zoom
          Craig, Terrill, Hale & Grantham
10        State Bar No. 02798000
          8422 Garland Road
11        Dallas, Texas 75218
          Email: Willb@cthglawfirm.com
12
13   COUNSEL FOR THE DEFENDANT, DEERE & CO:
14        BENJAMIN T. ZINNECKER - via Zoom
          State Bar No. 24066504
15        Email:  Bzinnecker@germer-austin.com
               AND
16        CHRIS A. BLACKERBY - via Zoom
          State Bar No. 00787091
17        Email:  Cblackerby@germer-austin.com
          Germer Beaman & Brown, PLLC
18        301 Congress Avenue, Suite 1700
          Austin, Texas 78701
19        Phone:  512.472.0288
20
21
22
23
24
25
```

**Page 3**

```
1                  INDEX TO PROCEEDINGS

2                                            PAGE

3    Appearances...................................  2

4    CADE OWEN

5         Examination by Mr. Taylor.............. 4
          Examination by Mr. Zinnecker..........27
6         Further Examination by Mr. Taylor......41
          Further Examination by Mr. Zinnecker...65
7         Further Examination by Mr. Taylor......68
8    Corrections/Signature Pages....................74
9    Reporter's Certificate.........................76
10   **********************************************************

11                   EXHIBIT INDEX
12   EXHIBIT NO.   DESCRIPTION              PAGE
13           ****NO EXHIBITS MARKED****
14
15
                      -o0o-
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1              P R O C E E D I N G S
2         COURT REPORTER:  We are on the record.
3    Today's date is July 28th, 2020.  The time is 11:56 a.m.
4    This is the deposition of CADE OWEN, and it is being
5    conducted remotely in accordance with the Seventeenth
6    Emergency Order regarding the COVID-19 State of
7    Disaster, Sections 3(c) and (d).  The witness is located
8    at 507 E. Coliseum Drive, Snyder, Texas 79549.
9         My name is Katrina Gentry.  My certification
10   number is 2630.  I am administering the oath and
11   reporting the deposition remotely by stenographic means
12   from my home office in Corpus Christi.  I am
13   representing Hill & Romero, 7000 N. 10th Street, Suite
14   C-2B, McAllen, Texas 78504.
15        The witness has been identified to me
16   through attestation of counsel.
17        Is that correct, Counsel?
18        MR. ZINNECKER:  Yes, that's correct.
19        COURT REPORTER:  Okay, thank you.
20        Would counsel please state their
21   appearances and locations for the record.
22        MR. TAYLOR:  David Taylor on behalf of the
23   Plaintiffs in Minneapolis, Minnesota.
24        MR. ZINNECKER:  Ben Zinnecker for
25   Deere & Company in Snyder, Texas.
```


Exhibit E

0034

Page 5

1       MR. BOYLES:  Will Boyles for Hurst Farm
2 Supply in Snyder, Texas.
3       COURT REPORTER:  Thank you.
4       Would you please raise your right hand,
5 Mr. Owen, and take this oath.
6       CADE OWEN,
7 having been first duly sworn, testified as follows:
8       EXAMINATION
9 BY MR. TAYLOR:
10    Q.  Good afternoon, Mr. Owen.  We met just prior to
11 the start of this deposition.  My name is Dave Taylor,
12 and I represent the Plaintiffs in this case.  Have you
13 ever been deposed before?
14    A.  Excuse me?
15    Q.  Have you ever been deposed before?
16    A.  No, sir.
17    Q.  Okay.  Were you in the room when we went over
18 the general rules of thumb for Mr. Ratheal?
19    A.  No, sir.
20    Q.  Okay.  Well, just in a nutshell, sir, the
21 format here when people are being deposed it's really
22 the attempt or the intention is for us to have a
23 conversation where I ask you questions, you give me some
24 answers, and it happens in a normal course; however,
25 everything is being taken down here, as we just heard by

Page 6

1 the court reporter, and that is a difficult job to do
2 when one person is talking, and almost impossible to do
3 when two people are talking.  And in the normal course
4 of conversations people talk over each other all the
5 time.
6       So I'm going to need to improve my ability
7 to not interrupt you when you're giving me an answer,
8 I'm going to ask you to not give me the answer until I'm
9 done asking the question.  Does that sound fair?
10    A.  I understand.
11    Q.  Okay.  And the other thing I tell people
12 generally is because everything is being taken down we
13 need to make sure that your answers are in actual words
14 as opposed to shakes of the head, nods of the head.
15 This is not being videoed, so words work best, fair?
16    A.  Yes, sir.
17    Q.  The last thing I tell people, and this is a
18 quirk of mine probably, in that I will routinely confuse
19 things between my head and my mouth, and it will come
20 out confusing.  What I'm mostly interested about or
21 interested in is making sure I'm understanding the
22 information you're giving me.
23       So if I ask you something that you don't
24 understand, it's not an attempt to trick you or anything
25 like that, it's just I don't know what I'm saying.  Just

Page 7

1 tell me to say it again or do something different and
2 we'll figure it out, okay?
3    A.  Yes, sir.
4    Q.  So, Mr. Owens (sic), we did hear a little bit
5 about you and your possible involvement in the -- in
6 this case in the earlier deposition, so I don't want to
7 go over a ton of old ground, but can you tell me were
8 you involved at all in the sale of the what we call "the
9 Hughes stripper"?
10    A.  No, sir.
11    Q.  Nothing that you could add in terms of personal
12 knowledge as to how it was bought, what was talked
13 about, anything like that?
14    A.  No, sir.
15    Q.  Okay.  Do you know Cody Hughes?
16    A.  I do, yes, sir.
17    Q.  Did you know him before they bought this
18 stripper?
19    A.  No, sir.
20    Q.  Okay.  Fair to say you know Cody by way of your
21 employment at Hurst?
22    A.  That's true, yes, sir.
23    Q.  How long have you been working at Hurst?
24    A.  Four years.
25    Q.  Four years.

Page 8

1       And tell me generically what you do there.
2    A.  I'm a field technician.  I work on all
3 John Deere equipment out in the field.
4    Q.  Customers call in, they've got a problem,
5 because a lot of this equipment is hard to move they
6 send people out as opposed to always requiring people to
7 bring in their car, that kind of thing, right?
8    A.  Yes, sir.
9    Q.  So do you go around in a truck from spot to
10 spot, or do you usually report in at Hurst and they give
11 you a list of places you've got to go that day?  How
12 does that work?
13    A.  Yes, sir, come in in the morning, get my
14 service calls, go about my day.
15    Q.  Okay.  On October 23rd of 2017 you were out
16 doing your service calls, right?
17    A.  Yes, sir.
18    Q.  And at some point during that day you learned
19 that there was a fire on the Hurst stripper, correct?
20    A.  Yes, sir.
21    Q.  Did you have any contact with Cody Hughes or
22 CWH Farms or the Hughes stripper prior to that
23 October 23rd, 2017 call?
24    A.  Yes, sir.
25    Q.  I couldn't remember if you were the guy that



Page 9

1 went and did the training and kind of fine tuning of the
2 machine once it was delivered or not, but tell me about
3 your involvement prior to October 23rd of 2017.
4     A.  Performed a walk-through training evaluation
5 with the customer and installed a rear back-up camera.
6     Q.  Okay.  Anything else?
7     A.  No, sir.
8     Q.  Did that training happen in the field where the
9 fire happened on October 23rd?
10    A.  No, sir.
11    Q.  Where did that training happen?
12    A.  At the customer's barn.
13    Q.  Okay.  Was the training specific to a CS690, or
14 was it general field operations, that kind of stuff?
15    A.  CS690 only.
16    Q.  Okay.  Do you recall when that was done?
17    A.  No, sir.
18    Q.  So you had that interaction in terms of the
19 walk around and the initial training of the CS690, and
20 then what is the next interaction you had with anybody
21 from CWH Farms or involvement with the Hughes stripper?
22    A.  A few days later on the first initial fire.
23    Q.  Okay.  So that would have been on October 23rd,
24 2017, that's when you were out doing your normal duties
25 and you get the call about a fire at the Hughes -- or on

Page 10

1 the Hughes stripper.  Describe for me what you do.
2     A.  Excuse me, can you repeat that, please?
3     Q.  Sure.  Describe for me what you do.  You get
4 that call, what is the next step?  What do you do?
5     A.  Get to the customer's equipment in the field
6 and go over with the customer exactly what happened, and
7 inspect the machine.
8     Q.  Okay.  And the customer that you met in the
9 field was Cody Hughes?
10    A.  That is correct, yes, sir.
11    Q.  And he described he had had a fire on his new
12 CS690.
13    A.  Yes, sir.
14    Q.  Did he tell you that there were only 2.7 hours
15 of fan use on it?
16    A.  Yes, sir.
17    Q.  Did that strike you as -- I mean, was that a
18 significant thing to you, or did that not mean anything
19 to you?
20    A.  No, sir, it didn't mean anything.
21    Q.  Okay.  Except you knew this was virtually brand
22 new.
23    A.  Yes, sir.
24    Q.  So tell me what you guys talked about.
25    A.  Customer contacted me, he had smelled smoke, I

Page 11

1 did not visualize any fire.  Performed a walk-through
2 and run-out test on this machine from front to back,
3 header, cleaner, accumulator, R and B, and the injection
4 system, you know, when it ejects the bail out, a full
5 run of the machine with the customer; did not find any
6 damage.
7     Q.  Okay.  Did Mr. Hughes describe to you that he
8 saw flames?
9     A.  No, sir.
10    Q.  Okay.  He said that he smelled smoke and saw
11 some smoke, right?
12    A.  Correct.
13    Q.  When you looked at the header of this machine
14 on October 23rd, 2017 did you see any evidence of rocks
15 being ingested in it?
16    A.  Not to my knowledge, no, sir.
17    Q.  Okay.  When you looked at the header on
18 October 2017 -- October 23rd of 2017 did you see any
19 evidence that led you to believe that rebar had been
20 ingested into the machine?
21    A.  Can you repeat that one more time?
22    A.  Sure.  On October 23rd of 2017 when you were
23 doing the inspection of the machine did you see anything
24 on the header that led you to believe that a piece of
25 rebar had been sucked through that machine?

Page 12

1     A.  No, sir.
2     Q.  Okay.  On October 23rd of 2017 when you were
3 doing an inspection on the header of the Hughes stripper
4 did you see any evidence on the header that indicated to
5 you that any foreign debris had been through that
6 machine?
7     A.  Not to my knowledge, no, sir.
8     Q.  Did you separate the header from the machine?
9     A.  No, sir.
10    Q.  Did you look at the feeder house of the
11 machine?
12    A.  Yes, sir.
13    Q.  Did you see anything there or any evidence to
14 indicate that there had been a piece of rebar sucked
15 through that portion of the machine?
16    A.  Nothing out of the ordinary, no, sir.
17    Q.  Did you see any chipped John Deere green paint
18 in the area of the machine?
19    A.  No, sir.
20    Q.  Did you inspect the rock shoot that is
21 immediately prior to the cleaning portion of the
22 machine?
23    A.  The best I could, yes, sir.
24    Q.  And when you looked at that portion of the
25 machine did you see any chipped John Deere paint on that



0036

Page 13

1  rock shoot?
2      A.  No, sir.
3      Q.  Did you see any physical evidence on that rock
4  shoot that a piece of foreign debris or rebar has been
5  deposited and may have been sucked through the machine?
6      A.  It is possible, but I didn't see any, no, sir.
7      Q.  I didn't ask if something was possible, I'm
8  asking about evidence.
9          And I wanted to find out if you saw
10 anything on that rock shoot that led you to believe that
11 a piece of rebar had been sucked through that machine.
12     A.  No, sir.
13         MR. ZINNECKER:  Form.
14     A.  No, sir.
15     Q.  (By Mr. Taylor) Then you looked at the cleaning
16 section of the machine, the cleaner, correct?
17     A.  Yes, sir.
18     Q.  And then the sawtooth drums?
19     A.  Yes, sir.
20     Q.  You opened up the shields?
21     A.  Yes, sir.
22     Q.  And you didn't see any evidence of rocks or
23 rebar or anything like that being sucked through that
24 area of the machine either.
25     A.  No, sir.

Page 14

1      Q.  You didn't remove any belts.
2      A.  No, sir.
3      Q.  And then you moved on.  You went through the
4  accumulator.
5      A.  That's correct, yes, sir.
6      Q.  And then you didn't see any signs in the
7  accumulator of any rocks or any rebar as has been
8  deposited was sucked into the machine, correct?
9      A.  No, sir.
10     Q.  Then you went to the R.B.U., the round bailing
11 unit in the back of the machine, correct?
12     A.  Yes, sir.
13     Q.  And that's where most of the fire damage was
14 for the second fire, correct?
15     A.  Correct.
16     Q.  And during your October 24th, 2017 inspection
17 of this machine after that fire after 2.7 hours worth of
18 use you didn't see any evidence of rocks or rebar being
19 ingested through the machine as indicated on the R.B.U.
20 either, right?
21         MR. ZINNECKER:  Form.
22     A.  No, sir.
23     Q.  (By Mr. Taylor) In fact, when you were there to
24 investigate the October 23rd fire on the machine you
25 didn't identify a single piece of evidence that

Page 15

1  indicated a piece of steel like a piece of rebar had
2  gotten into the machine in some unknown fashion, right?
3      A.  No, sir.
4      Q.  The same could be said in regards to evidence
5  of a rock being pushed through that machine, you didn't
6  identify a single piece of evidence through your
7  head-to-toe inspection, front-to-back inspection of that
8  entire machine in your October 23rd, 2017 inspection,
9  correct?
10     A.  No, sir.
11     Q.  Correct, you did not find -- that's a bad way
12 of asking that.
13     A.  Yes.
14     Q.  So you get done with your inspection of the
15 machine, did you also use a heat gun?
16     A.  No, sir.
17     Q.  Did you provide a heat gun to take temperatures
18 of bearings to CWH Farms?
19     A.  No, sir.
20     Q.  Okay.  Are you aware of whether or not
21 Hurst Farm did?
22     A.  No, sir.
23     Q.  Did you check the bearings on the header in any
24 fashion in your October 23rd, 2017 inspection?
25     A.  Yes, sir.

Page 16

1      Q.  Did you see bearings that were out?
2      A.  No, sir.
3      Q.  Did you see any bearings that had failed?
4      A.  No, sir.
5      Q.  Okay.  When you get done with your inspection
6  on the 23rd of October, 2017 what's the next thing you
7  do?
8      A.  Can you repeat that, please?
9      Q.  When you're done on October 23rd, after you've
10 done your head-to-toe inspection, you haven't found any
11 evidence of rocks or rebar or anything like that, when
12 you don't know what caused the fire what is the next
13 thing you do?
14     A.  Call my supervisor and move to the next job.
15     Q.  Fair enough.
16         The day goes by on the 23rd.  The 24th
17 starts and you're back in the truck, right?
18     A.  Correct.
19     Q.  And at some point on October 24th, 2017 you get
20 another call indicating that there was another fire on
21 the Hughes stripper.
22     A.  Correct.
23     Q.  Okay.  And so you go back over to Cody's field,
24 same field that you were there the day before, right?
25     A.  Correct.



Page 21

1  correct?

2       MR. ZINNECKER:  Form.

3    A.  Correct.

4    Q.  (By Mr. Taylor) Once you sized-up the scene on

5  October 24th, you've looked around, you noticed that the

6  back left tire is blown out, what's the next thing you

7  do?

8    A.  Call the supervisor to see how I proceed with

9  the job, the inspection.

10   Q.  Okay.  What did your supervisor tell you?

11   A.  Really for me there is nothing I could do,

12 so...

13   Q.  Did you look at the machine or inspect the

14 machine in any way on October 24th?

15       MR. BOYLES:  Dave, you cut out again.

16   Q.  (By Mr. Taylor) Okay, sorry.  On October 24th

17 did you perform a similar inspection on the machine that

18 you did on October 23rd?

19   A.  Due to the damage on the machine and the oil on

20 the platforms, no, sir.

21   Q.  Okay.  Did you look at the header on October

22 24th when you were in the field?

23   A.  Yes, sir.

24   Q.  You did.

25       Did you notice anything on the header that

Page 22

1  indicated to you that rocks had been ingested in through

2  the rows in the header?

3    A.  Other than normal wear on the machine, no, sir.

4    Q.  Did you see anything on the header that led you

5  to believe that a piece of rebar had been ingested or a

6  piece of scrap metal had been ingested through it?

7    A.  No, sir.

8    Q.  At some point the header is separated from the

9  machine, correct?

10   A.  Yes.

11   Q.  Do you know who did that?  Was that Cody or was

12 that somebody else?  Do you have any idea?

13   A.  Usually it's the customer.

14   Q.  Were you there when it was done?

15   A.  No, sir.

16   Q.  At some point once the header was removed from

17 the machine it was actually placed just immediately in

18 front of the machine in the field, right?

19   A.  Correct.

20   Q.  Is that where Hurst Farm looked at it when they

21 were looking at it as the potential item to purchase?

22   A.  I do not know.

23   Q.  Okay.  Were you involved in the purchase of the

24 header from the Hughes stripper?

25   A.  No, sir.

Page 23

1    Q.  Okay.  Did you understand or do you know now

2  that that -- that the header that was on the Hughes

3  stripper at the time of the 24 October fire, that that

4  header was sold to Hurst Farm?

5    A.  Yes, sir.

6    Q.  Okay.  Did you -- or at any point after

7  Hurst Farm purchased that header did you hear about any

8  problems or repairs that needed to be made on the

9  header?

10   A.  No, sir.

11   Q.  Okay.  When you were looking at the header on

12 October 24th, 2017 did you believe there was anything

13 defective about the header?

14   A.  No, sir.

15   Q.  You looked at the bearings again that day?

16   A.  Yes, sir.

17   Q.  You determined that the bearings were not -- or

18 that you did not see any bearings that had failed?

19   A.  No, sir.

20   Q.  You did not see any bearings that looked like

21 they were in the process of failing getting hot?

22   A.  No, sir.

23   Q.  In short, you couldn't see anything on the

24 header on October 24th, 2017 when you were looking at

25 it, which was for the second time, you couldn't see

Page 24

1  anything on that header that led you to believe that it

2  had anything to do with the fire, right?

3       MR. ZINNECKER:  Form.

4    A.  I honestly don't know, it was two years ago.

5    Q.  (By Mr. Taylor) But you don't know -- as you

6  sit here right now you don't know, but what we do know

7  is you didn't identify anything on the header at that

8  time as being something that might have caused the fire,

9  correct?

10       MR. ZINNECKER:  Form.

11   A.  Correct.

12   Q.  (By Mr. Taylor) You didn't go to Mr. Ratheal

13 and say, "Hey, I have a bearing out here on the third

14 row, that's most likely our culprit," right?

15   A.  Right.

16   Q.  It never happened because you never identified

17 any piece of evidence like that.

18       MR. ZINNECKER:  Form.

19   Q.  (By Mr. Taylor) Correct?

20   A.  That's correct.

21   Q.  Okay.  And ultimately Hurst buys the header,

22 and as far as you know they didn't have to do anything

23 to it to eventually sell it to another customer,

24 correct?

25   A.  To the best of my knowledge.



Page 25

1    Q.  And to the best of your knowledge you don't
2  think that there is anything wrong with that header that
3  was on the machine on the 23rd of October of 2017 or on
4  the machine on October 24th of 2017, anything wrong with
5  that header that led to this fire, right?
6        MR. ZINNECKER:  Form.
7    A.  Not to the best of my knowledge, no, sir.
8    Q.  (By Mr. Taylor) Right.  And you've looked at it
9  twice.
10   A.  Correct.
11   Q.  And you've got experience looking at some of
12  these machines specifically for bearings that go out,
13  right?
14   A.  That's correct.
15   Q.  And one of the things that a technician does
16  for John Deere when he's driving around in the truck is
17  he goes out and he repairs bearings.
18   A.  Yes, sir.
19   Q.  And so if there was a bearing that had gone out
20  or was on its way to going out on the header, that would
21  have been something that would have been right in your
22  alley to be able to identify, right?
23   A.  That's correct.
24   Q.  And you didn't identify it on October 23rd nor
25  on October 24th.

Page 26

1    A.  No, sir.
2    Q.  Now, I know that your profession is to fix farm
3  implements; do you have any training in regards to the
4  investigation of the cause and/or origin of fires?
5    A.  No, sir.
6    Q.  Okay.  I'll tell you what you might have done
7  in terms of, "Hey, we occasionally see spot fires on
8  farm machinery, and I go and I fix them," right?
9    A.  Correct.
10   Q.  You're not former fire department, never been
11  trained as a fire investigator.
12   A.  No, sir.
13   Q.  What you are able to say with some -- and I
14  would say with a reasonably good degree of expertise,
15  is, "I am able to go identify components on a piece of
16  farm machinery that might have failed or in the state of
17  failure."
18   A.  Sure.
19   Q.  And that's what your inspection does, that's
20  what they do is go out and look at these machines, try
21  to identify the problems, and then fix those problems.
22   A.  Correct.
23   Q.  And you looked at the Hughes stripper two
24  different times, you went over that cotton header two
25  different times checking the bearings, all within your

Page 27

1  area of expertise, and you didn't see any sign of
2  failure.
3    A.  That's correct.
4    Q.  And no sign of rebar ingestion.
5    A.  No, sir.
6    Q.  No sign of rock ingestion.
7    A.  No, sir.
8    Q.  And no sign of foreign debris ingestion in
9  either of your examinations of the header.
10   A.  No, sir.
11   Q.  Thank you, Mr. Owen, that's all I've got.
12      MR. ZINNECKER:  Give us a minute to switch
13  speakers and microphones.
14      Okay, can everybody hear me okay?
15      MR. TAYLOR:  Yes.
16        EXAMINATION
17  BY MR. ZINNECKER:
18   Q.  Mr. Owen, my name is Ben Zennicker, and I
19  represent Deere in this case; do you understand that?
20   A.  Yes, sir.
21   Q.  Now, you are not a cause of origin expert I
22  think as you talked about a little earlier; is that
23  correct?
24   A.  That's right.
25   Q.  But you're able to testify about what you saw,

Page 28

1  and based on your experience as a mechanic on
2  October 23rd and October 24th, 2017?
3    A.  That is correct.
4    Q.  And you have how many years of experience
5  repairing ag equipment and working on work orders for
6  repairs?
7    A.  Four years.
8    Q.  Okay.  Are you familiar with the idea that
9  fires are things that do happen on harvesting equipment?
10   A.  That is correct.
11   Q.  And a lot of times the crops that are harvested
12  are volatile; is that true?
13   A.  That's true.
14   Q.  Are there a number of possible causes of a fire
15  involving harvesting equipment?
16   A.  There is.
17   Q.  Does the fact that a fire happens mean there
18  was something wrong with the equipment?
19   A.  No, sir.
20   Q.  Does the fact that a fire happened after a
21  couple of hours of operation mean there is something
22  wrong with the equipment?
23      MR. TAYLOR:  Objection, form, foundation.
24   A.  No, sir.
25   Q.  (By Mr. Zinnecker) Do you know whether a fire



Page 29

1 can start in the header without it having a defect?
2        MR. TAYLOR:  Objection, form.
3    A.  Can you repeat that, please?
4    Q.  (By Mr. Zinnecker) Sure.  Have you ever seen
5 fires start in a header before?
6        MR. TAYLOR:  Objection.
7    A.  Yes.
8    Q.  (By Mr. Zinnecker) Have you ever seen fires
9 start in the header without there being a problem with
10 the bearings, for example?
11    A.  That is correct.
12    Q.  Can a fire start in the header without pointing
13 to a specific component and saying, "That's what caused
14 it?"
15    A.  That is correct.
16        MR. TAYLOR:  Objection, form, foundation.
17    Q.  (By Mr. Zinnecker) And have you actually been
18 personally involved in cases where the fire appeared to
19 start in the header but you didn't see anything wrong
20 with the header from a component perspective?
21        MR. TAYLOR:  Objection, form, foundation.
22    A.  That is correct.
23    Q.  (By Mr. Zinnecker) Okay.  Now, I want to talk
24 to you about the October 23rd, 2017 fire, okay?
25    A.  Yes, sir.

Page 30

1    Q.  Have you seen fire damage before on a piece of
2 John Deere equipment?
3    A.  Yes, sir.
4    Q.  Do you know -- and you're not a cause of origin
5 expert, but have you seen where a fire has happened on a
6 piece of ag equipment before?
7    A.  That is correct, yes, sir.
8    Q.  During that first fire did you see any evidence
9 of a fire happening in the header area?
10    A.  No, sir.
11    Q.  Okay.  And describe the process generally of
12 what you did to look at the header on October 23rd,
13 2017; what did you do?
14    A.  First thing pulled the box off the top of the
15 unit, remove the covers, look at the bearings and any
16 component that could cause friction of any sort,
17 metal-to-metal contact, and the actual run of the header
18 with the machine at 4 RPMs.
19    Q.  So you took the covers off the header rows; is
20 that right?
21    A.  That's right.
22    Q.  Did you see any evidence of thermal damage in
23 the area where the headers are installed on the machine
24 or anything like that?
25    A.  No, sir.

Page 31

1    Q.  Okay.  Do you remember -- do you know what
2 hydraulic fluid looks like?
3    A.  Yes.
4    Q.  Is hydraulic fluid in place in the header, is
5 that part of the way the header works?
6        MR. TAYLOR:  Objection, form.
7        MR. ZINNECKER:  What's the basis?
8        MR. TAYLOR:  It's unintelligible to say
9 that hydraulic fluid is in place in the header.
10    Q.  (By Mr. Zinnecker) Okay, does hydraulic fluid
11 play a part in the operation of the header?
12    A.  Yes.
13    Q.  What is that?
14    A.  It controls all your hydraulic lift, your
15 hydraulics for your motor that turns your header, your
16 row units.
17    Q.  Did you see any evidence of hydraulic fluid in
18 the header area during your inspection for the first
19 fire?
20    A.  No, sir.
21    Q.  And you took the covers off the header rows,
22 did I hear you say that right?
23    A.  Yes.
24    Q.  You didn't see any evidence of fire or anything
25 else?

Page 32

1    A.  No.
2    Q.  Now, Mr. Hughes earlier in this case said that
3 the cleaner and the sawtooth blades were in pristine
4 condition; would you agree with that?
5        MR. TAYLOR:  Objection, form.
6    A.  Yes.
7    Q.  (By Mr. Zinnecker) Let me ask it this way, how
8 would you describe the condition of the cleaner after
9 the first fire?
10    A.  No thermal damage whatsoever, all screws in
11 place on sawtooth blades, bearings intact.
12    Q.  All right.  Describe in detail, please, your
13 inspection of the saw drum and the saw drum blades when
14 you went out for the October 23rd, 2017 fire.
15    A.  First thing is remove all covers off the
16 cleaner, machine is off, you turn the cleaner by hand
17 using a pry bar, and also inspection of the doffler's
18 rear cleaner.
19    Q.  Okay.  And did you turn the drum as well?
20    A.  Yes, sir.
21    Q.  Okay.  Did you -- are you confident that you
22 inspected every single saw drum blade and every single
23 bearing on that October 23rd, 2017 inspection?
24    A.  To the best of my knowledge, yes, sir.
25    Q.  Okay.  And what did you see?



Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF TEXAS
 3                  FORT WORTH DIVISION
 4
 5   NATIONWIDE AGRIBUSINESS       )
 6   INSURANCE COMPANY, as         )
 7   subrogee of CWH FARMS,        )
 8           Plaintiff,            ) Civil Action No.:
 9         vs.                     ) 4:19-CV-00425-O
10   DEERE & COMPANY,              )
11           Defendant.            )
12
13          The deposition of TRACE LANDERS, called
14   for examination, taken pursuant to the Federal
15   Rules of Civil Procedure of the United States
16   District Courts pertaining to the taking of
17   depositions, taken before KRISTIN C. BRAJKOVICH, a
18   Certified Shorthand Reporter, CSR. No. 84-3810, of
19   said state, via Zoom, on the 20th day of August,
20   A.D. 2020, at 9:11 a.m.
21
22
23
24
```

Page 2

```
 1   PRESENT:
 2        YOST & BAILL, LLP,
 3        (2050 U.S. Bank Plaza South,
 4        220 South Sixth Street
 5        Minneapolis, Minnesota 55402,
 6        1-612-338-6000), by:
 7        MR. DAVID J. TAYLOR,
 8        dtaylor@yostbaill.com,
 9             appeared viz Zoom on behalf of
10             Plaintiff;
11
12        GERMER BEAMAN & BROWN PLLC,
13        (301 Congress Avenue, Suite 1700,
14        Austin, Texas 78701,
15        1-512-472-0288), by:
16        MR. CHRIS A. BLACKERBY,
17        cblackerby@germer-austin.com,
18             appeared via Zoom on behalf of
19             Defendant.
20
21   ALSO PRESENT:  MR. JACOB EVERHART, Deere & Company.
22
23   REPORTED BY:  KRISTIN C. BRAJKOVICH,
24             CSR No. 84-3810.
```

Page 3

```
 1        (WHEREUPON, the witness was duly
 2        sworn.)
 3        TRACE LANDERS,
 4   called as a witness herein, having been first duly
 5   sworn, was examined and testified as follows:
 6        EXAMINATION
 7   BY MR. TAYLOR:
 8     Q.   Good morning, Mr. Landers.  As you know,
 9   my name --
10     A.   Good morning.
11     Q.   As you know, my name is Dave Taylor.  I
12   represent the plaintiffs in this case.  I am going
13   to ask you some preliminary questions.  I'm not
14   sure if I know the answers to these, but hopefully
15   we'll move through them very quickly.
16        Have you ever been deposed before?
17     A.   I have been deposed one other time by
18   you.
19     Q.   Okay.  Was it just the single time as
20   the 30(b)(6) representative speaking on behalf of
21   John Deere in this case?  Was that your only prior
22   deposition?
23     A.   Yes.
24     Q.   Okay.  So it probably goes without being
```

Page 4

```
 1   said, but fair to say that you have not been
 2   deposed as a fire investigator at any point in your
 3   professional history?
 4     A.   I have not.
 5     Q.   Have you ever issued, beyond what was
 6   issued in this case, any fire investigation
 7   reports, expert reports pursuant to federal rules
 8   of evidence, generally Federal Rule 26?  Have you
 9   ever done that before outside of what was done in
10   this case?
11     A.   I have not.  Are you getting feedback
12   Dave?
13     Q.   No.  I can hear you.
14     A.   So I have not.  I have only done the
15   report for this case and the supplementary report
16   provided as well.
17     Q.   Have you ever issued a fire engineering
18   or expert report in any litigation, whether it's
19   federal or state?
20     A.   No.
21     Q.   So the two reports that you have written
22   and disclosed in the course of formal litigation
23   are the two reports that exist here?
24     A.   Correct.  Correct.
```





Exhibit

F

0041

TRACE LANDERS
NATIONWIDE AGRIBUSINESS vs DEERE & CO.

August 20, 2020
241–244

Page 241

1  just trying to get -- hopefully to get you to agree
2  that those bolts are supposed to have heads on
3  them.  If they have the heads broken off of them,
4  it's a mechanical failure of some sort?
5      A.    Correct.
6      MR. BLACKERBY:  Objection, form to the term
7  "mechanical."
8  BY MR. TAYLOR:
9      Q.    The question of how the heads were
10  broken off is up for debate, but the fact that the
11  heads are broken off is a mechanical failure
12  internal to the machine, right?
13      A.    Right.
14      Q.    Okay.  So the machine that we have got
15  that is the subject of this case had had four hours
16  of fan use on it, and we can agree that when
17  everybody looked at it, it had five broken bolt
18  heads on it, correct?
19      A.    Correct.
20      MR. BLACKERBY:  Objection, form.
21  BY MR. TAYLOR:
22      Q.    And those broken bolt heads, those five
23  individual mechanical failures, are in the cleaner
24  section of the machine, correct?

Page 242

1      A.    Correct.
2      Q.    There are only -- it's a finite way in
3  which those bolt heads can be broken, would you
4  agree with that?
5      A.    Correct.
6      Q.    They can either be overtorqued or
7  overtightened?  That is one way?
8      A.    Correct.
9      MR. BLACKERBY:  Objection, form.
10  BY MR. TAYLOR:
11      Q.    They could be sheared off in some
12  fashion, either this way or that way, but the head
13  gets snipped off in a lateral way, a shearing
14  force?
15      A.    Are you talking in a general context, or
16  are you saying that the bolts of this drum could be
17  sheared off by overtorquing it.
18      Q.    I'm saying that bolts in general --
19      A.    Okay.
20      Q.    -- can be broken -- or you can break the
21  bolt head off of a bolt in three different ways, is
22  what I would say.  I will ask you if you agree with
23  me on that.
24      MR. BLACKERBY:  Objection.

Page 243

1  BY MR. TAYLOR:
2      Q.    You can either twist it off by over
3  tightening it, correct?
4      MR. BLACKERBY:  Objection, form.
5  BY MR. TAYLOR:
6      Q.    Correct, sir?
7      A.    Correct.
8      Q.    Okay.  You can shear it off?
9      A.    Yeah.
10      Q.    That is number two, correct?
11      A.    Correct.
12      Q.    You can pull the top off, overcome the
13  clamping force of the bolt?
14      A.    That is three.  There's more.
15      Q.    What are the additional ways in which
16  you could break a bolt head off?
17      A.    A bolt stretching -- I'm getting
18  feedback again.
19      MR. BLACKERBY:  Sorry.
20  BY THE WITNESS:
21      A.    So too much bolt tension, so bolt
22  stretch.
23  BY MR. TAYLOR:
24      Q.    From the bottom?

Page 244

1      A.    Yeah, like you are pulling it apart.
2      Q.    Okay.  Sort of like the clamping, but
3  this sort of thing, right?
4      A.    Yeah, and then bending.  Bending.  You
5  have two pieces that are bound together bending a
6  load on the bolt.
7      Q.    Are there any bending loads on the bolts
8  that are the subject that we are talking about?
9      A.    No.
10      Q.    All right.  So you could pull a bolt
11  from the bottom and get the head to pop off,
12  similar to grabbing it from the top and pulling it
13  from the top, right?
14      A.    Yep.
15      Q.    So maybe that is a fourth way.  It
16  depends on how you look at it.
17      A.    Correct.
18      Q.    Any other ways that you can think of?
19      A.    Those are the main ones.
20      Q.    Okay.
21      A.    Ones that I can think of.
22      Q.    Now, in regards to the self-tapping
23  screws here, I know that you have done some testing
24  or what you purport to be testing.  I'm not really



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONWIDE AGRIBUSINESS | § | |
| INSURANCE COMPANY, as subrogee of | § | |
| CWH FARMS, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO.: 4:19-CV-00425-O |
| | § | |
| vs. | § | |
| | § | |
| DEERE & COMPANY, | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT OF CODY W. HUGHES

STATE OF ___TEXAS_____ )
                                                    ) ss.
COUNTY OF ___NoLAN_____ )

I, Cody W. Hughes, being first duly sworn, state and allege as follows:

1.    I am a Fifth generation cotton farmer from the Sweetwater, Texas area.

2.    I am a 50/50 partner with my father, Willis W. Hughes, in CWH Farms LLC.

3.    My father and I were both involved with Hurst Farm Supply in the purchase of the John Deere CS690 Cotton Stripper ("Subject Stripper") that burned on October 24, 2017 that is the subject of this lawsuit.

4.    Our general practice at CWH Farms is to make sure our equipment is within the manufacturer's warranty as repairs and delays can be expensive. We accomplish this by attempting to trade in machines as their manufacturer's warranties expire.

5.    At the time of the purchasing of the Subject Stripper, I was aware that the John Deere CS690 was a new machine warranted against defects in workmanship and material. I also

- 1 -



Exhibit

G

exhibitsticker.com

0043

understood that if a problem arose from a defect in the machine that John Deere would have covered the necessary repairs.

6.      The fact that the Subject Stripper came with a warranty against defects in workmanship and material was part of the reason my father and I purchased the Subject Stripper.

7.      In an effort to make sure we were always running equipment that was covered by the John Deere warranty, we discussed with Hurst Farm Supple the future trade-in value of the Subject Stripper at the time of its purchase, including executing a purchase order for a 2018 John Deere CS690 to replace the Subject Stripper upon trade.

FURTHER YOUR AFFIANT SAITH NOT.

_____
Cody W. Hughes

Subscribed and sworn to before me
this 26th day of August , 2020.

_____
Notary Public

KELLY G. SHELTON
Notary Public, State of Texas
NOTARY ID # 202302-7
My Commission Exp 10-30-23

- 2 -

0044

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONWIDE AGRIBUSINESS | § | |
| INSURANCE COMPANY, as subrogee of | § | |
| CWH FARMS, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO.: 4:19-CV-00425-O |
| | § | |
| vs. | § | |
| | § | |
| DEERE & COMPANY, | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT OF WILLIS W. HUGHES

STATE OF ___Texas___                )
                                                          ) ss.
COUNTY OF ___Nolan___          )

I, Willis W. Hughes, being first duly sworn, state and allege as follows:

1.      I am a Fourth generation cotton farmer from the Sweetwater, Texas area.

2.      I am a 50/50 partner with my son, Cody W. Hughes, in CWH Farms LLC.

3.      My son and I were both involved with Hurst Farm Supply in the purchase of the

John Deere CS690 Cotton Stripper ("Subject Stripper") that burned on October 24, 2017 that is

the subject of this lawsuit.

4.      Our general practice at CWH Farms is to make sure our equipment is within the

manufacturer's warranty as repairs and delays can be expensive. We accomplish this by

attempting to trade in machines as their manufacturer's warranties expire.

5.      At the time of the purchasing of the Subject Stripper, I was aware that the John

Deere CS690 was a new machine warranted against defects in workmanship and material. I also

- 1 -



0045

understood that if a problem arose from a defect in the machine that John Deere would have covered the necessary repairs.

6.       The fact that the Subject Stripper came with a warranty against defects in workmanship and material was part of the reason my son and I purchased the Subject Stripper.

7.       In an effort to make sure we were always running equipment that was covered by the John Deere warranty, we discussed with Hurst Farm Supple the future trade-in value of the Subject Stripper at the time of its purchase, including executing a purchase order for a 2018 John Deere CS690 to replace the Subject Stripper upon trade.

FURTHER YOUR AFFIANT SAITH NOT.

_____
Willis W. Hughes

Subscribed and sworn to before me
this 26th day of August , 2020.

_____
Notary Public

KELLY G. SHELTON
Notary Public, State of Texas
NOTARY ID # 202302-7
My Commission Exp 10-30-23

- 2 -

**0046**

Hamers Engineering LLC
753 Y Ave
Ames, IA 50014
Phone: 515-357-0749

**HAMERS**

---

MECHANICAL ENGINEERING REPORT #1

Mr. David Taylor
Yost & Baill, LLP
2050 US Bank Plaza South
220 South Sixth Street
Minneapolis, MN  55402
Via email: dtaylor@yostbaill.com

| | |
|---|---|
| Date: | March 6, 2020 |
| Insured: | CWH Farms |
| Loss Location: | rural Roscoe, TX |
| Date of Loss: | October 24, 2017 |
| Nationwide Claim #: | 188377-GG |
| Hamers File #: | 17H101 |

Dear Mr. Taylor:

This will be my initial report regarding the above referenced investigative assignment.

ENCLOSURES

1. 54 – John Deere CS690 Exam photographs-SRH-2017-12-13
2. 51 – John Deere CS690 Exam photographs-SRH-2020-02-18
3. 17H101 – CWH Farms Sign-In Sheet-2017-12-13
4. Artifact list – none collected

ADDITIONAL MATERIALS REVIEWED

1. Defendant's Initial Disclosures 2019/10/04
2. Defendant's Responses and Objections to Plaintiff's RFA, Set I 2020/01/16
3. John Deere CS690 Marketing Brochure
4. John Deere CS690 Operator's Manual – OMKK33834
5. John Deere CS690 Parts Catalog – PC12381
6. John Deere CS690 Technical Manuals – TM124819 & TM124919
7. John Deere-CWH Farms Photographs (Bates Stamps 2043-2136)

BACKGROUND

According to information provided to this investigator, this loss involved a fire on a 2017 model John Deere CS690 cotton stripper.  The owners reportedly purchased the new cotton stripper from Hurst Farm Supply, Inc. in Snyder, TX.  Hurst reported that the cotton stripper went through the dealer setup protocol at their Lorenzo, TX location and it was then delivered to CWH Farms.

**Exhibit**

**I**

CWH000071

0047

Mr. David Taylor
March 6, 2020
Claim No: Nationwide 188377-GG
Page 2 of 9

CWH Farms is owned by Mr. Cody Hughes.  Mr. Hughes reported that the subject cotton stripper had approximately nine engine hours and four fan hours at the time of the fire.  Mr. Hughes indicated that the October 24, 2017 fire was the second fire on the subject cotton stripper.  The first fire occurred on October 23, 2017 when the cotton stripper had approximately 2 ½ fan hours.  Mr. Hughes was able to extinguish the first fire and then called Hurst Farm Supply to examine the cotton stripper.

Hurst Farm Supply reportedly examined the cotton stripper and did not locate any potential ignition sources or problems with the cotton stripper after the first fire.  Hurst Farm Supply reportedly told the insured that the cotton stripper was field ready and that he could commence harvesting with the unit.

On October 24, 2017, CWH Farms was operating the subject cotton stripper and a fire was discovered in the accumulator.  The fire was reportedly transferred to the baler where it caught the baler belts on fire.  The insureds had a 1000 gallon water tank in the field at the time the fire was discovered but they were unable to extinguish the fire before significant damage occurred.

The purpose of this investigation was to examine the subject cotton stripper and to determine the cause of this fire loss.

<u>INVESTIGATION</u>

On December 13, 2017, I traveled to the loss location near Roscoe, Texas to examine the subject cotton stripper.  During the examination, a series of photographs were taken.  These photographs were captioned and a photo slate was prepared.  A copy of the photo slate is included with this report and a CD of the full resolution photographs is available upon request.  An attendance sheet of the representatives present during the examination is also included with this report.

The subject cotton stripper was still located in the field where the fire occurred.  The cotton stripper had been moved from the fire location to the edge of the field prior to the examination.  The cotton stripper had been moved approximately 40 yards to the northwest after the fire.  The cotton stripper was identified as a John Deere CS690 with a serial number of 1N0C690SKH4065098.

At the time of the fire, the cotton stripper was equipped with an eight row John Deere cotton stripper head.  The head had been removed from the cotton stripper prior to my examination.  According to information provided by Hurst Farm Supply, the head had been removed from the subject cotton stripper and placed into service on another unit.  Hurst Farm Supply reported that there were no operational problems with the cotton stripper head when it was placed into service on another unit.

March 6, 2020
Claim No: Nationwide 188377-GG
Page 3 of 9

Photographs #1 through #7, on the enclosed photo slate, show the extent of fire damage on the subject cotton stripper.  There was extensive fire damage in the round module builder (RMB) on the unit.  The RMB is also referred to as the baler.

The engine compartment, the exhaust aftertreatment and hydraulic pump compartment and the cab experienced very little fire damage.  The cotton fan and air ducts were intact and unaffected by the fire.

The cotton cleaner was also examined.  The bearings for the paddle auger, saw tooth drums, doffer, cleaner fan and trash auger were examined and appeared to be in serviceable condition.  There was no rock or foreign objection ingestion damaged noted on the saw tooth drums or on any components in the cleaner.  All of the saw blade points were sharp and properly orientated.  During the examination, I noted that there were four saw tooth blade screws that had the head snapped off on the upper saw tooth drum and there was one screw head snapped off on the lower drum.  There was no evidence of any foreign objects striking the screw heads and causing them to break.

The doffer was also examined.  The doffer is a rotating cylinder equipped with twelve nylon brushes which removes the cotton from the upper and lower saw tooth drums and discharges the cotton into the air stream leading to the accumulator.

After examining the cleaner, I examined the accumulator.  There was burnt cotton observed in the accumulator and the metal panel which separated the baler from the accumulator was heat damaged.  I checked the bearings for the meter rollers and the beater rollers and they were in serviceable condition.  There were no indications of a mechanical failure in the accumulator.

After examining the accumulator, I examined the round module builder (baler).  The baler includes a rubber feed belt which runs from the accumulator to the baler.  The feed belt was consumed in the fire.  Additionally, rubber belts draped between the baler rollers form the bale chamber.  All of the rubber baler belts were damaged and consumed in the fire.  The baler belts are routed through a series of rollers which rotate as the belts travel.  The baler rollers are supported on each end with bearings.  I checked for failed bearings in the baler and did not observe any bearings that had potentially failed.

A second examination of the baler was held on February 18, 2020.  During this examination, the cleaner including the saw tooth drums and doffer were thoroughly examined.  On the saw tooth drums, we marked the location of each of the broken screw heads.  All of the broken screw heads were installed in the end holes on the saw tooth blades.  One particular row of screws included three of the five broken screw heads.

During the examination of the doffer, I noted that there were impact marks on the doffer which lined up with the saw tooth blades which were attached with the screws that had snapped off screw heads.  Photographs #88 through #99, on the enclosed photo slate, document the condition of the doffer and show the impact marks on the doffer from the

Mr. David Taylor
March 6, 2020
Claim No: Nationwide 188377-GG
Page 4 of 9

loose saw tooth blades.  Photograph #93, reproduced below, shows one location where the saw tooth blade had struck the doffer.



Loose saw tooth blade

*Photograph 93 – Doffer struck with loose saw tooth blade*

### ANALYSIS

Figure #1, below, is an excerpt from the John Deere Operator's Manual for the CS690 Cotton Stripper showing the cotton cleaner.  The cotton cleaner on the subject cotton stripper was designed to remove the larger foreign material from the stripped cotton.  The stripped cotton is conveyed up the main duct and distributed across the cleaner by the paddle auger noted on Figure #1 as "C".  The cotton leaves the paddle auger and is distributed across the upper saw drum ("E").  Channel shaped saw blades attached to the saw tooth drum grab the cotton and pull it under the grid bars ("F") located around the outside of the saw tooth drum.  The larger foreign material and some cotton drops below the upper saw tooth drum and is processed a second time by the lower saw tooth drum ("G").  The cotton is hooked onto the saw tooth drums by the hooked teeth on the saw tooth blades.  The saw tooth drums rotate past the grid bars toward the rear of the cleaner where the cotton is removed from the upper and lower saw tooth drums by the doffer ("M").  The doffer is a rotating cylinder brush that dislodges the cotton from the teeth of the saw tooth blades and discharges the cotton into the air stream from the cleaner fan ("L") which carries the cotton to the accumulator.

Case 4:19-cv-00425-O   Document 56   Filed 08/28/20   Page 53 of 86   PageID 726

## Understanding Cleaner Operation



A—Cleaner Bypass Lever
B—Front Duct
C—Feeder
D—Feeder Control Bar

E—Upper Saw Drum
F—Upper Grid Bars
G—Lower Saw Drum
H—Saw Brush
I— Secondary Reclamation Brush

J— Lower Grid Bars
K—Trash Auger
L—Fan
M—Doffer, 12 Brush
N—Doffer Brushes

O—Rear Duct
P—Accumulator

*Figure 1 – Cotton cleaner John Deere Operator's Manual for the CS690 Cotton Stripper*

The channel shaped saw tooth blades are attached to the saw tooth drum with five screws per blade.  It takes two semicircular saw tooth blades to go around the circumference of the saw tooth drum.  Figure #2, below, shows the saw tooth drum and saw tooth blades attached to the drum with screws.  There are two double rows of screws which attached the ends of the semicircular shaped blades to the saw tooth drum.

CWH000075

0051

Mr. David Taylor
March 6, 2020
Claim No: Nationwide 188377-GG
Page 6 of 9



Screws that attached the blades to the drum

Channel shaped saw tooth blade

*Figure 2 – Saw tooth drum and saw tooth drum blades*

In this case, five saw blade screw heads were observed to be snapped off.  All of the snapped off screw heads were located in the double rows of screws which attached the ends of the saw tooth blades.  Four out of the five screws were located on the leading edge of the saw tooth blade but the screw head which was snapped off on the lower saw tooth roll was on the trailing edge of the saw tooth blade.

Figure 3 shows a saw tooth drum from an end view.  The green center circle is the drum itself and the dark blue outer half circle is one saw tooth blade and the orange half circle is the corresponding blade which covers the circumference of the drum.  The black lines represent the screws which attach the blades and they are numbered 1 – 10.  The blue circle represents the doffer.  Both drums are turning in opposite directions to each other and they are not normally in contact with each other.

If a screw is broken off at location #1 on the diagram, the blade is able to pull away from the drum during operation.  The force of the cotton on the blade will continue to pull the

Mr. David Taylor
March 6, 2020
Claim No: Nationwide 188377-GG
Page 7 of 9

unattached blade away from the drum.  The blade will bend backward until it reaches the next screw which in this case is screw #2.  If the blade is bent far enough backwards, it will break off right at the location of screw #2.  When the blade is bent away from the drum but has not reached the point where it breaks off at the next screw, the blade has the potential to strike the doffer because it is sticking too far out from the surface of the saw tooth drum.



*Figure 3 – Saw tooth drum and doffer contact scenario with a broken saw tooth blade screw*

On the subject cotton stripper, there were slight impact marks on the doffer which indicated that the saw blades had been in contact with the doffer.  The scenario described in Figure #3 shows how the saw tooth blades can contact the doffer after the attachment screw head

CWH000077
0053

Mr. David Taylor
March 6, 2020
Claim No: Nationwide 188377-GG
Page 8 of 9

breaks.  The gouge marks on the doffer are evidence that there was metal to metal contact within the cleaner of the cotton stripper.

The gouge marks on the subject doffer were in the early stages of development based on the number of hours the unit has operated.  If the condition is allowed to fully develop over time the gouge marks on the doffer develop into deeper more easily observed gouge marks. Report Photograph #1, below, is from another cotton stripper that had fractured saw tooth blades which allowed the saw tooth blades to strike the doffer.



*Report Photograph 1 – Exemplar doffer and saw tooth drum with gouge marks from the saw tooth blades.*

Based on my examination of the cotton stripper, it seems most likely that the metal to metal contact within the cleaner was the cause of the fire on the subject cotton stripper.  The metal to metal contact would have created sparks that have the potential to ignite the cotton as it passes through the cleaner.  The cotton would have been transferred to the accumulator immediately after contact with the doffer which is consistent with the fire developing in the accumulator and baler.

The location of the broken screw heads and the absence of any evidence of a rock ingestion indicate that the screws were likely overtightened at the factory which caused the heads to snap off of the screws.  The Technical Repair Manual cites a torque of 53 in-lbs. for the saw blade screws (Page 110-05-1).  All of the broken screws were located in the double

Mr. David Taylor
March 6, 2020
Claim No: Nationwide 188377-GG
Page 9 of 9

rows of screws which also indicates that all of the broken screws were in the end holes on the saw blades. The subject cotton stripper reportedly had only four fan hours at the time of the second fire. It seems highly unlikely that there could be five screw heads broken off in the cleaner with no indications of any rock ingestion problems in the cleaner.

## CONCLUSIONS

Based on my examination of the subject cotton stripper and based on my experience and education, this fire loss was caused by the sparks produced from metal on metal contact between the doffer and a saw blade on the saw tooth drum. The doffer was slightly gouged from contact with the loose saw tooth blades indicating that the saw tooth blades were in direct metal on metal contact with the doffer. As noted above, it is the opinion of this investigator that the saw tooth blades were loose due to the fact that the screws were overtightened when originally installed at the factory. The screw heads separated from the overtightened fasteners which allowed the saw tooth blade to bend back from the saw tooth drum and contact the doffer when in operation.

The opinions contained in this report are based upon inspections conducted and information known to date. New information may require conclusions and opinions to be reevaluated. Accordingly, please forward any new information you receive at your earliest convenience.

If you should have any questions regarding these items, please contact this investigator. I would like to thank you for the opportunity to be of service in this matter, and I am also submitting a service bill for your consideration.

Respectfully Submitted,

Steven R. Hamers, P.E.
Mechanical Engineer

Case 1:19-cv-00435-DII   Document 56   Filed 09/29/20   Page 58 of 86   Page ID 731



17H101-SRH-001 - Front overview



17H101-SRH-002 - Right front corner



17H101-SRH-003 - Right side overview



17H101-SRH-004 - Right rear corner



17H101-SRH-005 - Left rear corner



17H101-SRH-006 - Left side overview

Case 5:19-cv-00435-C Document 86 Filed 03/23/20 Page 59 of 86 PageID 732



17H101-SRH-007 - Left front corner



17H101-SRH-008 - Manufacturer's identification tag



17H101-SRH-009 - Dealership label



17H101-SRH-010 - Fire location in the field



17H101-SRH-011 - Fire location in the field



17H101-SRH-012 - Fire location in the field

Case 4:19-cv-00435-P Document 86 Filed 09/28/20 Page 60 of 86 PageID 733



17H101-SRH-013 - Exhaust aftertreatment and hydraulic pumps



17H101-SRH-014 - Exhaust aftertreatment and hydraulic pumps



17H101-SRH-015 - Cotton fan



17H101-SRH-016 - Air filter and DEF tank



17H101-SRH-017 - Hydraulic oil reservoir



17H101-SRH-018 - Header lift frame and lower duct

Case 2:19-cv-00435-Z Document 86 Filed 03/29/22 Page 61 of 86 PageID 734



17H101-SRH-019 - Header lift frame and lower duct



17H101-SRH-020 - Fan air duct and lower cotton duct



17H101-SRH-021 - Fire extinguisher holder on the cab platform



17H101-SRH-022 - Cab



17H101-SRH-023 - Cab



17H101-SRH-024 - RMB – hydraulic drive motor

Case 1:19-cv-00435-DII Document 86 Filed 02/28/20 Page 62 of 86 Page ID 735



17H101-SRH-025 - Left side service platform and ladder access to the accumulator



17H101-SRH-026 - Left side service platform



17H101-SRH-027 - Left side service platform



17H101-SRH-028 - Cleaner feeder paddle



17H101-SRH-029 - Cleaner feeder paddle



17H101-SRH-030 - Cleaner – saw tooth drum and grid bars

Case 3:19-cv-00435-G Document 56 Filed 02/28/20 Page 63 of 86 PageID 736



17H101-SRH-031 - Cleaner – saw tooth drum and grid bars



17H101-SRH-032 - Upper saw tooth drum



17H101-SRH-033 - Upper saw tooth drum – note broken screw head



17H101-SRH-034 - Upper saw tooth drum – note two broken screw heads



17H101-SRH-035 - Trash auger – right side



17H101-SRH-036 - Trash auger

**File# 17H101 - CWH Farms - Yost & Baill LLP - File# Nationwide 188377-GG**
**December 13, 2017 - Cotton Stripper Exam Photographs - Page 7 of 9**

Case 1:19-cv-00435-SH Document 86 Filed 02/28/20 Page 64 of 86 PageID 737



17H101-SRH-037 - Saw brush and reclamation brush



17H101-SRH-038 - Fan cover panel



17H101-SRH-039 - Doffer



17H101-SRH-040 - Doffer



17H101-SRH-041 - Meter rollers in the accumulator



17H101-SRH-042 - Meter rollers in the accumulator

Case 2:19-cv-00435-Z Document 86 Filed 09/28/20 Page 65 of 86 PageID 738



17H101-SRH-043 - Accumulator compactor auger



17H101-SRH-044 - Beater rollers



17H101-SRH-045 - Beater rollers



17H101-SRH-046 - Heat and fire damage along the back panel of the accumulator



17H101-SRH-047 - Heat and fire damage along the back panel of the accumulator



17H101-SRH-048 - Round module builder (RMB)

Case 1:19-cv-00435-DII    Document 86    Filed 09/29/20    Page 66 of 86    PageID 739



17H101-SRH-049 - RMB – take up arm rollers



17H101-SRH-050 - RMB - take up arm rollers



17H101-SRH-051 - Round module builder (RMB)



17H101-SRH-052 - Round module builder (RMB)



17H101-SRH-053 - Round module builder (RMB)



17H101-SRH-054 - Round module builder (RMB)

Case # 19-cv-00462-JPO   Document 96   Filed 02/28/20   Page 67 of 86   PageID 740
February 18, 2020



17H101-SRH-055 - Cotton stripper overview



17H101-SRH-056 - Exhaust aftertreatment



17H101-SRH-057 - Manufacturer's identification label



17H101-SRH-058 - Engine compartment



17H101-SRH-059 - Hydraulic lines and air cleaner



17H101-SRH-060 - Header lift frame and lower duct separator

Case #:10-cv-00465-20 Document 36 Filed 03/23/20 Page 68 of 86 PageID 741



17H101-SRH-061 - Lower duct separator



17H101-SRH-062 - Lower duct separator



17H101-SRH-063 - Cotton cleaner



17H101-SRH-064 - Cotton cleaner drive pulleys



17H101-SRH-065 - Cotton cleaner – saw tooth drums



17H101-SRH-066 - Cotton cleaner – saw tooth drums

CWH000090

0066

Case 4:19-cv-00452-SDJ   Document 16   Filed 02/28/20   Page 69 of 86   PageID 742



17H101-SRH-067 - Locating and marking the broken screw heads on the saw tooth drums



17H101-SRH-068 - Locating and marking the broken screw heads on the saw tooth drums



17H101-SRH-069 - Locating and marking the broken screw heads on the saw tooth drums



17H101-SRH-070 - Locating and marking the broken screw heads on the saw tooth drums



17H101-SRH-071 - Saw tooth blades – note no damage to the teeth near the broken screw heads



17H101-SRH-072 - Saw tooth blades – note no damage to the teeth near the broken screw heads

Case 4:19-cv-00485-SDJ Document 56 Filed 03/23/20 Page 70 of 86 PageID 743



17H101-SRH-073 - Locating and marking the broken screw heads on the saw tooth drums



17H101-SRH-074 - Locating and marking the broken screw heads on the saw tooth drums



17H101-SRH-075 - Locating and marking the broken screw heads on the saw tooth drums



17H101-SRH-076 - Locating and marking the broken screw heads on the saw tooth drums



17H101-SRH-077 - Locating and marking the broken screw heads on the saw tooth drums



17H101-SRH-078 - Locating and marking the broken screw heads on the saw tooth drums

Case 4:19-cv-00485-SDJ Document 56 Filed 03/23/20 Page 71 of 86 PageID 744



17H101-SRH-079 - Saw tooth blades – note no damage to the teeth near the broken screw head



17H101-SRH-080 - Saw tooth blades – note no damage to the teeth near the broken screw heads



17H101-SRH-081 - Saw tooth blades – note no damage to the teeth near the broken screw heads



17H101-SRH-082 - Locating and marking the broken screw heads on the saw tooth drums



17H101-SRH-083 - Locating and marking the broken screw heads on the saw tooth drums



17H101-SRH-084 - Locating and marking the broken screw heads on the saw tooth drums

Case 4:19-cv-00485-SDJ Document 56 Filed 03/23/20 Page 72 of 86 PageID 745



17H101-SRH-085 - Locating and marking the broken screw heads on the saw tooth drums



17H101-SRH-086 - Locating and marking the broken screw heads on the saw tooth drums



17H101-SRH-087 - Locating and marking the broken screw heads on the saw tooth drums



17H101-SRH-088 - Doffer



17H101-SRH-089 - Impact marks on the doffer in line with the loose saw tooth blades.



17H101-SRH-090 - Impact marks on the doffer in line with the loose saw tooth blades.

CWH000094

0070

Case 4:19-cv-00485-SDJ Document 56 Filed 03/23/20 Page 73 of 86 PageID 746



17H101-SRH-091 - Impact marks on the doffer in line with the loose saw tooth blades.



17H101-SRH-092 - Impact marks on the doffer in line with the loose saw tooth blades.



17H101-SRH-093 - Impact marks on the doffer in line with the loose saw tooth blades.



17H101-SRH-094 - Impact marks on the doffer in line with the loose saw tooth blades.



17H101-SRH-095 - Impact marks on the doffer in line with the loose saw tooth blades.



17H101-SRH-096 - Impact marks on the doffer in line with the loose saw tooth blades.

Case 4:19-cv-00453-2020 Document 56 Filed 03/23/20 Page 74 of 86 PageID 747



17H101-SRH-097 - Impact marks on the doffer in line with the loose saw tooth blades.



17H101-SRH-098 - Impact marks on the doffer in line with the loose saw tooth blades.



17H101-SRH-099 - Impact marks on the doffer in line with the loose saw tooth blades.



17H101-SRH-100 - Beater rollers in the accumulator



17H101-SRH-101 - Beater rollers in the accumulator



17H101-SRH-102 - Upper duct separator

Case #:19-cv-00185-2020 Document 6-6 Filed 02/28/20 Page 75 of 86 PageID 748



17H101-SRH-103 - Upper duct finger grates



17H101-SRH-104 - Upper duct finger grates



17H101-SRH-105 - Upper duct finger grates

-

-                                                    -



**Hamers Engineering LLC**
Phone: 515-357-0749

753 Y Avenue
Ames, IA 50014

Date: 12/13/2017

File #: 17H101

Insured: CWH Farms

Loss Address: Rural Roscoe, TX



| | |
|---|---|
| **HAMERS** ENGINEERING<br>**Steven R. Hamers**, PE<br>MECHANICAL ENGINEER<br>(515) 357-0749<br>steve@hamersengineering.com<br>www.HamersEngineering.com | **FireMCI** Mitigation Consulting & Investigation<br>Tim Christensen - PE, CEFI, CVFI<br>+1-309-781-5388<br>TChristensen@FireMCI.com<br>Specializing in Mobile Off-Road Equipment |
| Signature _(signed)_ | Signature _(signed)_ |
| Party Representing<br>CWH Farms - Nationwide | Party Representing<br>John Deere |
| **RIMKUS** CONSULTING GROUP, INC.<br>DONALD G. MOSER, IAAI-CFI<br>SENIOR FIRE CONSULTANT<br>1431 GREENWAY DRIVE<br>SUITE 900<br>IRVING, TEXAS 75038<br>PH (972) 518-0900<br>(877) 271-1168<br>FAX (972) 518-0011<br>CELL (469) 426-8476<br>E-MAIL: DGMOSER@RIMKUS.COM<br>WWW.RIMKUS.COM | _(Place card or fill out information)_<br>Name Jeff Ratheal<br>Company Hurst Farm Supply<br>Address<br>Email jeff@hurstfs.com<br>Phone/Fax |
| Signature _(signed)_ | Signature _(signed)_ |
| Party Representing<br>Hurst Supply | Party Representing |
| _(Place card or fill out information)_<br>Name MARK WHATLEY<br>Company UNIFIED INVESTIGATION<br>Address 1700 TECH CENTRE PKY.<br>#110 ARLINGTON, TX 76014<br>Email MWHATLEY@UIS-USA.com<br>Phone/Fax 817-789-8251 | _(Place card or fill out information)_<br>Name<br>Company<br>Address<br>Email<br>Phone/Fax |
| Signature _(signed)_ | Signature |
| Party Representing<br>CWH Farms | Party Representing |

Page ___ of ___

CWH000098

0074

# Steven R. Hamers, P.E.

Mechanical Engineer
Cell: (515) 357-0749
steve@hamersengineering.com

## Education

Iowa State University, Ames, Iowa
Bachelor of Science, Agricultural Engineering, May 2010
Primary Emphasis: Machinery Design and Grain Handling Systems

Iowa State University, Ames, Iowa
Bachelor of Science, Agricultural Studies, May 1998
Primary Emphasis: Agronomy and Crop Production Systems

## Licensure

Licensed Professional Engineer
Arkansas – License No. 19376
Iowa - License No. 22578
Minnesota – License No. 56597
North Dakota – License No. PE-27784
South Dakota – License No. C-7907
Kansas – License No. 26637
Nebraska – License No. E-17339
Wisconsin – License No. 46940-6

## Professional Experience

2017 – Current: Hamers Engineering LLC, Ames, IA
Mechanical Engineer / Principal Member
- Perform mechanical failure investigations on fuel gas systems, appliances, plumbing components and HVAC systems
- Consult on mechanical and agricultural topics including the following: agricultural equipment fires; grain dryer fires; construction equipment failures; moisture control and source analysis; and product failure analysis

2009 - 2017: Independent Forensic Investigations Corp., Urbandale, IA
Mechanical Engineer (2015) / Agricultural Consultant
- Conduct mechanical failure investigations including fuel gas system failures, appliance malfunctions and water losses
- Consult on mechanical and agricultural topics including the following: agricultural equipment fires; grain dryer fires; construction equipment failures; moisture control and source analysis; and product failure analysis

CWH000099
0075

2008 - 2009 : Iowa State University, Ames, IA
  Undergraduate Research Assistant – Agricultural Engineering Dept.
  - Collected and processed field data using survey equipment
  - Evaluated crop residue for an erosion control study
  - Collect data and ran modeling software for underground water flow

2003 - 2007 : Valley Bank & Trust, Mapleton, IA
  President and CEO from 02/2005 – 08/2007
  - Managed operations of a $53M agricultural based bank
  - Operated in-house insurance agency

1998 - 2003 : Danbury Agri-Service, Danbury, IA
  Head Agronomist / Equipment Manager
  - Diagnosed crop production problems and developed solutions
  - Implemented precision farming program

1993 - 1998 : Boyle Construction, Danbury, IA
  Carpenter / General Laborer
  - Provided labor for new home and business construction projects
  - Experience with concrete and wood foundations
  - Evaluated shingles and estimated replacement roofing costs

1987 - 2000 : Hamers Farms, Danbury, IA
  General Laborer
  - Provided labor for family farming operation
  - Operated and maintained farming equipment

## Teaching and Speaking Engagements

| | |
|---|---|
| March 27, 2019 | Iowa State Fire Marshal Fire/Arson Investigator School - Instructor for agricultural fires, appliance fires and fuel gas system failures |
| March 27, 2018 | Iowa State Fire Marshal Fire/Arson Investigator School - Instructor for agricultural fires, appliance fires and fuel gas system failures |
| September 28, 2017 | 48th Annual Nebraska Fire & Arson Investigation Conference – Instructor for Agricultural Building and Equipment Fires |
| May 2, 2017 | 2017 Farm Bureau Operations Conference, Des Moines – Presenter of "Wood Heat a Burning Problem" |
| March 26, 2017 | Iowa State Fire Marshal Fire/Arson Investigator School - Instructor for agricultural fires, appliance fires and fuel gas system failures |
| October 12, 2016 | Farmers Alliance  - "Farm Subrogation" co-presenter with Attorney David Taylor |
| June 9, 2016 | Wisconsin Reinsurance Annual Meeting – Role of Forensic Engineering in Insurance Claims |
| March 22, 2016 | Iowa State Fire Marshal Fire/Arson Investigator School - Instructor for agricultural fires, appliance fires and fuel gas system failures |
| October 22, 2015 | NASP Iowa Chapter Meeting – Presentation on "Building an Investigative Team" |

CWH000100
0076

| March 24, 2015 | Iowa State Fire Marshal Fire/Arson Investigator School - Instructor for agricultural fires, appliance fires and fuel gas system failures |
| November 10, 2014 | NASP Annual Conference – "Subrogation on the Farm" co-presenter with Attorneys David Taylor and Timothy Poeschl |
| October 2, 2014 | NASP Minnesota Chapter meeting – "Subrogation on the Farm" co-presenter with Attorneys David Taylor and Timothy Poeschl |
| March 25, 2014 | Iowa State Fire Marshal Fire/Arson Investigator School - Instructor for agricultural fires, appliance fires and fuel gas system failures |
| March 19, 2013 | Iowa State Fire Marshal Fire/Arson Investigator School - Instructor for agricultural fires, appliance fires and fuel gas system failures |
| September 21, 2012 | International Association of Arson Investigators - Iowa Chapter Fire Investigation Seminar – Instructor for agricultural fires |
| March 16, 2012 | Iowa State Fire Marshal Fire/Arson Investigator School - Instructor for agricultural fires, appliance fires and fuel gas system failures |

## Professional Affiliations / Certifications

F.I.R.E Certified Fireplace and Chimney Inspector – FCI-269
American Society of Agricultural and Biological Engineers - Member
ASM International – Member
American Society of Mechanical Engineers - Member
National Fire Protection Association – Member
International Association of Arson Investigators, Inc. - Member

## Continuing Education

Sept 24-25, 2018 – Certified Fire Protection Specialist Primer Training - NFPA
Feb 20-22, 2018 – Advanced Principles of Fire Dynamics – Gulf Coast Fire Investigation, Research, and Education
Sept 12-14, 2016 – International Symposium on Fire Investigation Science & Technology
June 24, 2016 – NASP / IAAI "Arson Investigators Subrogation Webinar Series" – Vetting the Expert
June 8, 2016 – Burn Cell Research & Education – Grinnell Mutual & Iowa Chapter IAAI
August 3-8, 2015 – F.I.R.E Certified Fireplace and Chimney Inspector Program
July - October, 2014 – PPI - Mechanical PE Live Online Review Course (50 Hours)
October 9-10, 2013 - Fire Findings - Investigating Solid Fuel-Burning Appliance Fires
April 16-19, 2013 - Fire Findings - Investigation of Gas and Electric Appliance Fires
September 10-11, 2012 - ASM International – How to Organize and Run a Failure Investigation
September 12-14, 2012 - ASM International – Principles of Failure Analysis
May 2011 - Agricultural Machinery Conference – Technical Sessions
*Product Safety Standards*
*New Technologies in Operator Safety*
*Fire Prevention Technology*
August 2010 - Grain System Inc. – 2 day grain dryer operation class

CWH000101
0077

Steven R Hamers - Testimony History

| Date | Case | County | State | Case Number | Type | For |
|------|------|--------|-------|-------------|------|-----|
| 11/16/2012 | Gary Marshall and Terry Marshall d/b/a Marshall Brothers Partnership vs. GSI Group d/b/a GSI | Beadle | SD | Civ. No. 10-489 | Deposition | Plaintiff |
| 4/30/2013 | State Farm Fire and Casualty Company et al. vs. MECO Corporation | Southern District | IA | 4:12-cv-00309-RP-CFB | Deposition | Plaintiff |
| 11/1/2013 | Mahoney etal v. Sherwin-Williams et al. | Scott | IA | LACE122009 | Deposition | 3rd Party |
| 1/20/2015 | Arne / Beving v. Burke et al. | Clark | SD | Civ 13-42 | Deposition | Plaintiff |
| 5/19/2016 | Bowman et al. v. Dometic Corporation | Southern District | IA | 4:14-CV-00089-SMR-HCA | Deposition | Plaintiff |
| 11/18/2016 | Realm Inc. v. Warnick & Reeves Mechanical | Jasper | IA | LACV0119733 | Deposition | Defendant |
| 12/9/2016 | Estate of Kurt Sulzman v. Deere & Company, et al. | Madison | IA | LACV034262 | Deposition | Defendant |
| 12/13/2016 | Nelson v. Holcomb Delivery, Inc., Nebraska Furniture Mart, Inc. et al. | Pottawattamie | IA | LACV112306 | Deposition | Plaintiff |
| 1/26/2017 | Protsman et al v. H&H Harvesting, et al | Chouteau | MT | DV-14-15 | Trial | Defendant |
| 7/28/2017 | Mark Merfeld et al v. Dometic Corporation | Northern District | IA | 6:16-CV-2096-LTS | Deposition | Plaintiff |
| 8/3/2017 | Horn et al v. R&D Plumbing | Polk | IA | LACL135326 | Deposition | Plaintiff |
| 9/7/2017 | Craig Naber v. Jerald "Jerry" Naber | Buchanan | IA | EQCV009085 | Deposition | Plaintiff |
| 11/3/2017 | Farm Bureau Property & Casualty Insurance a/s/o Russell Seekins v. CNH Industrial America LLC | Northern District | IA | 3:16-CV-03122 | Deposition | Plaintiff |
| 11/3/2017 | Farm Bureau Property & Casualty Insurance a/s/o Troy Wheeler v. CNH Industrial America LLC | Northern District | IA | 4:16-CV-00636-CRW-SBJ | Deposition | Plaintiff |
| 11/9/2017 | S&R Egg Farm Inc. & Nationwide Agribusiness Insurance Company v. Munters Corporation; Hitachi America, Ltd. Et al | Eastern District | WI | 15-CV-1362 | Deposition | Plaintiff |
| 1/11/2018 | Craig Naber v. Jerald "Jerry" Naber | Buchanan | IA | EQCV009085 | Trial | Plaintiff |
| 5/3/2018 | Lashbrook v. Owens | Black Hawk | IA | LACV131359 | Deposition | Defendant |
| 7/16/2018 | Robert Roden v. Mid-States Equipment LLC | Washington | WI | 17-CV-0255 | Deposition | Plaintiff |
| 9/25/2019 | Robert Roden v. Mid-States Equipment LLC | Washington | WI | 17-CV-0255 | Trial | Plaintiff |
| 11/21/2019 | 212 Truck & Trailer Repair LLC v. Harry's Septic & Sewer S | Clark | SD | 12 CIV 17-000038 | Trial | Plaintiff |

<u>FEE SCHEDULE</u>

Effective 01/01/2020

Steven Hamers, P.E. – Mechanical Engineer
  Regular hourly rate -          $260 / hr
  Deposition testimony rate -    $390 / hr
  Trial testimony rate -         $390 / hr

All travel time is billed at the regular rate portal to portal
Mileage is billed at $0.80 per mile
Photographs are billed at $1.00 each with a daily maximum of $100.00
Hotels, airfare and additional travel expenses are billed at cost
Overnight stays include a meal & incidental per diem billed at $39.00 / night

Evidence Storage Charges – Hamers Engineering LLC offers evidence storage.  The storage fees are billed in six month intervals and vary depending on the size of the stored artifact.  The minimum storage fee is $25.00 per month.  Storage of very large artifacts can be arranged with an outside vendor.

CWH000103
0079

## Page 72

```
 1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
 2                  FORT WORTH DIVISION
 3  NATIONWIDE AGRIBUSINESS)
    INSURANCE COMPANY, AS )
 4  SUBROGEE OF CWH FARMS, ) CIVIL ACTION NO.
                          ) 4:19-cv-00425-O
 5       Plaintiff,       )
                          )
 6       vs.              ) VIDEOTAPED
                          ) VIDEOCONFERENCE
 7  DEERE & COMPANY,      ) DEPOSITION OF
                          ) STEVE HAMERS, P.E.,
 8       Defendant.       ) VOLUME II
    -----------------------)
 9
10
11        THE VIDEOTAPED VIDEOCONFERENCE
12  DEPOSITION OF STEVE HAMERS, P.E., VOLUME II,
13  taken before Chris A. Quinlin, Registered
14  Professional Reporter and Notary Public of the
15  State of Iowa, commencing at 9:36 a.m.,
16  August 18, 2020.  All parties appeared via
17  videoconference.
18
19
20
21
22     Reported by:  Chris A. Quinlin, R.P.R.
23
24
25
```

## Page 73

```
 1           A P P E A R A N C E S
 2  Plaintiff by:   DAVID J. TAYLOR
                    (via videoconference)
 3                  Attorney at Law
                    YOST & BAILL, LLP
 4                  2050 U.S. Bank Plaza South
                    220 South Sixth Street
 5                  Minneapolis, MN 55402
                    (612) 338-6000
 6                  dtaylor@yostbaill.com
 7  Defendant by:   CHRIS A. BLACKERBY
                    (via videoconference)
 8                  Attorney at Law
                    GERMER BEAMAN & BROWN, PLLC
 9                  301 Congress Avenue
                    Suite 1700
10                  Austin, TX 78701
                    (512) 472-0288
11                  cblackerby@germer-austin.com
12  Videographer:   JUANITA UMANA
                    (via videoconference)
13
    Also present:   JACOB EVERHART
14                  (via videoconference)
                    TRACE LANDERS
15                  (via videoconference)
16
17
18
19
20
21
22
23
24
25
```

## Page 74

```
 1                 I N D E X
 2  Examination by:          Page
 3  Mr. Blackerby            76, 267
 4  Mr. Taylor               247, 274
 5
 6  Exhibit               Marked
 7  Exhibit 15               277
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 75

```
 1              P R O C E E D I N G S
 2            THE VIDEOGRAPHER:  Okay.  The
 3  time is 9:36 a.m., and we are on the record.  It
 4  is August 18th, 2020.
 5            This begins the videotaped
 6  deposition of Steve Hamers taken in the matter
 7  of Nationwide Agribusiness Insurance Company, as
 8  subrogee of CWH Farms, versus Deere & Company,
 9  case number which is 4:19-cv-00425-O.
10            My name is Juanita Umana.  I'm
11  the remote videographer for today.  Our court
12  reporter is Chris Quinlin.  We are representing
13  Esquire Deposition Solutions.
14            As a courtesy, everyone who is
15  not speaking please mute your audio.  And when
16  you're ready to speak, please unmute yourself.
17            Counsel, will you please state
18  your name and whom you represent, after which
19  the court reporter will swear in the witness.
20            MR. TAYLOR:  Dave Taylor on
21  behalf of the plaintiffs.
22            MR. BLACKERBY:  Chris Blackerby
23  on behalf of Deere.
24
25
```



Page 124

1  bolts can become separated during operation or
2  popped off?
3     A.  Well, that's from knowledge about bolts
4  in general.
5     Q.  Well, I --
6     A.  I mean --
7     Q.  So I'm talking about cotton strippers
8  and how these things operate and what kind of
9  conditions they go through in the field and how
10  the cotton and material that gets in there
11  interacts with it.
12         I know you've said you've never
13  operated one and you've never serviced one.  So
14  in terms of the explanation as to how bolts on
15  the drum of a cotton stripper might be sheared
16  off or popped off during operation, what's the
17  basis for the -- your belief that it's either
18  overtightening or some type of rock strike?
19         MR. TAYLOR:  Objection.  Form.
20     A.  Well, Mr. Blackerby, there's only so
21  many ways to break the head off of a bolt
22  regardless of whether it's in a cotton stripper
23  or it's in something else.  The two ways to do
24  it are to shear it off or to torque it off.  And
25  that's it.  That's the only two ways to do it.

Page 125

1     Q.  All right.
2     A.  So that's how, I guess, I arrive at
3  that, which then within the unit the way to
4  torque them off is to have them be overtightened
5  and the way to shear them off is to hit them
6  with something.  Or maybe you could potentially
7  overload the blade and pull it enough to shear
8  the bolt off, but that -- that would be similar
9  to striking a rock or something -- some foreign
10  material in there is most likely what has to
11  happen.
12     Q.  That third explanation that you just
13  added was one that I was wanting to know if you
14  were aware of or recognized.  You understand
15  that something could overload the blade and
16  cause it to move laterally and potentially shear
17  off the bolt head that way; right?
18     A.  Yeah.  I believe that's correct.  You
19  would see some evidence of that.
20     Q.  Well, we'll -- And we'll get to that,
21  whether or not you would see some evidence of
22  that, but a potential way -- there's -- so
23  we've -- we've now come up with -- you can --
24  you can think of three ways in which a bolt head
25  could go missing on one of these cotton

Page 126

1  strippers.
2         One would be an overtorquing
3  situation.  The other one would be a -- some
4  type of rock strike that got in there and
5  actually hit the bolt head or pinched the bolt
6  head in such a way that it popped it off.  And
7  the third way would be some type of load on the
8  blade laterally that would maybe move it and
9  shear off the bolt head.
10         That's three potential ways in
11  which it could happen.  I'm not -- I'm not
12  trying to say you're agreeing that that happened
13  in this case, but those are three potential
14  ways.  Do you agree with that?
15     A.  I think that's a fair statement.
16     Q.  Okay.  If the -- If there is a bolt
17  head that is sheared off or -- or popped off
18  during operation, is it your contention that you
19  will always see some kind of broken teeth or
20  some type of evidence?
21         MR. TAYLOR:  Objection.  Form.
22     A.  I think it depends on the mechanism at
23  which it was broken off.
24     Q.  So this is during operation.  So we're
25  taking overtorquing out of the analysis.  You

Page 127

1  think that there is some ways during operation
2  in which a bolt head could be sheared off
3  without it leaving some type of physical
4  evidence?
5         MR. TAYLOR:  Objection.  Form.
6     A.  I -- I guess I -- I believe it would
7  leave some physical evidence, because if there's
8  a rock that takes it out, then that would leave
9  some type of -- of mark or something close to
10  the screw head that takes it out.
11         And if it is overloaded due to
12  shear, then we should see a mark on the blade
13  that shows that the screw head moved or that
14  the -- where the indent is on the blade, we
15  should see that mark on the blade that the screw
16  head had repositioned itself.
17         So yes, I think it's going to
18  leave some evidence.
19     Q.  So it may not have a broken sawtooth
20  blade, but you may have some -- I mean, in terms
21  of the teeth, but you're saying that there may
22  be some evidence on the actual blade itself
23  where it interacted with the bolt?  Is that what
24  you're saying?
25         MR. TAYLOR:  Objection.



STEVE HAMERS, P.E. Volume II
NATIONWIDE AGRIBUSINESS vs DEERE & CO.

August 18, 2020
272–275

Page 272

1   Q.   Okay.  So the one in the background is
2   the -- is the spot that we looked at earlier?
3   A.   That's correct.
4   Q.   Okay.  And then --
5   A.   And then if you pull down right to
6   there, that spot lines up with that spot that we
7   looked at early on.
8   Q.   Okay.  And then this discoloration that
9   we see off in the background, farther off, where
10  it also goes across the doffer, you're just
11  saying that's not the same type of damage, even
12  though --
13  A.   It's not the same damage, no.
14  Q.   And how do you distinguish it between
15  looks?  What is it that distinguishes it in your
16  mind from -- from the condition we're seeing
17  here?
18  A.   Well, these are lined up with the
19  sawtooth blade, first of all.  And those
20  discolored areas over there, they're not going
21  down or through the paint layer the way that
22  these do.  And those areas over there are not --
23  the paint is not worn off over the whole width
24  of the support for the doffer brush.
25  Q.   Okay.  So you're saying that because

Page 273

1   the -- like, for example, this area has -- it's
2   all the way across, it's different than other
3   areas which are not all the way -- the area of
4   paint that's worn off is not all the way across,
5   and so therefore that's indicative to you that
6   it's not from contact?
7   A.   That's right.  And this -- this
8   close-up area here that you were just pointing
9   at actually has some -- some metal wear marks on
10  it.
11  Q.   It has some, I'm sorry, what?
12  A.   Some wear marks on it, if you want to
13  zoom in on that area.
14  Q.   Sure.  Show me.  This area right here?
15  Is this what you're talking about?
16  A.   Yeah, right here.  Zoom in there.
17  Okay.  You see the striations on there, those
18  metal marks?
19  Q.   You're talking about this right here?
20  A.   Yep.
21  Q.   Okay.  So you're -- you're claiming
22  that that is -- right there is evidence that
23  these striations are some type of evidence of
24  metal-on-metal contact?
25  A.   That's right.  That's where the teeth

Page 274

1   from the sawtooth blade are striking that.
2   MR. BLACKERBY:  Okay.  All right.
3   I think -- I think that's it.  Anything else you
4   want to add?
5   RECROSS-EXAMINATION
6   BY MR. TAYLOR:
7   Q.   Yeah.  I forgot to ask, Mr. Hamers, I
8   did ask you a number of questions in regards to
9   the other experts that have been hired in this
10  case, whether they're hired by the plaintiffs or
11  retained by John Deere, and them collectively
12  pointing out or not pointing out any evidence of
13  rock ingestion.
14  Do you recall all those
15  questions?
16  A.   I do, yes.
17  Q.   In a similar vein, if -- not to belabor
18  the point, but let -- are there any of the
19  experts that are retained by Deere -- John Deere
20  in this case, whether it's Trace Landers or Tim
21  Christensen, that identified any additional
22  mechanical failure within the Hughes stripper
23  besides the broken bolt heads?
24  A.   Not that I'm aware of, no.
25  Q.   Okay.  Are you aware of anyone at Hurst

Page 275

1   Farm Supply identifying any mechanical failure
2   within the Hughes stripper that is beyond the
3   broken bolt heads?
4   A.   No, not that I'm aware of.
5   Q.   Is it fair to say that we have evidence
6   of a mechanical failure by way of these broken
7   bolt heads as a potential cause of this fire
8   leading to the metal-on-metal contact versus the
9   possibility that rocks were ingested into this
10  machine without any of the experts identifying
11  any evidence?
12  MR. BLACKERBY:  Form, leading.
13  A.   That is what we have here for evidence
14  so far, is we do have good physical evidence
15  that shows that the sawtooth blades were
16  striking the doffer.  And there's no evidence of
17  any rock ingestion.
18  MR. TAYLOR:  I have no more
19  questions.  Thanks.
20  MR. BLACKERBY:  I think we've
21  beat the horse to death.
22  MR. TAYLOR:  We'll read and sign.
23  I think we're good.  Okay.
24  THE WITNESS:  Chris, I'd like to
25  read and sign.  I don't do a lot of these over



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONWIDE AGRIBUSINESS INSURANCE COMPANY, as subrogee of CWH FARMS, | § § § § | |
| Plaintiff, | § | CIVIL ACTION NO.: 4:19-CV-00425-O |
| vs. | § § § | |
| DEERE & COMPANY, | § § | |
| Defendant. | § | |

## AFFIDAVIT OF MARK H. WHATLEY, IAAI-CFI, CFEI, CVFI

STATE OF  Texas _____ )
                                        ) ss.
COUNTY OF  Tarrant _____ )

I, Mark H. Whatley, being first duly sworn, state and allege as follows:

1.     I am a Certified Fire and Explosion Investigator (CFEI) with over 21 years of experience, currently employed with Complete Fire Investigations, LLC.

2.     I was retained by Plaintiff Nationwide Agribusiness Insurance Company to investigate the origin and cause of the fire to CWH Farms' 2017 John Deere CS690 cotton stripper. I worked in tandem with Mechanical Engineer, Steve Hamers in this effort.

3.     At the December 13, 2017 initial joint scene inspection, it was reported that the header that been in use with the cotton stripper had been removed and was in service on another machine.

4.     I understood the header that had been in use with the cotton stripper had been looked at, but did not know the extent of the inspection at the time of the initial joint scene inspection.

- 1 -

Exhibit

K

0083

5.    I have since had the opportunity to review the July 28, 2020 deposition testimony of John Deere mechanic and Hurst Farm Supply employee Cade Owen, who performed two different inspections of the header.

6.    Mr. Owen repeatedly testified that he inspected the header by removing all of the shields checking for any signs of a mechanical or progressive failure. Mr. Owen found no signs of any problems or problems starting with the header after the October 23, 2017 fire. *See* Appx. at 0034 (Ex. E at 11:13-12:7; 15:23-16:4; 25:1-7; 30:11-32:1)

7.    Mr. Owen performed a similar inspection of the header after the October 24, 2017 fire and again, found no signs of any issues with the header. *See* Appx. at 0034 (Ex. E at 14:16-22; 21:21-22:7; 23:11-22; 25:1-26:1; 26:23-27:10)

8.    As Mr. Owen is a knowledgeable and experienced mechanic and now that I know the extent his two inspections, I can rule out the header as a possible area of origin for this fire pursuant to NFPA 921.

FURTHER YOUR AFFIANT SAITH NOT.



Mark H. Whatley

Subscribed and sworn to before me
this 28 day of _____ August, 2020.

_____
Notary Public

MARIO SANCHEZ
My Notary ID # 131665349
Expires July 31, 2022

- 2 -

0084