IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| NATIONWIDE AGRIBUSINESS INSURANCE COMPANY, as subrogee of CWH FARMS, | § § § § | |
| Plaintiff, | § | CIVIL ACTION NO.: 4:19-CV-00425-O |
| | § | |
| vs. | § § | |
| DEERE & COMPANY, | § § | |
| Defendant. | § § | |

### APPENDIX

1.  Trace Landers June 8, 2020 Expert Report and Opinions………...APPX. 001-APPX. 018
    (Exhibit A)

2.  April 29, 2019 correspondence to Deere & Company...……...…...APPX. 019-APPX. 035
    (Exhibit B)

3.  August 20, 2020 Deposition of Trace Landers.………...……….…..APPX. 036-APPX. 040
    (Exhibit C)

## Expert Report and Opinions

Nationwide Agribusiness Insurance Company v. Deere & Company

Model CS690 Cotton Stripper – Serial Number: 1N0C690SKH4065098

Stripper Head 608SH – Serial Number: 1N0S608HKH0010089

CWH Farms

Roscoe, TX



Prepared by:

Trace Landers
Staff Fire Engineer
John Deere Global Crop Harvesting
P.O. Box 8000
Waterloo, IA 50704
Phone: (319) 292-7184
June 8, 2020





Exhibit
A



**Expert Report**
Nationwide Agribusiness Insurance Company v. Deere & Company
Page 2 of 17

Chris A. Blackerby
Ben Zinnecker
Germer Beaman & Brown PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701

Re:     Case No. 4:19-cv-00425-O; *Nationwide Agribusiness Insurance Company v. Deere &*
        *Company*; In the United States District Court for the Northern District of Texas, Fort
        Worth Division

Mr. Blackerby and Mr. Zinnecker:

Pursuant to your request, I prepared the following report summarizing my preliminary expert
opinions in the above-referenced case.  Because my analysis is part of my regular job duties and
responsibilities, I am not receiving any specific compensation for my analysis.

**Qualifications, Training, and Experience**

My relevant expertise includes product engineering, design and development, manufacturing,
failure analysis, and fire scene investigation for agricultural vehicles, engine and aftertreatment
systems, and off-road equipment.

   *Career*

I have worked for Deere & Company ("Deere") for over 20 years.

From May 2000 to July 2011, I was a product design and manufacturing engineer for John Deere
Agricultural and Construction & Forestry equipment at both the Waterloo Product Engineering
Center and Dubuque Works.

In July 2011, I transitioned to John Deere Power Systems (JDPS) as a Senior Fire Engineer,
where I was responsible for engine and aftertreatment systems.  In this role, I was responsible for
fire prevention, design review, and event investigation for all existing and new product
programs.

In March 2017, I became a Staff Fire Engineer for John Deere Global Crop Harvesting, while
also retaining my previous fire engineering responsibilities with JDPS.  In this position, I provide
fire prevention, design review, and event investigation support for Deere combines and specialty
crop harvesting equipment (including cotton harvesters).

   *Education and Certifications*

I received a Bachelor of Science degree in Manufacturing Design Technology, a Bachelor of
Arts degree in General Industry and Technology, and a minor in Industrial Technology
Education from the University of Northern Iowa.  I also have a Master of Design Engineering



**Expert Report**
Nationwide Agribusiness Insurance Company v. Deere & Company
Page 3 of 17

from the University of Wisconsin Platteville.  I am a NAFI certified fire and explosion investigator (CFEI), certified vehicle fire investigator (CVFI), and a certified fire investigation instructor (CFII).

*Other*

In addition to my work experience, I have operated farm and construction equipment my entire life.

Attached to this report is a curriculum vitae outlining additional information about my professional education, training, and experience.

**Basis of Opinions**

I base my conclusions and opinions to date on the following:

- My review of the materials outlined in the following section;

- Notes and photographs from a pre-suit, December 13, 2017 joint inspection of the subject 2017 John Deere CS690 cotton stripper (PIN:  1N0C690SKH4065098) originally owned by CWH Farms;

- A February 18, 2020 inspection of the subject cotton stripper in a field approximately 1.5 miles west of the intersection of FM 608 and FM 2319 west of Roscoe, Texas;

- A May 27, 2020 inspection of the head (PIN:  1N0S608HKH0010089) originally installed on the cotton stripper at the time of the October 24, 2017 fire—but materially altered at the time of the inspection—at 5942 FM 41, Ropesville, Texas 79358;

- My understanding of the design, function, and use of the CS690 cotton stripper and its components;

- My knowledge of Deere & Company's product development, design, and manufacturing processes and documents;

- My knowledge of the operating and other information and documents provided in connection with the cotton stripper;

- My knowledge of the interpretation and application of the relevant voluntary industry standards; and

- My formal education, training, and experience in the sciences and scientific principles bearing on this case.



**Expert Report**
Nationwide Agribusiness Insurance Company v. Deere & Company
Page 4 of 17

## Materials Reviewed

*Discovery Responses*

1. Plaintiff's Initial Disclosures
2. Defendant's Initial Disclosures
3. Defendant's Responses and Objections to Plaintiff's Requests for Admission, Set I
4. Defendant's Answers and Objections to Plaintiff's First Set of Interrogatories

*Documents Produced by Deere*

5. Marketing Brochure [DEERE-CWHFARMS-000001-24]
6. Operator's Manual [DEERE-CWHFARMS-000025-574]
7. Parts Catalog [DEERE-CWHFARMS-000575-2042]
8. Post-incident scene and product photos [DEERE-CWHFARMS-002043-2059]
9. Photos taken by Tim Christensen during 12/13/17 inspection [DEERE-CWHFARMS-002060-2136]
10. Technical Manual [DEERE-CWHFARMS-002137-7004]
11. Cleaner Saw Assembly Drawing [CONFIDENTIAL] [DEERE-CWHFARMS-007005]
12. Warranty Reports [DEERE-CWHFARMS-007006-09]
13. DTACs [DEERE-CWHFARMS-007010-13]
14. PIPs [DEERE-CWHFARMS-007014-30]
15. Notes from consultant Tim Christensen taken during 12/13/17 inspection [DEERE-CWHFARMS-007031-35]
16. Saw Assembly Drawing [CONFIDENTIAL] [DEERE-CWHFARMS-007036]
17. Warranty for cotton stripper

*Documents Produced by Plaintiff*

18. Pre-suit demand and inspection correspondence [CWH000001-9]
19. Hurst Farm Sales Record [CWH000010]
20. John Deere Retail Installment Contract [CWH000011-000016]
21. Sign-in sheet for 12/13/17 inspection [CWH000017]
22. Post-incident scene and product photos [CWH000018]
23. Damage documentation [CWH000019-33]

*Depositions*

24. Cody Wayne Hughes (5/19/2020)

*Inspection Photos*

25. Photos taken by Trace Landers during 2/18/20 and 5/27/20 inspections
26. Photos taken by Plaintiff's experts during their inspections

**004**



**JOHN DEERE**

**Expert Report**
Nationwide Agribusiness Insurance Company v. Deere & Company
Page 5 of 17

27. Steven R. Hamers report and exhibits
28. Mark H. Whatley report and exhibits

*Publications and Standards*

29. NFPA 921 (2017 edition)
30. NFPA 921 (2011 edition)
31. ISO 4254-1 & 7
32. ASABE S279
33. ASABE S318
34. ISO 3600
35. ANSI Z535.4
36. ISO 11684
37. ASTM E678-07
38. ASTM E620-18

**Cotton Stripper and Head History**

The subject cotton stripper (PIN: 1N0C690SKH4065098) was manufactured at the John Deere Des Moines Works in Ankeny, Iowa, on June 22, 2017.  It was sold to CWH Farms of Roscoe, TX in August 2017.  From the date of the fire to the present, the cotton stripper has remained in a field exposed to the elements.

The head on the machine at the time of the fire (PIN: 1N0S608HKH0010089), was removed and sold after the fire.  The second owner, Gary Foster, purchased the head on August 15, 2018.  It is currently owned by Mike Henson in Ropesville, TX, who purchased it on September 10, 2019.

**Circumstances of Fires**

The cotton stripper was involved in two fires, and Cody Wayne Hughes was the operator during both.  (Hughes Depo. at 50-51.)  The first fire occurred on October 23, 2017.  (*Id.* at 51.)  Mr. Hughes began operating the machine at about 5:00 pm, and after approximately 2.7 fan hours, he noticed smoke coming from the passenger side of the round module builder (RMB).  (*Id.* at 56, 58, 65.)  After the fire was extinguished, a technician from Hurst Farm Supply inspected the machine in the field on the morning of October 24, 2017.  (*Id.* at 66.)  The cleaner was in "pristine" condition, and the technician could not find anything wrong with it.  (*Id.* at 63-65.)

The second fire occurred October 24, 2017.  Mr. Hughes began operating the machine around 2:00 or 2:30 pm.  (*Id.* at 67.)  Mr. Hughes was heading west, with a northeast wind, when the second fire occurred at approximately 4.0 fan hours.  (*Id.* at 69-70.)



**Expert Report**
Nationwide Agribusiness Insurance Company v. Deere & Company
Page 6 of 17

**Methodology**

*Fire Cause and Origin*

The National Fire Protection Association (NFPA) is an international nonprofit organization established in 1896.  The company's mission is to reduce the worldwide burden of fire and other hazards on the quality of life by providing and advocating consensus codes and standards, research, training, and education.  With a membership that includes more than 50,000 individuals from around the globe, NFPA is the world's leading advocate of fire prevention and an authoritative source on public safety.

NFPA is responsible for 300 codes and standards designed to minimize the risk and effects of fire by establishing criteria for building, processing, design, service, and installation in the United States and many other countries.  Its more than 250 technical code- and standard-development committees are comprised of approximately 9,000 volunteers, who vote on proposals and revisions in a process accredited by the American National Standards Institute (ANSI).

Deere rigorously follows NFPA 921, Guide for Fire and Explosion Investigations (2017 edition) when investigating fires worldwide.  The scientific method is the primary tool for identifying the cause and origin of a fire (NFPA 921 ch. 4).  Under the scientific method, an investigator gathers and analyzes evidence, and then uses inductive reasoning to develop a hypothesis.  The investigator must then test the hypothesis using the principles of deductive reasoning.  If no hypothesis can withstand an examination by deductive reasoning, the issue should be considered undetermined.

NFPA 921 section 4.4 describes the "basic method of a fire investigation" in most incidents should involve the following five steps:

1.  Receiving the assignment
2.  Preparing for the investigation
3.  Conducting the investigation
4.  Collecting and Preserving Evidence
5.  Analyzing the Incident

This report outlines the analysis of the origin and cause of the fire based on the scientific method described in NFPA 921.

*Deere Design History and Safety Process*

Deere has a long history of designing safe products and implementing safety features, monitoring product performance, providing warranty support, and providing service parts in an industry leading, dealer-supported channel.  Safety performance is monitored right along with any other performance measure.



**Expert Report**
Nationwide Agribusiness Insurance Company v. Deere & Company
Page 7 of 17

Deere uses a disciplined and accepted product delivery process for developing, verifying, and validating products for the markets in which it participates. The process follows accepted design steps, and projects are required to meet specific metrics and measures to progress from one design phase to another. Safety plans are made for each product, and an accepted Hazard Discovery and Rating System is one of the tools Deere uses to ensure that all products are safe and acceptable for their intended use. A Product Safety Committee is charged with determining a product is safe and ready for customer use before it authorizes production.

The Hazard Detection and Rating System is a systematic review of the product designed to identify hazards that reasonable operators or bystanders may be exposed to during the normal operation and service of the machine, or when safety critical components or systems of the machine malfunction or fail. This systematic review seeks to identify hazards that arise during the use of the machine by a reasonable person. This is embodied in the Deere General Rule:

- An acceptable design is one that does not present unreasonable risk of injury to a product user or others in its proximity.

Deere applies this General Rule enterprise-wide as follows:

- Consider persons, environmental conditions, and other products with which a product is likely to be involved. If, after such consideration, it appears there exists a hazard that is not acceptable, then:

  o Eliminate or reduce the hazard in so far as is possible without an unreasonable impairment of product function, and/or unreasonable cost relative to the total cost of the product and seriousness of the hazard.

  o Remaining hazards are reasonable and acceptable only if appropriate safety instructions can be clearly written and displayed and if such instructions can be practically followed.

**Investigation**

*First Cotton Stripper Inspection (12/13/17)*

The parties jointly inspected the cotton stripper fewer than two months after the fire on December 13, 2017. Photos from this inspection reveal most of the fire damage in the rear of the machine in the accumulator and RMB.



**JOHN DEERE**
**Expert Report**
Nationwide Agribusiness Insurance Company v. Deere & Company
Page 8 of 17



*RIMG1991*



*RIMG1989*



*RIMG2053*

There is also thermal damage to the paint and charring at the cotton flow duct near the head attachment.



*RIMG2016*

The inspection revealed four sheared cleaner teeth bolt heads.



**Expert Report**

Nationwide Agribusiness Insurance Company v. Deere & Company

Page 9 of 17



*RIMG2042*



*RIMG2041*

There were no bent, cracked, or broken teeth.



*RIMG2036*



*RIMG2037*

The head was not available for the inspection.

*Second Cotton Stripper Inspection (2/18/20)*

I attended a joint, second machine inspection on February 18, 2020.  The cotton stripper was still in the field at the same location and had not moved.  The unit was in repairable condition and not a total loss.  I noted baler and accumulator damage from the fire, and thermal damage at the cotton feed area where the head attaches.



*P2181448*



*P2181485*

After sitting in the field for over two years in the same location, exposed to the elements, many areas of the machine showed rust and oxidation.  Compared to photos from the initial inspection,



**JOHN DEERE**
**Expert Report**
Nationwide Agribusiness Insurance Company v. Deere & Company
Page 10 of 17

the second inspection revealed areas that had visible rust and oxidation—both inside the cleaner, and in areas where there was fire damage.



*P2181530*

I observed four broken/sheared cleaner bolts in the cleaner, but none of the cleaner teeth were bent or broken. I also inspected the doffer and did not find any evidence of interference, grinding, loss of material, or thermal friction on it or the corresponding cleaner drums. I observed three areas on the doffer that appeared to have surface rust and paint chipping, and none of these areas lined up with cleaner teeth.



*P2181583*

I also saw and photographed several rocks in the field near the machine.



**Expert Report**

Nationwide Agribusiness Insurance Company v. Deere & Company

Page 11 of 17



*P2181448*



*P2181485*

The head was not available for the inspection.

*Head Inspection (5/27/20)*

On May 27, 2020, I attended a joint, third inspection, in Ropesville, Texas, of the head that was on the cotton stripper at the time of the fire.



*P5270026*

During the inspection, the head was installed on a different CS690 cotton stripper owned by Mike Henson.  Mr. Henson is the third owner of the head.

Mr. Henson purchased the head in September 2019 and harvested 3000+ acres with it.  Western Equipment rebuilt the head before Mr. Henson purchased it.



**Expert Report**
Nationwide Agribusiness Insurance Company v. Deere & Company
Page 12 of 17

The inspection revealed the inside of each row unit—including the row unit sheet metal, augers, and framework—had been repainted.




*P5270034*
*P5270097*

Typically, paint will wear off in this area during harvest.

I also noticed green paint overspray on some of the bearing covers and hardware.




*P5270034*
*P5270097*

Mr. Henson stated that he repaints these areas on all his heads once each harvest concludes.

Because the unit had been repainted, I was not able to document, observe, or photograph the head in its original condition.



**John Deere**

**Expert Report**
Nationwide Agribusiness Insurance Company v. Deere & Company
Page 13 of 17

**Analysis and Discussion**

*Fire Cause and Origin*

It is my opinion that the cause of the October 24, 2017 fire is undetermined for the following reasons:

1.  It is not possible to rule out all potential causes of the fire (and as I discuss in the "Response to Steven R. Hamers' Opinions" and "Response to Mark H. Whatley's Opinions" sections below, Plaintiff's experts did not properly rule out alternative fire causes either). For example, a separate fire involving this cotton stripper occurred the previous day (October 23, 2017) and was reported to have started in the head of the machine. I also observed thermal damage to the paint on the machine in the area where the head attaches.

    Mr. Whatley acknowledges this thermal damage in his report. (Whatley Report, Attachment 1 at 5 (CWH000046).) This damage is in the flow of cotton and crop material. The head was not made available to Deere for the initial inspection. The head was not preserved and had been materially altered before any Deere representative had an opportunity to inspect the head. Accordingly, friction heat—either from foreign objects, or from damage to the head—cannot be ruled out as a cause for the fire incident, and fire pattern in this area warranted further investigation of the head. Furthermore, I cannot rule out smoldering material on the machine from the first fire being a potential cause for the fire on October 24, 2017.

2.  An area of origin and evidence of a competent ignition source have not been established on the machine or head.

3.  The saw assembly cleaner teeth are heat treated and are therefore robust and not easily bent in normal harvest operation. The following cannot be ruled out as potential causes of the bolt heads shearing off: the transfer of forces from a foreign object lodged in the cleaner, or an object plugging the cleaner, causing increased force on teeth through the cotton media. Foreign debris is a possible explanation for why there would be sheared bolt heads without damage to the cleaner teeth.

*Failure to Preserve Evidence*

As discussed elsewhere in this report, the head was not available either at the initial, December 13, 2017 inspection, or at the February 18, 2020 inspection, despite Deere's requests to inspect the head. When Deere located the head following the February 18, 2020 inspection and inspected it in May 27, 2020, it was not preserved in its original condition following the fire.

As discussed in the previous section of this report, the head is a critical piece of evidence because of the fire patterns observed in the area where the head attaches and the reports about the



**JOHN DEERE**
**Expert Report**
Nationwide Agribusiness Insurance Company v. Deere & Company
Page 14 of 17

first fire originating in the head of the machine.  Yet Plaintiff Nationwide did not preserve the head, and this critical piece of evidence changed ownership twice since the fire occurred in October 2017.  The head was reported to have been rebuilt, by the dealer, prior to the purchase by Mike Henson (3rd owner) in late 2018, and Mr. Henson reported that he harvested 3000+ acres with the head in 2019.  When the head was made available by Mr. Henson for inspection roughly 2.5 years after the fire in May 2020, Mr. Henson had completely repainted the inside of each row unit of the head, including the frame, sheet metal, and augers.  Mr. Henson repaints this area of his heads each year to prevent rust.  The repainting materially altered the head and made any potential investigation for fire pattern in the head row-units impossible to determine.

*No Evidence of Defects in Material or Workmanship in the Cotton Stripper*

Based on my training, experience, and following documents and information, my opinion is the four broken cleaner teeth bolts were not over-torqued and did not leave the factory in a failed condition:

1.  The dealer inspected the cotton stripper cleaner assembly after the first, October 23, 2017 fire incident.  Cody Wayne Hughes reported the area was in "pristine condition," with no evidence of broken cleaner teeth or bolt heads.  (Hughes Depo. at 63-65.)

2.  The cleaner teeth brackets have no evidence of cracking or fracture.

3.  Assembly and quality control measures are in place to ensure that cleaner teeth hardware is properly installed.  Torque tools are used for assembly, and parts are audited per the cleaner saw assembly print drawing (AN405199).

*Response to Steven R. Hamers' Opinions*

In his report, Mr. Hamers opines there is evidence of metal-on-metal contact between the cleaner teeth or hardware and the doffer.  Mr. Hamers relies on photos of an exemplar doffer and cleaner saw assembly, and photos (including "photograph 93") purportedly showing locations where the saw teeth struck the subject doffer.

Mr. Hamers' reliance on the condition of the saw blades on the exemplar assembly is flawed because the exemplar cleaner teeth are bent, broken, and in a different condition than the cleaner teeth on the subject assembly.  The cleaner teeth on the subject machine are not bent or broken, and there is no marking evidence on the subject doffer like there is on the exemplar doffer.

Regarding photograph 93 and other photos purportedly showing contact points between the saw teeth and the subject doffer:

o   The locations Mr. Hamers highlights do not show evidence of friction heat.

o   There is no paint discoloration in the immediate areas noted on the doffer.



**JOHN DEERE**
**Expert Report**
Nationwide Agribusiness Insurance Company v. Deere & Company
Page 15 of 17

o   The teeth of the cleaner do not line up with the marks on the doffer—including the marks on photograph 93.

o   The marks on the doffer in photograph 93 were observed over two years after the fire, and during that time the cotton stripper had been sitting in a field exposed to the elements.  So it is probable that the oxidation on the doffer resulted from long-term exposure to the elements.

Deere has quality and manufacturing controls in place to prevent over-torqueing of the cleaner fasteners.  The dealer's October 23, 2017 inspection following the first fire also noted that this damage was not present.  The most likely failure of this joint is a stripped fastener/hole thread, not a broken, self-tapping screw.  Deere has an oversized diameter service part screw for this based on service feedback and experience for this very reason.

Mr. Hamers ignores the fire pattern in the cotton feed area of the machine where the head attaches.  (Hamers Report, Attachment at 3 (CWH000082).)  Cotton flows from the front of the machine to the back, which results in a wrapped cotton module.  Mr. Hamers did not examine the head before forming his opinions and therefore did not properly consider or eliminate the head as a potential cause and origin of the fire.

Mr. Hamers does not consider or eliminate embers, charred cotton, or smoldering material from the October 23, 2017 fire as a potential cause of the October 24, 2017 fire.

Mr. Hamers' failure to eliminate potential fire causes and areas of origin violates NFPA 921, section 19.6.5:

> The process of elimination is an integral part of the scientific method.  All potential ignition sources present or believed to be present, in the area of origin, should be identified and alternative hypotheses should be considered and challenged against the facts.  Elimination of a testable hypothesis by disproving the hypothesis with reliable evidence is a fundamental part of the scientific method . . . .  Determination of the ignition source must be based on data or logical inferences drawn from that data . . . .  Any hypotheses formulated for the causal factors (e.g., first fuel, ignition source, and ignition sequence), must be based on the analysis of facts and logical inferences that flow from those facts.  Those facts and logical inferences are derived from evidence, observations, calculations, experiments, and the laws of science.  Speculative information cannot be included in the analysis.

*Response to Mark H. Whatley's Opinions*

Mr. Whatley opines that mechanical sparks in the cleaner were the ignition source for the fire.  Like Mr. Hamers, in forming this opinion, Mr. Whatley acknowledges—but does not address— thermal damage to the paint on the machine where the head attaches.  (Whatley Report, Attachment 1 at 5 (CWH000046).)  The first fire was reported to have started in the head.  Mr.



**Expert Report**
Nationwide Agribusiness Insurance Company v. Deere & Company
Page 16 of 17

Whatley did not inspect the head in its condition at the time of the fire and only inspected it in its altered condition during the May 27, 2020 inspection.

Like Mr. Hamers, Mr. Whatley does not consider or eliminate embers, charred cotton, or smoldering material from the October 23, 2017 fire as a potential cause of the October 24, 2017 fire.

Mr. Whatley's failure to eliminate potential fire causes and areas of origin violates NFPA 921, section 19.6.5.

Furthermore, for the reasons discussed in the previous section responding to Mr. Hamers' opinions, there is no evidence of a competent ignition source in the cleaner because there is no evidence of metal-on-metal contact.

**Conclusions**

The cause and origin of the October 24, 2017 fire is undetermined.  The head is a critical piece of evidence that was not preserved following the fire.  And based on my training, experience, and the documents and information discussed above, there is no evidence of defects in materials or workmanship, and the broken cleaner teeth bolts were not overtightened and did not leave the factory in a failed condition.

Neither Mr. Whatley nor Mr. Hamers properly developed and tested a hypothesis meeting the criteria of NFPA 921 regarding the cause and origin of the fire.  Neither expert provided any evidence to show that the areas of interest on the saw drum and doffer were the cause or origin of the fire.  Mr. Hamers did not inspect the head at any time, and Mr. Whatley did not inspect the head in its incident condition, but only in its post-incident, materially altered condition.  Neither expert followed the "basic method of a fire investigation" outlined in NFPA 921 section 4.4 before forming their opinions.

NFPA 921 is clear:  if an investigator cannot develop and prove a hypothesis, then the fire is undetermined (4.3.6).  Since neither Mr. Whatley nor Mr. Hamers were able to present a hypothesis meeting NFPA 921 criteria, or more simply the scientific method, then they must— but improperly, do not—consider the fire undetermined.

These are my opinions to date.  All my opinions in this report are based upon a reasonable degree of engineering probability and certainty.  I may later supplement this report with additional opinions based on additional facts or evidence, or additional analysis, testing, or research conducted by me or others.



**JOHN DEERE**
**Expert Report**
Nationwide Agribusiness Insurance Company v. Deere & Company
Page 17 of 17

Sincerely,

*Trace Landers*

Trace Landers

Enclosure

## *Trace D. Landers*

**101 Blake Rd.**
**Denver, IA 50622**
**(319) 984-5848**
**LandersTraceD@JohnDeere.com**

**EDUCATION:**

- Master of Science degree in Engineering-Design from the University of Wisconsin-Platteville
- Undergraduate degrees from the University of Northern Iowa
    - B.S. degree in Manufacturing Technology: Design
    - B.A. degree in General Industry and Technology
    - Minor in Industrial Technology Education

**EXPERIENCE AND TRAINING:**

- Fire engineering experience with John Deere Power Systems and Ag & Turf products
- Member of the National Association of Fire Investigators (NAFI)
- NAFI certified fire and explosion investigator (CFEI), certified vehicle fire investigator (CVFI), and certified fire investigation instructor (CFII)
- Conducted 50+ fire investigations related to off road equipment
- Experience working with Deere product support and legal teams
- Engineering and manufacturing experience within the Ag. & Construction & Forestry Divisions at John Deere
- Experience leading and working with engineering, quality, and manufacturing teams
- Named on (5) patents and (1) trade secret for Deere
- Extensive new product (PDP) and continuous improvement (CI) engineering experience
- Tractor cab design engineer for 7R, 8R, and 9R tractor platforms
- Structures and engine enclosure engineer for John Deere skid steers
- Extensive design experience with vehicle structures, sheet metal, castings, plastics, and machining
- Experience interacting with manufacturing, engineering, quality, and supply management on a daily basis
- Robotic weld manufacturing and industrial engineering experience
- Have created testing plans to verify and validate engineering solutions
- Support new product prototype programs at John Deere in the factory and at the test sites
- Conducted, facilitated, and support design reviews frequently

**PRIOR EMPLOYMENT:**

- Deere and Company, Global Crop Harvesting & JDPS, Des Moines and Waterloo, IA
- (Staff Equipment Fire Engineer, Specialty Crop Harvesting and JDPS), March, 2017 to Present
- Deere and Company, John Deere Power Systems (PEC), Waterloo, IA
- (Senior Equipment Fire Engineer, Engine Applications), July, 2011 to March, 2017
- Deere and Company, John Deere Waterloo Works (PEC), Waterloo, IA
- (Design Engineer, Cab ROPS, Interior, & Exterior Components), November, 2005 to July, 2011
- Deere and Company, John Deere Waterloo Works (DSS), Waterloo, IA
- (Manufacturing Engineer, Cab Weld/Machining), January, 2005 to November, 2005
- Deere and Company, John Deere Dubuque Works, Dubuque, IA
- (Design Engineer, Skid Steer Loaders), March, 2002 to January, 2005
- Deere and Company, John Deere Waterloo Works (PEC), Waterloo, IA
- (Engineering Co-op), May, 2000 to March, 2002

**References Available Upon Request**

| From: | David Taylor |
|---|---|
| To: | Reed Scott M |
| Cc: | Shani Sudduth; Shane McSparron; Michelle Hurley |
| Subject: | CWH Farms - 2017 JD CS690 Cotton Stripper Total Loss fire, DOL: OCT 24, 2017, Roscoe TX |
| Date: | Monday, April 29, 2019 9:59:21 AM |
| Attachments: | 1765362.pdf |
| Importance: | High |

Scott,

I am writing to provide you with a copy of our client's damage documents and to hopefully begin a discussion to get this one resolved without the need to resort to formal litigation.

Attached please find a copy of our damage documents showing the value of the damages suffered.   A total of $614,843.77 was suffered in damage, but only $581,000.00 was paid due to policy limits.   Please consider this correspondence to be our client's demand for compensation of the lower $581,000.00.

As you know, this machine suffered a fire prior to the total loss fire the gives rise to this claim.   Incredibly, the second total loss fire happened before the machine had 10 hours of use on it.   Because this machine as virtually brand new at the time of loss, we are confident it was within warranty.   We therefore do not believe there are any colorable ELD arguments to be made for this loss.

Based on our review of this loss as well as things learned through other JD Cotton Stripper fire investigations, we know that there is/has been an issue with the saw tooth blade screws breaking off which allows the saw tooth blade to run loose.   When that happens you have metal coming into contact with metal (the saw tooth and the drum) in the very place where you're threshing dry cotton.   Not a good scenario at all.

Now that I have gotten our damages together, please contact me to discuss resolving this one very quickly.   I really do not want to go to the trouble of engaging local counsel on this only to settle once we are in suit.   Moreover, as I think our history and common sense dictate, there is more room to move when the parties (JD included) have not wasted a bunch of money on litigation.

I am sure you will agree Deere does not want to defend a 10 hour old machine fire, which evidence of physical defect or failures.

Thanks,
Dave

David J. Taylor
Attorney at Law
Yost & Baill, LLP
2050 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, MN 55402
612.244.2931 – direct dial
612.344.1689 – facsimile



**Exhibit**

**B**

**019**

*NOTICE: This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521, is confidential, and may be legally privileged.  The information is solely for the use of the addressee named above. If you are not the intended recipient, any disclosure, copying, distribution or other use of the contents of this information is strictly prohibited. If you have received this e-mail in error, please notify us by return e-mail and delete this message. Thank you.*

**020**

| 472,500.57 | Machine payoff amount |
| 108,499.43 + | Remaining amount of machine due to insured |
| -------------------------- | |
| 581,000 = | Machine Limits |

| Clear | |
| 20,000.00 | Rental Limits |
| 10,000.00 + | Extra Expense Limits |
| 3,485.95 + | Remove rear tire to facilitate moving |
| 357.82 + | Fire extinguisher recharge |
| -------------------------- | |
| 33,843.77 = | |

| Clear | |
| Clear | |
| 472,500.57 | |
| 108,499.43 + | |
| 33,843.77 + | |
| -------------------------- | |
| 614,843.77 = | |





**JOHN DEERE**
FINANCIAL

John Deere Financial
6400 NW 86th Street, P.O. Box 6600
Johnston, IA  50131-6600  USA

## Letter of Guarantee

22-Nov-17

Claim # 188377GG
    Eq:    2017 John Deere S690 CSTP   1N0C690SKH4065098

Customer Name:          CWH FARMS
John Deere Financial Account#:   **REDACTED**

To Whom It May Concern:

Deere and Company will release its lien on the above equipment if $472,500.57 is received by 12/22/2017.

Please remit payment to:

    **Regular Mail:**               **Overnight Mail:**
    John Deere Financial         John Deere Financial
    ATTN:  Insurance Dept.     ATTN:  Insurance Dept.
    P.O. Box 6640             6400 N.W. 86th St.
    Johnston, IA 50131 6640    Johnston, IA  50131

If you have any questions, please call (888) 427-8713.

Sincerely,

**Desiree Manfull**
John Deere Financial
Insurance Coordinator

Copy of this letter sent to:

N/A

023

 **MARKET VALUATION REPORT**

Prepared for NATIONWIDE ENTERPRISE

## REPORT SUMMARY

 **CLAIM INFORMATION**

| | |
|---|---|
| Owner | Unk<br>Roscoe, TX 79545 |
| Loss Unit | Farm 2017 John Deere CS690 |
| Loss Unit Type | HEAVY EQUIPMENT |
| Loss Incident Date | 10/24/2017 |
| Claim Reported | 11/14/2017 |

The CCC ONE® Market Valuation Report reflects CCC Information Services Inc.'s opinion as to the value of the loss unit, based on information provided to CCC by NATIONWIDE ENTERPRISE.

 **INSURANCE INFORMATION**

| | |
|---|---|
| Report Reference Number | 86607642 |
| Claim Reference | 188377-GG |
| Adjuster | Martina, Russ |
| Hours | 4 |
| Last Updated | 11/14/2017 11:25 AM |

### VALUATION SUMMARY

| | |
|---|---|
| **Base Value** | **$ 577,743.00** |
| AUGER SEPARATING KIT | + $ 4,000.00 |
| FRONT CAMERA | + $ 781.78 |
| **Adjusted Value** | **$ 582,524.78** |

| **Total** | **$ 582,524.78** |
|---|---|

The total may not represent the total of the settlement as other factors (e.g. license and fees) may need to be taken into account.

BASE VALUE

This is derived from comparable unit(s) available or recently available in the marketplace at the time of valuation, per our valuation methodology described on the next page.

Inside the Report

Valuation Methodology............................ 2
Loss Unit Information.............................. 3
Comparable Units.................................. 4
Valuation Notes.................................... 5
Supplemental Information......................... 6

© Copyright 2016 CCC Information Services Inc. All Rights Reserved.

Page 1 of 6

024

CCC⬛ONE  MARKET VALUATION REPORT

Owner: Unk
Claim: 188377-GG

# VALUATION METHODOLOGY

## How was the valuation determined?



### CLAIM INSPECTION

NATIONWIDE ENTERPRISE has provided CCC with the zip code where the loss unit is garaged, loss unit PIN, mileage/hours, options and additional equipment, as well as loss unit condition, which is used to assist in determining the value of the loss unit.



### DATABASE REVIEW

CCC maintains an extensive database of units that currently are or recently were available for sale in the U.S. This database includes units advertised for sale by dealerships or private parties. All of these sources are updated regularly.

### SEARCH FOR COMPARABLES

When a valuation is created the database is searched and comparable units are selected. On current year units, new units for sale at the time of the valuation may have been used. The zip code where the loss unit is garaged determines the starting point for the search. Comparable units are similar to the loss unit based on relevant factors. If a sufficient number of comparable units cannot be located, CCC may also obtain dealer quotations for a unit with attributes as reported by the insurer.



### CALCULATE VALUATION

Adjustments to the price of the selected comparable units are made to reflect differences in attributes, including mileage/hours, options, additional equipment, refurbishments, after factory equipment, and condition. Dollar adjustments are based upon market research. Finally, the Base Value is the straight average of the adjusted values of the comparable units. Due to the unique nature of the loss units valued in the Commercial and Recreational Vehicle division, a valuation specialist handles each request individually.



© Copyright 2016 CCC Information Services Inc. All Rights Reserved.

 **MARKET VALUATION REPORT** | Owner: Unk
Claim: 188377-GG

# 🚐 LOSS UNIT INFORMATION

## LOSS UNIT DETAILS

| | |
|---|---|
| Location | Roscoe , TX  79545 |
| PIN | 1N0C690SKH4065098 |
| Year | 2017 |
| Make | John Deere |
| Model | CS690 |
| Engine Horse Power | 530 |
| Power/Fuel Type | Diesel |
| Engine Hours | 4 |
| Transmission Type | HYDROSTATIC |
| Drive Train | Other |
| Rollover Protection | Enclosed Cab W/AC |
| Option Tire/Tracks | T |

Property Identification Number assigned by the manufacturer to the Loss Unit.

Please review the information in the Loss Unit Information Section to confirm the reported mileage and condition, and to verify that the information accurately reflects the options, additional equipment, refurbishments or other aspects of the loss unit that may impact the value.

NATIONWIDE ENTERPRISE uses condition inspection guidelines to determine the condition of the loss unit prior to the loss. The guidelines describe physical characteristics for the loss unit, for the condition selected based upon age. Inspection Notes reflect observations from the appraiser regarding the loss unit's condition.

## LOSS UNIT CONDITION

| | Condition |
|---|---|
| Overall Rating | Exceptional |

## EQUIPMENT

| | |
|---|---|
| Cab With Heat And Ac | ✓ |
| Power Steering | ✓ |
| Insulation Package | ✓ |
| Pneumatic Tires | ✓ |

 **MARKET VALUATION REPORT**    | Owner: Unk
Claim: 188377-GG

## COMPARABLE UNITS

|  | Loss Unit | Comp 1 | Comp 2 |
|---|---|---|---|
| Price |  | $600,000 | $586,700 |
| **Year/Make/Model** | 2017 John Deere CS690 | 2018 John Deere CS690 | 2018 John Deere CS690 |
| Hours | 4 | NEW | NEW |
| **Configuration** |  |  |  |
| Transmission Type | HYDROSTATI |  |  |
| Drive Train | Other | Other | Other |
| Front Tire % Wear Remaining |  | 100 | 100 |
| Rollover Protection | Enclosed Cab W/AC | Enclosed Cab W/AC | Enclosed Cab W/AC |
| Drive Train Other | PRWD | PRWD | PRWD |
| Power/Fuel Type | Diesel | Diesel | Diesel |
| Engine Hours | 4 | 0 | 0 |
| Rear Tire % Wear Remaining |  | 100 | 100 |
| Engine Horse Power | 530 |  | 530 |
| Option Tire/Tracks | T | T | T |
| **Additional Equipment** |  |  |  |
| Insulation Package | ✓ | ✓ | ✓ |
| Power Steering | ✓ | ✓ | ✓ |
| Pneumatic Tires | ✓ | ✓ | ✓ |
| Cab With Heat And Ac | ✓ | ✓ | ✓ |
| **Condition** | Exceptional | Average | Average |
| **Adjustments:** |  |  |  |
| **Make/Model/Trim** |  | - $ 14,951 | - $ 14,951 |
| **Configuration** |  |  |  |
| Front Tire % Wear Remaining |  | - $ 300 | - $ 300 |
| Engine Hours |  | - $ 56 | - $ 56 |
| Rear Tire % Wear Remaining |  | - $ 300 | - $ 300 |
| **Additional Equipment** |  |  |  |
| **Condition** |  | $ 0 | $ 0 |
| **Adjusted Comparable Value** |  | $584,393 | $571,093 |

**Comp 1**    Updated Date: 11/13/2017
**2018 John Deere CS690**
**PIN** UNKNOWN
**Dealership** BE IMPLEMENT
**Location** Littlefield, TX
**Contact** CLAY
**Telephone** (806) 385-5108
**Source** Dealer Ad

**Comp 2**    Updated Date: 11/13/2017
**2018 John Deere CS690**
**PIN** UNKNOWN
**Dealership** HURST FARM SUPPLY
**Location** Snyder, TX
**Contact** JEFF
**Telephone** (325) 573-3201
**Source** Dealer Ad

**Comparables** used in the determination of the Base Value are not intended to be replacement units but are reflective of the market value, and may no longer be available for sale.

**Price** is the amount that the dealership will accept to sell the unit, though a lower price may be obtainable through negotiation.

© Copyright 2016 CCC Information Services Inc. All Rights Reserved.

Page 4 of 6

**027**

 MARKET VALUATION REPORT

Owner: Unk
Claim: 188377-GG

## VALUATION NOTES

11/13/2017 11:17 - AVERAGE HOURS = 200

The following information was provided after the valuation was completed

11/14/2017 11:25 - Pre/Post Tax data modified after Valuation

11/14/2017 11:25 - PVADJ CHANGE REQUESTED BY: MARTINA, RUSS

11/14/2017 09:09 - Pre/Post Tax data modified after Valuation

11/14/2017 09:09 - PVADJ CHANGE REQUESTED BY: MARTINA, RUSS

This Market Valuation Report has been prepared exclusively for use by NATIONWIDE
ENTERPRISE, and no other person or entity is entitled to or should rely upon this Market
Valuation Report and/or any of its contents. CCC is one source of valuations, and there
are other valuation sources available.

© Copyright 2016 CCC Information Services Inc. All Rights Reserved.

028

# CCC ONE. MARKET VALUATION REPORT

Owner: Unk
Claim: 188377-GG

## SUPPLEMENTAL INFORMATION

 **LOSS UNIT HISTORY INFORMATION**

Using the VIN for this loss unit, VINguard® detected discrepancies or prior history requiring additional research. Please review the information detailed below.

### VINguard®

VINguard® Message: The VIN check digit calculation detected an error in the VIN. We were able to value the loss unit based on the loss description.VINguard was unable to decode the VIN on this loss unit. We were able to value the loss unit based on the loss description.

© Copyright 2016 CCC Information Services Inc. All Rights Reserved.

**029**

# SHORT-TERM LEASE AGREEMENT

| LESSEE CWH Farms | DATE 10-27-17 | LEASE TERM 30 days | BEGINS 10-27-17 | ENDS 11-25-17 |
|---|---|---|---|---|
| STREET 2210 CR 137 | CUSTOMER PO NO. | | ACCOUNT NO. | |
| CITY, ST ZIP Roscoe Tx. 79545 | LESSOR NAME AND ADDRESS | | | |
| TELEPHONE 325-721-3823 | | STEPHEN BRADY | | |
| CONTACT Cody Hughes | | 215 FM 2569 | | |
| | | PADUCAH, TX 79248 | | |

| | |
|---|---|
| | LEASE RATE PER HOUR/ACRE: | 350.00 |
| | X ESTIMATED LEASE HOURS/ACRES: | 100.00 |
| SECURITY DEPOSIT:          $ | = ESTIMATED LEASE CHARGE: | 35,000.00   0.00 |
| | + LEASE DOC FEE: | |
| *LEASE PAYMENT DUE PRIOR TO INITIAL LEASE PERIOD AND AT THE BEGINNING OF EACH SUBSEQUENT LEASE PERIOD.* | + TAXES: | |
| NOTES | + SERVICE CHARGE: | |
| LEASEE IS RESPONSIBLE FOR FURNISHING PHYSICAL DAMAGE, THEFT AND FIRE INSURANCE.  LEASEE IS ALSO RESPONSIBLE FOR RETURNING MACHINE IN LIKE OR BETTER CONDITION THAN WHEN IT WAS RECEIVED | + HAULING: | |
| | + OTHER: | |
| | TOTAL LEASE CHARGE: | $ 0.00 |

LOCATION WHERE EQUIPMENT WILL BE USED

| CITY, ST ZIP Roscoe Tx 79545 | COUNTY Nolan |
|---|---|

*LESSEE WILL NOT REMOVE THE EQUIPMENT FROM THIS LOCATION WITHOUT WRITTEN PERMISSION FROM LESSOR.*

| CG TICKET NO | QTY | MODEL | SERIAL NO | HOUR METER | PRESENT VALUE |
|---|---|---|---|---|---|
| 186073 | 1 | CS690 | 1NOCC690STD4045205 | 538 | 517,500.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| LOSS DAMAGE WAIVER | HARVEST USE | INSURANCE LOSS PAYEE NAME AND ADDRESS | |
|---|---|---|---|
| YES ☐  NO ☒ | YES ☒  NO ☐ | Stephen Brady | JDFinancial |
| LESSEE (CUSTOMER) SIGNATURE | | LESSOR (DEALER) | LESSOR SIGNATURE |
| CWHFarms | | STEPHEN BRADY | Stephen Brady |

THIS LEASE AGREEMENT IS SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET OUT ON THE FOLLOWING PAGES HEREOF, ALL OF WHICH ARE HEREBY MADE A PART OF THIS LEASE AGREEMENT.

Page 1 of 4

Nov 08 17 10:28p                                                                                      p.2

# LEASE AGREEMENT

**1. General.** The above-named Lessor hereby leases to the above-named Lessee the equipment listed herein ("Equipment") for the term and with the lease payments set out above. Lease payments shall be made to Lessor at the address shown above or to such other person and address as Lessor may direct from time to time. Lessee will pay the cost of transporting the Equipment from Lessor's place of business and returning it thereto. Such transportation shall take place during the term hereof. Lessee agrees to remit to Lessor the lease payments and all other amounts when due and payable, even if Lessor does not send Lessee a bill or an invoice. Lessee agrees that any amount due under this Lease Agreement, may, if specified above, at the option of the Lessor, be submitted by Lessor as a charge authorized by Lessee to the PowerPlan or Farm Plan account of Lessee, and Lessee agrees that the terms of that account shall thereafter apply to any accepted charges. For any payment which is not received by its due date, Lessee agrees to pay a late charge equal to 5% of the past due amount (not to exceed the maximum amount permitted by law) as reasonable collection costs, plus interest from the due date until paid at a rate of 1.5% per month, but in no event more than the maximum lawful rate. Restrictive endorsements on checks Lessee sends to Lessor will not change or reduce Lessee's obligations to Lessor. If a payment is returned to Lessor by the bank for any reason, Lessee agrees to pay Lessor a fee of $25.00, or the maximum amount permitted by law, whichever is less. Lease payments and other payments may be applied, at Lessor's discretion, to any obligation Lessee may have to Lessor or its assignee or any affiliate of Lessor or its assignee. If the total of all payments made during the lease term exceeds the total of all amounts due under the Lease Agreement by less than $25, Lessor may retain such excess. Lease terms and conditions from all invoices, monthly statements, or other agreements between Lessor and Lessee are hereby incorporated into this Lease Agreement. LESSEE'S PAYMENT OBLIGATIONS ARE ABSOLUTE AND UNCONDITIONAL, AND ARE NOT SUBJECT TO CANCELLATION, REDUCTION OR SETOFF FOR ANY REASON WHATSOEVER.

**2. Security Deposit.** Any Security Deposit will be held by Lessor in a non interest bearing account, commingled with other funds. Lessor may apply the Security Deposit to any amounts due under the Lease Agreement and, if Lessor does so, Lessee agrees to promptly remit to Lessor the amount necessary to restore the Security Deposit to the original amount. The Security Deposit will be returned to Lessee within thirty days of termination of the Lease Agreement and final inspection by Lessor, provided Lessee is not in default.

**3. Equipment Use.** LESSOR HAS NOT MADE, AND DOES NOT MAKE, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE EQUIPMENT'S MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, OR OTHERWISE. Lessor is the owner of the Equipment and the Lessee has only the right to use the Equipment under the terms of this Lease Agreement. You agree to USE THE EQUIPMENT ONLY FOR AGRICULTURAL, BUSINESS OR COMMERCIAL PURPOSES AND NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES. It is contemplated that the Equipment will be operated for not more than the Maximum Hours specified above, and Lessee agrees

to pay additional lease prorated at the applicable daily, weekly or monthly rate for each hour the Equipment is used in excess of the Maximum Hours. The additional lease for excess hours shall be paid at the time the Equipment is returned or, if the Equipment is leased for more than thirty days, on the first day of the month following such use. If there is an hour meter furnished, Lessee agrees to keep it connected to the Equipment and in good working condition at all times and it is to be used as the conclusive basis of the number of hours or operation. Lessee agrees to affix and maintain, in a prominent place on the Equipment, any labels, plates or other markings Lessor may provide. Lessee agrees to pay $___ if the hour meter is damaged or rendered inoperative during the term of this Lease Agreement. Lessee shall indemnify Lessor against all loss or damage to the Equipment while it is out of Lessor's possession. Damage to the Equipment, shall not abate or excuse the making of prescribed lease payments.

**4. Risk of Loss.** Lessee unconditionally assumes all risk and liability for, all damages for injuries or death to person and property arising out of or related (whether directly or indirectly) to the use, lease, possession or transportation of the Equipment including any claims Lessor was negligent, failed to warn Lessee of any risks or dangers associated with use, possession or transportation of the Equipment, failed to assist Lessee load, unload, transport or inspect the Equipment before, during or after the Term of Lease. Lessee's obligation to insure the Equipment continues until Lessee returns the Equipment to Lessor and Lessor accepts it. Neither Lessor, its assigns, the wholesale distributor nor the Manufacturer shall be liable for any special, incidental, consequential or punitive damages which may result from any failure or use of the Equipment or for breach of this Agreement. Until the Equipment is returned to Lessor in satisfactory condition, Lessee is responsible for all risk of loss and damage, loss, theft, destruction or seizure of the Equipment. Lessee must promptly notify Lessor of any such event. In the event of any loss or damage to the Equipment, Lessee agrees to promptly repair or replace the Equipment to Lessor's satisfaction, at Lessee's sole cost, and the terms of the Lease Agreement will continue to apply throughout the Lease Agreement term.

**5. Loss Damage Waiver.** This contract offers a LOSS DAMAGE WAIVER. To the extent that such loss, damage or destruction results from your gross negligence or willful misconduct, any limitation of your responsibility provided by the LOSS DAMAGE WAIVER or otherwise shall be void.

**6. Indemnification.** Lessee shall be solely responsible for all losses, damages, injuries, death, suits, actions, claims, attorneys' fees and costs, ("Claims"), incurred or asserted by any person, in any manner related to the Equipment or the use, lease, possession or transportation thereof including any Claims Lessor was negligent. Lessee agrees to protect, defend and indemnify and hold Lessor harmless, from and against all Claims of any kind or nature whatsoever, although Lessor reserves the right to control the defense and to select or approve defense counsel. Lessee will promptly notify Lessor of all Claims made. Lessee's liability under this Section is not limited to the amounts of insurance required under this Lease Agreement. This indemnity commences upon the

Page 2 of 4

Customer's Initials _CMY_

## LEASE AGREEMENT

Lease Term Begins on Date of this Lease Agreement and continues beyond the termination of this Lease Agreement, for acts or omissions, which occurred during the Lease Agreement term. Lessee waives all rights and remedies conferred upon a lessee under Article 2A of the Uniform Commercial Code.

**7. Addition of Accessories:** Lessee will not, without the express written consent of Lessor, install any accessories or devices on the Equipment if such installation will impair the originally intended function or use of the Equipment. All accessories or devices affixed to the Equipment shall automatically become the property of Lessor unless such accessory device can be removed without in any way (a) diminishing the value of the Equipment, or (b) affecting the originally intended function or use of the Equipment. Any damage to the Equipment caused by the removal of such accessories or devices shall be promptly repaired at Lessee's sole expense to the satisfaction of the Lessor.

**8. Compliance with Regulations:** Lessee shall comply with and conform to all laws and regulations relating to ownership, possession, use, transportation and maintenance of the Equipment. If applicable law requires tax returns or reports to be filed by Lessee, Lessee agrees to promptly file such tax returns and reports and deliver copies to Lessor. Lessee agrees to keep and make available to Lessor all tax returns and reports for taxes paid by Lessee. If applicable, Lessee shall include the Equipment in its lease fleet for emissions reporting purposes and shall accurately prepare and file all such reports in a timely manner.

**9. Inspection:** Lessee shall, whenever requested, advise Lessor of the exact location of the Equipment. Lessor and its representatives may, for the purpose of inspection, at all reasonable times, enter upon any job, building or place where the Equipment is located.

**10. Assignment:** Lessor may, without notice to Lessee, assign this Lease Agreement and all of Lessor's rights in and to the Equipment and all leases due or to become due to Lessor hereunder. Lessee's obligation to pay lease under this Lease Agreement shall not as to any such assignee be subject to any diminution arising out of any breach of any obligation hereunder or other liability of Lessor to Lessee. Lessee may not assign this Lease Agreement, sub-lease or allow anyone other than Lessee's employees to use the Equipment. Lessee agrees not to assert against Lessor's assignee any claims, offsets or defenses which Lessee may have against Lessor.

**11. Default:** If (a) Lessee shall (1) fail to make lease, service, or other payment when due, (2) attempt to sell or encumber the equipment, (3) cease operating, (4) institute or have instituted against him proceedings under any bankruptcy or insolvency law, (5) make an assignment for the benefit of creditors, (6) fail to comply with any other provisions of this Lease Agreement, (7) merge with or consolidate into another entity, (8) sell substantially all its assets, (9) dissolve or terminate its existence, (10) use the Equipment in a manner Lessor deems is improper or unreasonable; or (11) Lessee (if an individual) dies, or if, (b) any attachment, execution, writ of process is levied against the Equipment or any of Lessee's property, or if (c) a default

occurs+ under any other agreement between Lessee (or any of Lessee's affiliates) and Lessor (or any of Lessor's affiliates); or if (d) for any reason Lessor deems itself insecure or the Equipment unsafe; or if (e) Lessor, in its opinion, deems Lessee's financial condition unsatisfactory Lessor may determine that Lessee is in default (An "Event of Default").

**12. Remedies:** Upon the occurrence of an Event of Default, Lessee shall (a) deliver the Equipment to Lessor on demand and Lessor may enter upon any job, building or place where the Equipment is located and take possession thereof without notice to Lessee, and this Lease Agreement shall thereupon terminate and be forfeited at the option of Lessor (b) AS LIQUIDATED DAMAGES FOR LOSS OF BARGAIN AND NOT AS A PENALTY, pay the sum of (i) all leases and other amounts then due and payable to Lessor; plus (ii) the present value of all remaining lease payments and other amounts, discounted at the rate implicit in this Lease Agreement, (c) pay damages for any injury to the Equipment, legal expenses (including, without limitation, court costs and attorney's fees), the cost of any repossession and/or removal of the Equipment from the possession of Lessee, and all freight, storage, transportation and other charges incurred in such removal and return to Lessor at its place of business. Upon the occurrence of an Event of Default, Lessee may also exercise any other remedy available at law or in equity. These remedies are cumulative, are in addition to any other remedies provided for by law, and may be exercised concurrently or separately at any time. No delay in, or failure to, exercise or enforce any right or remedy hereunder, whether in whole or in part, shall serve to waive, compromise, impair or diminish any such rights or remedies.

**13. Construction:** This is an agreement for Equipment lease only and nothing herein shall be construed as conveying to Lessee any right, title or interest in or to any item of Equipment leased hereunder except as a Lessee. This Lease Agreement supersedes and replaces all prior understandings and communications (oral or written) concerning the subject matter thereof. In the event of an ambiguity in or dispute regarding the interpretation of this Lease Agreement, interpretation shall not be resolved by any rule providing for interpretation against the party who causes the uncertainty to exist or against the drafting party. If a court finds any part of this Lease Agreement to be invalid or unenforceable, the remainder of this Lease Agreement will remain in effect. Lessee permits Lessor to monitor and record telephone conversations between Lessee and Lessor.

**14. Guaranteed Lease – Return of Equipment:** Provided the guaranteed lease shown on the reverse side is or has been paid Lessee may return the Equipment and terminate this Lease Agreement on three days' notice to Lessor. In the event such termination occurs prior to the expiration of the Lease Agreement term, Lessee agrees to (a) promptly deliver the Equipment to Lessor at the time and place Lessor chooses; and (b) pay to Lessor the remainder of all lease payments for the Estimated Lease Period Guaranteed by Lessee, which will all be immediately due and payable. If this Lease Agreement is terminated for any reason and Lessee does not return the Equipment to Lessor, Lessee agrees to remit to Lessor, until such time as the Equipment is returned to Lessor in accordance with the provisions of this Section, additional

Page 3 of 4

Customer's Initials _CBW_

# LEASE AGREEMENT

lease payments each month equal the Lease Rate, or its monthly equivalent.

**15. Replacement:** Lessor may, at Lessor's option, replace the Equipment with a similar machine at any time during the lease term. Lessor will notify Lessee if Lessor intends to exercise this option, and Lessee will have three (3) business days following such notice in which to exercise the purchase option provided in this Lease or return the Equipment to Lessor. Upon return of the Equipment to Lessor, the lease term hereunder shall terminate, and the parties will enter into a new original Lease Agreement covering the replacement machine. Such new Lease Agreement shall extend, at a minimum, for the remainder of this Lease Agreement's lease term and shall have a lease rate no greater than the rate for lease of the Equipment hereunder.

**16. Lessee Representations and Warranties:** Lessee represents, warrants and covenants to Lessor so long as this Lease Agreement is in effect, that: (a) execution, delivery and performance by you of this Lease Agreement does not and will not (1) violate any applicable law; (2) breach any order of court or other governmental agency, or of any undertaking Lessee is a party to or by which Lessee is bound; (b) Lessee will comply with all applicable laws, ordinances and regulations; (c) Lessee will not take any action, including filing any tax or other report, that is inconsistent with Lessor's ownership of the Equipment; (d) all information Lessee has given to Lessor is true, accurate and complete; (e) since the date of the most recent financial information given to Lessor, no material adverse change in Lessee's business, assets, or prospects has occurred. Lessee will promptly deliver to Lessor such financial statements, reports and other information as Lessor may request; (f) Lessee is and will remain duly organized, validly existing and in good standing under the laws of Lessee's jurisdiction of organization; (g) Lessee is qualified to do business under the laws of all other jurisdictions where qualification is required or advisable; (h)the execution, delivery and performance by Lessee of the Lease Agreement will not breach any provision of Lessee's organizational documents or legal authority. Lessee acknowledges and agrees, that (1) the Equipment was selected by Lessee; (2) the Equipment (including all manufacturer manuals and instructions) has been delivered to, and examined by, Lessee (3) the safe operation and the proper servicing of the Equipment were explained to Lessee (4) Lessee received the written warranty applicable to the Equipment and understands that the written warranty is not a part of this Lease Agreement.

**17. General:** Time is of the essence of this Lease Agreement. LESSOR AND LESSEE EACH IRREVOCABLY WAIVE ANY RIGHT EITHER OF THEM MAY HAVE TO A JURY TRIAL. Lessor's failure at any time to require strict performance by Lessee of any of the provisions of this Lease Agreement shall not waive or diminish Lessor's right thereafter to demands strict compliance there with or with any provision. Waiver of any default shall not waive any other default. Any alteration or modification of this Lease Agreement shall be in writing and signed by the parties hereto. Lessee acknowledges receipt of a signed copy hereof. Lessee irrevocably authorizes Lessor, at any time, to (a) insert or correct information on this Lease Agreement, including Lessee's correct

legal name, serial numbers and Equipment descriptions; (b) submit notices and proofs of loss for any required insurance; and (c) endorse Lessee's name on remittances for insurance and Equipment sale or lease proceeds.

************************************************************
************************************************************

LESSOR:   **STEPHEN BRADY**

SIGNED BY: _____

DATE: _____

LESSEE:   CWHFARMS:

10-27-17

Page 4 of 4

Customer's initials _____

# DALE MARTIN & SON TIRE CO., INC.
212 East Broadway
Sweetwater, Texas 79556
325/235-5466

Invoice# 1-182473           Page: 1
Date 10/25/2017            Emp: 1-30 MRN / 1-30 MRM
In 10/25/2017  11:42 am * * * I N V O I C E * * *
Out 10/25/2017   4:30 pm

Sold To                                    Unit:                C5 690 REAR TIRE
C.W.D. FARMS                               Veh: JOHN DEERE STRIPPER
8210 CR 147                                Lic:
ROSCOE TX  79545                           Mil: In: 0 Out: 0
                                           Vin:
Cell Phone: 325-721-3835W                  PO:

                        Cell Phone: 325-721-3835C

| Size | Mech | Part # | QTY | Description | Parts | Labor | FET | Total |
|------|------|--------|-----|-------------|-------|-------|-----|-------|
| 30 | | NST000-005 | 1.00 | NON STOCK IF500/80R34 FSTNE AT DT | 3,275.00 | 0.00 | 0.00 | 3,275.00 |
| 30 | | STT000-000 | 1.00 | DISMOUNT/MNT STRIPPER STEER TIRE | 0.00 | 125.00 | 0.00 | 125.00 |
| 30 | | VLM500-005 | 1.00 | VALVE STEM METAL-TRACTOR | 10.95 | 0.00 | 0.00 | 10.95 |
| 30 | | STT000-012 | 1.00 | SERVICE CALL IN THE FIELD | 0.00 | 75.00 | 0.00 | 75.00 |

1.5 MILES WEST OF FM 608 ON FM 2419
TO WHITE POST ON LEFT.
GO DOWN TURNROW TO STRIPPER

***THANK YOU FOR YOUR BUSINESS***

| Cash | Check | Credit | Charge | Parts: | 3,285.95 |
|------|-------|--------|--------|--------|----------|
| 0.00 | 0.00 | 0.00 | 3,485.95 | Labor: | 200.00 |
| Change | | | | | |
| 0.00 | Check #: | | Due Date | Subtotal: | 3,485.95 |
| Signature: | | | 11/10/2017 | Sales Tax: | |
| | | | | Total: | 3,485.95 |

TERMS: Payment due by 10th of month following date of invoice. Late Charge 1.5% Per Month (18% Per Annum). Should it become necessary to place your account with an attorney for collection, you could be liable for attorney fees and court cost. Payable in Sweetwater, Nolan County, Texas.

034


JOHN DEERE
FINANCIAL

For customer inquiries contact us at:
1-800-356-9033 or visit us online:
MyJDFAccount.com

MULTI-USE ACCOUNT NUMBER **REDACTED**
CWH FARMS
2210 COUNTY ROAD 137
ROSCOE, TX 79545-3406
PHONE: 325-721-3823

## TRANSACTIONS POSTED TO YOUR ACCOUNT continued...

| Tran. Date | Date Posted | Invoice # / Reference | Program Description | | | Transaction Amount |
|---|---|---|---|---|---|---|

HURST FARM SUPPLY SNYDER Details continued from Invoice # 313422

| | | Quantity | Unit Price | | Item Total | Invoice Item Description |
|---|---|---|---|---|---|---|
| | | 1.00 Each | 1,344.60 | | 1,344.60 | FARM PLAN EXPENSE<br>Part# FPEXPENCE |
| 10/24/17 | 10/24/17 | 314384 | PURCHASE PARTS | | | 5,188.78 |
| | | Quantity<br>1.00 Each | Unit Price<br>153.32 | | Item Total<br>153.32 | Invoice Item Description<br>FIRE EXTIN<br>Part# AN276490 |
| | | 1.00 Each | 25.59 | | 25.59 | FIRE EXTINGUISHER REFILL<br>Part# FIREEXT |
| | | 2.00 Each | 47.86 | | 95.72 | BAR<br>Part# N221256 |
| | | 2.00 Each | 47.86 | | 95.72 | BAR<br>Part# N221257 |
| | | 4.00 Each | 3.57 | | 14.28 | PIN<br>Part# E86147 |
| | | 4.00 Each | 15.60 | | 62.40 | Pin<br>Part# KK36931 |
| | | 2.00 Each | 116.93 | | 233.86 | SENSOR<br>Part# AN372268 |
| | | 1.00 Each | 594.35 | | 594.35 | HOLDER<br>Part# AN221282 |
| | | 2.00 Each | 1,114.80 | | 2,229.60 | Flat Belt<br>Part# AKK23004 |
| | | 2.00 Each | 841.97 | | 1,683.94 | Flat Belt<br>Part# AN373217 |

*Handwritten annotations:*

C5690
×2
USED ALL IN FIRST
FIRE AND USED ALL
IN SECOND FIRE

$$\begin{array}{r} 153.32 \\ 25.59 \\ \hline 178.91 \times 2 = \$357.82 \end{array}$$

035

Page 1

```
1          IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF TEXAS
3              FORT WORTH DIVISION
4
5  NATIONWIDE AGRIBUSINESS    )
6  INSURANCE COMPANY, as      )
7  subrogee of CWH FARMS,     )
8        Plaintiff,           ) Civil Action No.:
9        vs.                  ) 4:19-CV-00425-O
10 DEERE & COMPANY,           )
11       Defendant.           )
12
13        The deposition of TRACE LANDERS, called
14 for examination, taken pursuant to the Federal
15 Rules of Civil Procedure of the United States
16 District Courts pertaining to the taking of
17 depositions, taken before KRISTIN C. BRAJKOVICH, a
18 Certified Shorthand Reporter, CSR. No. 84-3810, of
19 said state, via Zoom, on the 20th day of August,
20 A.D. 2020, at 9:11 a.m.
21
22
23
24
```

Page 2

```
1  PRESENT:
2        YOST & BAILL, LLP,
3        (2050 U.S. Bank Plaza South,
4        220 South Sixth Street
5        Minneapolis, Minnesota 55402,
6        1-612-338-6000), by:
7        MR. DAVID J. TAYLOR,
8        dtaylor@yostbaill.com,
9            appeared viz Zoom on behalf of
10           Plaintiff;
11
12       GERMER BEAMAN & BROWN PLLC,
13       (301 Congress Avenue, Suite 1700,
14        Austin, Texas 78701,
15       1-512-472-0288), by:
16       MR. CHRIS A. BLACKERBY,
17       cblackerby@germer-austin.com,
18           appeared via Zoom on behalf of
19           Defendant.
20
21 ALSO PRESENT:  MR. JACOB EVERHART, Deere & Company.
22
23 REPORTED BY:  KRISTIN C. BRAJKOVICH,
24           CSR No. 84-3810.
```

Page 3

```
1       (WHEREUPON, the witness was duly
2       sworn.)
3       TRACE LANDERS,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6       EXAMINATION
7  BY MR. TAYLOR:
8     Q.   Good morning, Mr. Landers.  As you know,
9  my name --
10    A.   Good morning.
11    Q.   As you know, my name is Dave Taylor.  I
12 represent the plaintiffs in this case.  I am going
13 to ask you some preliminary questions.  I'm not
14 sure if I know the answers to these, but hopefully
15 we'll move through them very quickly.
16       Have you ever been deposed before?
17    A.   I have been deposed one other time by
18 you.
19    Q.   Okay.  Was it just the single time as
20 the 30(b)(6) representative speaking on behalf of
21 John Deere in this case?  Was that your only prior
22 deposition?
23    A.   Yes.
24    Q.   Okay.  So it probably goes without being
```

Page 4

```
1  said, but fair to say that you have not been
2  deposed as a fire investigator at any point in your
3  professional history?
4     A.   I have not.
5     Q.   Have you ever issued, beyond what was
6  issued in this case, any fire investigation
7  reports, expert reports pursuant to federal rules
8  of evidence, generally Federal Rule 26?  Have you
9  ever done that before outside of what was done in
10 this case?
11    A.   I have not.  Are you getting feedback
12 Dave?
13    Q.   No.  I can hear you.
14    A.   So I have not.  I have only done the
15 report for this case and the supplementary report
16 provided as well.
17    Q.   Have you ever issued a fire engineering
18 or expert report in any litigation, whether it's
19 federal or state?
20    A.   No.
21    Q.   So the two reports that you have written
22 and disclosed in the course of formal litigation
23 are the two reports that exist here?
24    A.   Correct.  Correct.
```



Exhibit C

Page 153

1   put this into context, this is your support for
2   your opinion, which is contrary to the initial
3   cause and origin opinion by the John Deere
4   investigator in regards to the condition of the
5   field and the presence of rocks.
6          You believe that there were a lot of
7   rocks, and he has noted in his file that there were
8   no rocks, correct?
9      A.   So can I edit that a little bit?  It's
10  my opinion that this field -- I'm not talking about
11  the condition at the time of the fire.  I'm just
12  saying this field appears to have several rocks in
13  it, and that is the basis of my opinion.
14     Q.   I understand that.  So what you are
15  saying is, you don't have an opinion as to the --
16  in regards to the presence of rocks in the field at
17  the time of the fire, right?
18     A.   No.  I'm saying it's highly unlikely
19  that no rock were present at the time of the fire,
20  just because of the availability within a very
21  short distance to the machine, and this is a
22  several hundred acre field.
23     Q.   Okay.  So contrary to the prior answer,
24  you, in fact, do have an opinion of what the

Page 154

1   condition of the field was at the time of the fire,
2   right?
3      A.   That's a fair statement.
4      Q.   Okay.  And the basis for your opinion as
5   to the condition of the field at the time of the
6   fire is the pictures that we just listed, which you
7   show -- or what you believe show rocks, correct?
8      MR. BLACKERBY:  Objection, form.
9   BY THE WITNESS:
10     A.   Correct.  Correct.
11  BY MR. TAYLOR:
12     Q.   And it is limited to those pictures, in
13  terms of pictorial documentation?
14     A.   No, it's not.
15     MR. BLACKERBY:  Objection, form.
16  BY THE WITNESS:
17     A.   Sorry.  No.  I did not take pictures of
18  every single rock that I found in the field.  These
19  are just some of them, so they were very available.
20  They were not hard to find.
21  BY MR. TAYLOR:
22     Q.   I did not mean to imply that you took a
23  picture of every rock that you could have ever
24  found.  What I meant to imply was, this was the

Page 155

1   limit of pictures that you did take of rocks,
2   right?
3      A.   Correct.
4      Q.   There are not more of them in your file?
5      A.   No.
6      Q.   And it is on the basis of these pictures
7   that you say, I think it's highly unlikely that the
8   John Deere fire investigator who was investigating
9   the cause and origin of this fire, that he was
10  correct when he said that he walked the field and
11  saw no rocks?
12     MR. BLACKERBY:  Objection, form.
13  BY THE WITNESS:
14     A.   I think it's highly unlikely that the
15  cotton stripper, during its operation, did not
16  interact with rocks.
17     MR. TAYLOR:  I'm going to object as
18  nonresponsive.
19  BY MR. TAYLOR:
20     Q.   My question is really more along the
21  lines of, these are the pictures that you are using
22  to disagree with John Deere's fire investigator
23  that was there on-scene and said no rocks, right?
24  I'm not talking about the interaction --

Page 156

1      A.   Yeah.
2      Q.   -- of the cotton stripper with the
3   rocks.  We'll get to the lack of evidence.
4      A.   Well, he and Mr. Hamers because it's a
5   several-hundred-acre field, and if they walked over
6   a 100-acre field during their two-hour inspection,
7   I would be impressed.
8      Q.   Did you get the impression that they
9   said that they walked the entire field?
10     A.   Well, I think they said they walked the
11  field.
12     Q.   Is that what Mr. Christianson told you?
13     A.   They said they looked to see -- I don't
14  recall exactly how it was spelled out, but they
15  looked for rocks in the field.
16     Q.   Right.  Are you taking that to mean that
17  they walked every acre of the field?  I'm looking
18  for your interpretation of what you heard from
19  Mr. Christianson.
20     A.   To say that there's no rock in the
21  field, you would have to walk every acre of the
22  field.
23     Q.   So did you ask him that?
24     A.   It just stated that they looked for



Page 157

1  rocks in the field.
2      Q.   Do you have any reason to believe that
3  the cotton stripper was actually used in every acre
4  of the field before it burnt itself to the ground?
5      A.   It was not.
6      Q.   Okay.  Do you think that maybe it would
7  have been more reasonable for them to look in the
8  general area of where the cotton stripper had been
9  used rather than every acre of the field?
10     A.   That would make a lot of sense, yes.
11     Q.   Right.  You did not ask the question one
12  way or the other, so you don't know, right?
13     A.   I don't know.
14     Q.   All you know is that the John Deere fire
15  investigator that was retained by John Deere to
16  investigate the cause and origin of this loss, who
17  investigated it near in time to the fire, concluded
18  in his notes that there were no rocks in the field?
19     A.   Correct.
20     Q.   Okay.  And that was confirmed by the
21  other fire investigators that were hired by the
22  plaintiff that were also there investigating this
23  loss near in time to the fire, correct?
24     A.   Correct.

Page 158

1      Q.   So we have the three hypotheses or the
2  three ideas in terms of how this fire might have
3  started that we listed before the lunch hour.  One
4  was that there was a problem with the header,
5  right?
6      A.   Correct.
7      Q.   The second one was that there is a
8  continuation of the fire that started on the 23rd,
9  that rekindled and erupted on the 24th, correct?
10     A.   Correct.
11     Q.   Okay.  And then the third was -- I have
12  to check to see what it was.
13     A.   Cleaner.
14     Q.   The third was a potential problem in the
15  cleaner.  That is right.  Which is to include the
16  sawtooth drum, sawtooth blades, all of that, right?
17     A.   Correct.
18     Q.   Okay.  So in conducting your inspection
19  according to 921, NFPA 921, you take these three
20  ideas, these three hypotheses, and see how much
21  data supports each one or how much data negates
22  each one based on your investigation, right?
23     A.   Right.
24     Q.   Okay.  So if we were to look at, say,

Page 159

1  the second hypothesis, right, this idea of
2  rekindling from the first fire, what do you know
3  about the cause of the first fire?  Do you know
4  anything, or is that important to you?
5      A.   I have a DTAC report, and I think we
6  talked about this previously.  I have a DTAC report
7  from Jeff Ratheal at the dealership claiming that
8  the first fire on the 23rd of January was believed
9  to have started in the header, near the cross
10  auger, and that was a report.  That is really all I
11  know about that.
12     Q.   Okay.  When that report -- well, since
13  then you have learned more about that report,
14  right?
15     A.   Some.
16     Q.   For instance, you learned that Cade
17  Owen, who provided the information for that report,
18  said that it wasn't in the header, that there was
19  no fire seen there, correct?
20         MR. BLACKERBY:  Objection, form.
21  BY THE WITNESS:
22     A.   So he inspected what again, the header
23  and it wasn't --
24

Page 160

1  BY MR. TAYLOR:
2      Q.   No.  In reviewing Cade Owen's testimony,
3  you read that Cade Owen testified that there was no
4  fire in the header nor any smoke from the header?
5          MR. BLACKERBY:  Objection, form.
6  BY THE WITNESS:
7      A.   Did he evaluate fire patterns?
8  BY MR. TAYLOR:
9      Q.   I'm talking to you about what he relayed
10  in regards to the observation of fire or smoke.  He
11  testified that there was no observed fire or smoke
12  coming from the header.  You recall that because
13  you reviewed his testimony?
14     A.   I reviewed it, yeah.
15     Q.   And so you recall reading that
16  testimony?
17     A.   I did.
18     Q.   And that is different than the DTAC
19  report that you just referenced, right?
20     A.   Well, it depends on when Cade Owen
21  inspected it.  How do we know the smoke is still
22  there?  We don't.  I mean, I understand his
23  testimony, but he's also not qualified to make a
24  fire cause and origin suggestion.



Page 297

1    third supplemental -- Mr. Landers' second report
2    that came well after the disclosure was necessary
3    or the deadline.  We'll bring a motion for that,
4    but I am going to ask him questions specifically
5    about that just because I don't want to waste
6    people's time and try to reconvene.  Is that fair?
7        MR. BLACKERBY:  Noted.  I note your
8    objection, and you are not waiving any objection by
9    asking questions.
10       MR. TAYLOR:  Fair enough.
11   BY MR. TAYLOR:
12       Q.   So you did some tests or you looked at a
13   different cotton stripper as part of your
14   investigation that was just disclosed, I think,
15   last week, right?
16       A.   Correct.
17       Q.   Okay.  That cotton stripper had -- I
18   think you said earlier, had 900 hours on it?
19       A.   Correct.
20       Q.   And where -- who owned that?
21       A.   It's owned by the factory.
22       Q.   So it's not an in-field machine used on
23   an actual farm?
24       A.   Oh, it's been used on many actual farms

Page 298

1    down in Texas as testing.
2        Q.   What I'm saying is, it's not an actual
3    operating machine.  It's a machine that John Deere
4    uses to test things, right?
5        A.   Correct.
6        Q.   So in that sense, it's different than
7    the Cody Hughes machine, right?
8        MR. BLACKERBY:  Objection, form.
9    BY THE WITNESS:
10       A.   In what ways?
11   BY MR. TAYLOR:
12       Q.   Well, Cody Hughes is an actual farmer
13   using a machine in the field to actually produce a
14   salable item.  You are using it to run around and
15   potentially test certain things.  It's different.
16       MR. BLACKERBY:  Objection, form.
17   BY THE WITNESS:
18       A.   I guess.
19   BY MR. TAYLOR:
20       Q.   Was it also a 2017 CS690?
21       A.   Say that?
22       Q.   Was it also a 2017 CS690?
23       A.   No, this is not.
24       Q.   What was it?

Page 299

1        A.   It is an earlier version.  I believe it
2    was a 2014.
3        Q.   So it's not the same year either --
4        A.   No.
5        Q.   -- as Mr. Hughes' machine?
6        A.   Same components roughly.
7        Q.   You agree with me that the testing or
8    the looking at this other machine that you did was
9    of a machine of a different year than Mr. Hughes',
10   correct?
11       A.   It's a different machine, but
12   functionally everything is the same.
13       Q.   The machine that you looked at, that was
14   of a different year than Mr. Hughes' machine, had
15   50 times more hours or more than that, right?
16       A.   900 hours.
17       Q.   900 hours.  How many hours did the
18   machine that Mr. Hughes had have in comparison?
19       A.   Four to six hours.
20       Q.   A lot less, right?
21       A.   Correct.
22       Q.   The machine that you had looked at had
23   been moved from field to field to field, testing by
24   John Deere, right?

Page 300

1        A.   Correct.
2        Q.   Not Mr. Hughes' machine?  There's a
3    difference, right?
4        A.   I'm not sure where you are going with
5    it, but yes.
6        Q.   The testing or what you were looking to
7    do on this 2014 quite-used machine, what you wanted
8    to do was back out the screws and then to put them
9    back in and then to slowly torque them to see if
10   you could get them to strip, right?
11       A.   Correct.
12       Q.   That being the intent of the test, you,
13   in fact, did achieve that?  You backed out the
14   screws, you put them back in, and you slowly
15   increased the torque and you got them to strip,
16   right?
17       A.   Correct.
18       Q.   Now, that is not necessarily how they
19   are installed, right?
20       A.   Well, with the exception of the battery
21   gun.  That is how they are installed.  I realize
22   there's a delay by loosening up the screw, putting
23   it back in, but when it's already seated, it's not
24   yielded, it's not damaged.



TRACE LANDERS
NATIONWIDE AGRIBUSINESS vs DEERE & CO.

August 20, 2020
313–316

Page 313

1  BY THE WITNESS:
2      A.   I have it in front of me here.
3  BY MR. TAYLOR:
4      Q.   Could I draw your attention to page 7
5  out of 10?
6      A.   The supplemental report?
7      Q.   Yeah, this third report.
8      A.   Okay.
9      Q.   So there's three pictures on here, and
10  your lawyer a couple of days ago looked at this top
11  picture, and he blew it off and said that it was
12  evidence of a snapped bolt head that happened
13  during normal operation.  How did that bolt snap?
14      A.   So I don't know how that bolt snapped,
15  but I wanted to -- my intent here is to show a
16  machine in normal operation with an undamaged
17  blade, we can encounter that situation.  It's not
18  unusual.
19      Q.   So is it your position that these bolts
20  fail on a fairly frequent basis?  Is that what you
21  are trying to illustrate here?
22      A.   No.  They actually don't fail at a
23  frequent basis, but when they do, it's usually when
24  you are in some areas with a lot of debris.

Page 314

1      Q.   So how did this one break?
2      A.   I don't know how this one broke.  I was
3  not in the field with it, and I really don't know.
4      Q.   Are all three of these pictures from the
5  same machine?
6      A.   They are.
7      Q.   And the lower left-hand corner picture,
8  where you end up having the exploded thing, isn't
9  there a missing blade there?
10      A.   Yeah, there is.  So this is that test
11  machine.  We were putting on a significant amount
12  of test hours.  We are not always fixing every
13  blade because we are running it through conditions
14  that are more severe than the average customer
15  would introduce them to.
16      Q.   So this exemplar machine that you are
17  talking about or what you are considering to be an
18  exemplar for the Cody Hughes machine is one that
19  has broken blades, broken bolts, things that you
20  have moved around and tested a whole bunch of
21  different ways, right?
22      A.   Well, it has got some.
23      Q.   You have chosen three pictures here, and
24  they include pictures of broken bolts and blades,

Page 315

1  right?
2      A.   Yep.  That is what I said.
3      Q.   Are there more?
4      A.   Are there more what?
5      Q.   Broken bolts and blades on this machine.
6      A.   There may be a couple more on the drum
7  at the top.  I guess that was not my intent here.
8  My intent was to show you what can happen.
9      Q.   Sure.  My interest is to explore whether
10  or not they are similar to the subject machine.
11  And in the subject machine, there were no broken
12  blades, right?
13      A.   Right.
14      Q.   It had not been put through rigorous or
15  arduous testing by a manufacturer?
16      A.   Right.
17      Q.   The only similarity between what you are
18  calling the exemplar machine and the Cody Hughes
19  machine is that you can't explain why there are
20  broken bolts on both of those machines, right?
21      A.   Well, I can't explain it on this one
22  either.
23      Q.   That is exactly right.  You can't on
24  your testing machine and you can't on the Cody

Page 316

1  Hughes machine.  The difference between the two is
2  that the Cody Hughes machine is brand new, right?
3      A.   Uh-huh.
4      MR. BLACKERBY:  Objection, form.
5  BY MR. TAYLOR:
6      Q.   And the testing machine, you guys have
7  run it through its paces?
8      A.   I don't know when this bolt broke
9  either.  Maybe that broke early.  Who knows.  I
10  don't think that tells us anything.
11      Q.   Mr. Landers, you said between 2012 and
12  2017 you had inspected about ten pieces of farm
13  equipment that you inspected on your own, right,
14  without the supervision of anybody?
15      A.   I believe that's right.
16      Q.   Do you recall whether or not you came to
17  a conclusion as to the cause of any of those fires?
18      A.   I would have to look through my notes
19  and see.  I don't have my reports in front of me or
20  my notes of those investigations.
21      Q.   Okay.  Can you recall in any of your
22  investigations of farm equipment, harvesting
23  equipment, any fires in which you have come to a
24  conclusion in terms of the cause?

